U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

2025 FEB 27 PM 3: 15

CLERK
BY _____
DEPUTY CLERK

ANATOLY KISHINEVSKI )
Pro Se )
)
)
Plaintiff, )   Case No.: 2:24-cv-1440
)
)
v. )
)
)
NICHOLAS J. DEML, WILLIAM COLLINS, )
CALEB LEFEBVRE, EDWARD ADAMS, LORI )
MADDEN, CYNTHIA MASON, EFFECTIVE )
COUNSELING SOLUTIONS LLC, ZACHARY )
SCOTT, COLIN SEAMAN, VERMONT )
DEPARTMENT OF STATE'S ATTORNEYS )
AND SHERRIFFS and VERMONT )
DEPARTMENT OF CORRECTIONS )
)
)
*individually, jointly and severally* )
)
Defendants. )

## VERIFIED COMPLAINT

Plaintiff, Anatoly Kishinevski, proceeding pro se, brings this complaint against the

Defendants for violations of his constitutional rights under the Due Process and Equal Protection

Clauses of the Fourteenth Amendment, the Eighth Amendment's prohibition against Cruel and

Unusual Punishment, the First Amendment's protection of freedom of religion, and the First

Amendment's prohibition against retaliation for exercising protected speech and conduct.

Plaintiff further asserts a Monell claim against the Vermont Department of Corrections

(hereinafter "VTDOC"), working in concert with the Vermont Department of State's Attorneys

and Sheriffs (hereinafter "VTSAS"), for unconstitutional policies, customs, or practices.

Additionally, Plaintiff asserts state tort claims for Fraud, Intentional Misrepresentation,

Negligent Infliction of Emotional Distress, Intentional Infliction of Emotional Distress and

Defamation.

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands trial by

jury in this action of all issues so triable.

## I.    INTRODUCTION

1.    Respectfully, the pleadings presented herein are made in full recognition of the

Court's time and in strict compliance with FRCP 11(b).

2.    This Complaint serves as an intricate prayer and plea, for those in power to

adhere to the ethical truth written on their hearts, rather than manipulating and or disregarding

the ethical principles which they are supposed to study, sanctify and make foundational to all

choice of action.

3.    Plaintiff, who has directly been the victim of breaches of integrity perpetrated by

government employees, has studied relentlessly to develop the knowledge, vocabulary and

command of legal principles necessary to articulate and seek redress for the grief experienced,

as summarized in this Complaint..

4.    The causes of action from which this Complaint arises include events spanning

over an approximately three-year time period. Plaintiff was a VTDOC detainee for the first year

and subsequently on community supervision for approximately two years, until present.

5.    Plaintiff is a 39-year-old man who was detained at the Northern State

Correctional Facility in Newport, VT, from January 14, 2022, to January 12, 2023 (363 days).

Upon his release, Plaintiff was placed on community supervision under the responsibility of the

Vermont Department of Corrections (VTDOC) Hartford Probation and Parole Office in White

River Junction, Vermont.

     6.     Plaintiff had no prior experience with incarceration and is a religious Jew. During the year that Plaintiff was detained he was deprived of his ability to maintain necessary religious observances, which resulted in his lack of access to hygiene products and literal starvation of Plaintiff.

     7.     Deprivation of Plaintiff's constitutional rights and injuries sustained, as presented in this Complaint, are the product of a combination of bad faith acts including willful misconduct, deliberate indifference, gross negligence, and retaliation, by personal involvement of the Defendants, acting under the color of state law in all instances, individually, jointly and severally,

     8.     An aggravating factor to various matters pled in this complaint is the theft and obstruction of Plaintiff's mail by VTDOC personnel, including both incoming and outgoing privileged correspondence and legal processes.

     9.     It has been Plaintiff's observation and firsthand experience that tampering with mail by VTDOC personnel, including theft and general obstruction, are a systemic problem within VTDOC facilities.

     10.     The deprivation of Plaintiff's constitutional liberties, and the injuries sustained during his detention, caused significant emotional distress. This distress has continued beyond his period of detention and has worsened.

     11.     Upon Plaintiff's release into community supervision, additional bad faith acts by VTDOC personnel who are responsible for supervising Plaintiff, have resulted in progression of Plaintiff's emotional duress to the degree that on September 18th, 2024 **a forensic psychotherapist who is contracted to provide group counseling to VTDOC offenders,**

**expressed genuine concern that Plaintiff could have a heart attack from the amount of stress he observed Plaintiff to be experiencing.**

12.     At approximately the same time as the event in ¶12, Plaintiff was diagnosed with a stress disorder (Adjustment Disorder) by a third-party mental health services provider whom Plaintiff was seeing on his own accord. The diagnosing clinician stated that the primary stressor was Plaintiff's relationship with the VTDOC

13.     Plaintiff's injuries, as detailed in Section V: FACTUAL ALLEGATIONS, result from an array of abnormally stressful events caused by bad faith actions committed by the Defendants.

14.     As set forth herein, Plaintiff seeks declaratory judgments that the actions and policies of the Defendants are unconstitutional, that Plaintiff's constitutional rights have been violated by these actions and policies, injunctive relief to prevent further violations benefiting both the Plaintiff and the public, and both compensatory and punitive damages, including for the physical and emotional injuries sustained by Plaintiff.

## II.    JURISDICTION AND VENUE

15.     This case is brought pursuant to 42 U.S.C. § 1983. The case arises under the Constitution and the laws of the United States and presents a federal question within the Court's jurisdiction under Article III of the Constitution and 28 U.S.C. §§ 1331 & 1343.

16.     The Court has the authority to provide appropriate injunctive and declaratory relief pursuant to 28 U.S.C. §§ 2201 & 2202.

17.     This Court has supplemental jurisdiction over Plaintiff's state law claims of Fraud, Intentional Misrepresentation, Negligent Infliction of Emotional Distress, Intentional Infliction of Emotional Distress and Defamation pursuant to 28 U.S.C. § 1367, because they are

related to Plaintiff's federal claims and that they form part of the same case or controversy.

18.     Personal liability of Defendants is permitted by 12 V.S.A. § 5601(e)(6) and 12

V.S.A. § 5602(b) as Defendants actions constitute willful misconduct, gross negligence,

deliberate indifference, abuse of process, misrepresentation, deceit and fraud.

19.     Venue in the District of Vermont is proper under 28 U.S.C. § 1391(b) as a

substantial part of the acts giving rise to Plaintiffs' claims occurred in this District.

## III.     RELATED DOCKETS

20.     Kishinevski v. Deml et al. 2:23-cv-00429-kjd

21.     State of Vermont v. Anatoly Kishinesvki 24-AP-052

22.     Kishinevski v. Deml et al. 23-CV-00226

## IV.     PARTIES

23.     Plaintiff, ANATOLY KISHINEVSKI is a 39 year old man, currently under

community supervision by the VERMONT DEPARTMENT OF CORRECTIONS (hereinafter

"VTDOC"). Plaintiff is a resident of 99 Depot St., Wilder, VT, 05088.

24.     Defendant NICHOLAS J. DEML is the Commissioner of Corrections of the

VTDOC with office address, NOB 2 South, 280 State Drive, Waterbury VT 05671-2000. This

action is brought against him in his official capacity by way of *Monell v. Department of Social

Services of New York*, 436 U.S. 658 (1978) as he runs the VTDOC which maintains

unconstitutional policies, customs, or practices.

25.     Defendant WILLIAM COLLINS, was the Volunteer Service Coordinator at the

VTDOC Northern State Correctional Facility, 2559 Glen Road Newport, VT 05855 (hereinafter

"NSCF") for the duration Plaintiff was detained there. He is primary VTDOC personnel for

evaluating and replying to requests for religious accommodation by those in custody. This action is brought against him in his individual capacity

26.     Defendant CALEB LEFEBVRE, was the Security Operations Specialist at NSCF for a majority of the duration of Plaintiff's detention. At the time of the events alleged in this Complaint, he was primary VTDOC personnel for evaluating and replying to requests for religious accommodation by those in custody. This action is brought against him in his official capacity and individual capacity.

27.     Defendant EDWARD ADAMS is a Probation & Parole Officer of the VTDOC Hartford Probation and Parole office, 118 Prospect St #200, White River Junction, VT 05001. He is Plaintiff's probation officer. This action is brought against him in his official capacity and individual capacity for acts

28.     Defendant LORI MADDEN, (formerly LORI PERKINS) was Superintendent of NSCF for a significant portion of the time Plaintiff was detained there. She was directly involved with evaluating and replying to various requests and correspondence from Plaintiff. This action is brought against her in her official capacity and individual capacity.

29.     Defendant CYNTHIA MASON, was  a Kitchen Officer for the duration which Plaintiff was detained at NSCF. She is a primary VTDOC personnel who oversees and is responsible for kitchen operations at NSCF including ensuring meals are in compliance with prescribed religious accommodations.

30.     Defendant EFFECTIVE COUNSELING SOLUTIONS LLC (hereinafter "ECS") is a sole-member entity contracted by the VTDOC to provide specialized group therapy sessions to both incarcerated offenders and those on community supervision.

31.     Defendant ZACHARY SCOTT is a forensic psychotherapist who is the sole

owner and operator of ECS. This action is brought against Defendants ZACHARY SCOTT and

ECS in their individual capacity as their acts are grossly negligent, precluding any claim of

sovereign immunity per

32.   Defendant VERMONT DEPARTMENT OF CORRECTIONS has office address

of NOB 2 South, 280 State Drive, Waterbury VT 05671-2000 and this action is brought against

the agency in its official capacity.

33.   Defendant VERMONT DEPARTMENT OF STATE'S ATTORNEYS AND

SHERRIFFS (hereinafter "VTDSAS") has office address of 110 State St., Montpelier, VT

05633-640130. This action is brought against the agency in its official capacity.

## V.   EXHAUSTING ADMINISTRATIVE REMEDIES

34.   Some of the events which are the basis for claims in this Complaint occurred

during the year that Plaintiff was detained.

35.   Precluding action under 42 U.S.C. § 1983 is typically the requirement to exhaust

administrative remedies per 42 U.S.C. § 1997e(a), "No action shall be brought with respect to

prison conditions under section 1983 of this title, or any other Federal law, by a prisoner

confined in any jail, prison, or other correctional facility until such administrative remedies as

are available are exhausted."

36.   Pursuing "administrative remedies" while in the custody of VTDOC requires the

exhaustion of a *Grievance System* as defined by Directive #320 currently and #320.01 formerly.

37.   Vermont State Auditor Douglas R. Hoffer conducted an audit of the VTDOC

grievance process the same year Plaintiff was detained. He published a report on his findings on

Dec 16th, 2022, titled *Department of Correction - Significant Deficiencies Demonstrate Need*

*for Overhaul of the Prisoner Grievance Process.*

38.     Mr. Hoffer's report indicates that the VTDOC grievance process is so poorly

managed and ineffective that it is unreasonable for a prisoner to rely on it.

39.     Plaintiff attempted to exercise use of the VTDOC grievance system while he was

detained at NSCF and experienced as Mr. Hoffer's report describes.

40.     Quoting *Porter v. Nussle*, 534 U.S. 516, speaking in regards to the PLRA,

> "The statute's predominant concerns were to *promote administrative
> redress*, filter out groundless claims, and foster better prepared
> litigation of claims aired in court, and such concerns required the
> inmate to exhaust his administrative remedies prior to bringing his
> action concerning prison life."

41.     As stated by Mr. Hoffer's in his report,

> "The staff who oversee the grievance process have not received
> comprehensive and standardized training on the process, including
> how to record information in OMS. Indeed, staff responsible for
> coordinating grievances expressed concerns to us about the use of
> OMS, the degree of judgement needed to address grievances, and their
> lack of training."

42.     Plaintiff in recognizing that the grievance process was a futile effort still

completed exhaustion of administrative remedies (the grievance process) for at least one of the

matters he was suffering. However, before any corrective action could be secured he was

released.

43.     Plaintiff exhausted tremendous supplemental efforts to put the Defendants on

notice of the constitutional deprivations he was experiencing and the urgent need for

intervention. These efforts included sending detailed documents to the Defendants via email

and certified mail, summarizing the crisis Plaintiff was facing.

44.     These supplemental efforts were made possible by the generous help of

Plaintiff's associates, who worked together in an effort to attempt to secure relief for Plaintiff.

Defendants failed to offer any meaningful response or intervention allowing Plaintiff to

experience great suffering.

45.     Per the forgoing and subsequent pleadings with exhibits in support of, it is
anticipated that exhaustion of administrative remedies will be found to be irrelevant, were lack
of such may normally prevent this action from proceeding.

## VI.    FACTUAL ALLEGATIONS

46.     Plaintiff was detained at Northern State Correctional Facility under the
custody of the VTDOC on January 14th, 2022, where he remained for 364 days while
working towards resolution of a criminal case in which he was the defendant.

47.     While detained, Plaintiff was denied food compliant with his kosher dietary
practice and experienced literal starvation as a result. The starvation was marked by various
symptoms including his hair becoming drastically thinner and changing color, weight loss
and extreme emotional distress.

48.     Through his detention, Plaintiff was also denied critical hygiene products that
were part of his kosher lifestyle. This resulted in Plaintiff being deprived of toothpaste for
literally an entire year.

49.     Kosher is a term that implies something to be spiritually fit. Kosher is not a
universally defined philosophy nor are the laws of kosher (including kashrus) singularly
defined. There are fundamentals in what constitutes kosher, but kosher practice varies
amongst different sects of Jews and on an individual level. What one Jew considers kosher
another Jew may not.

50.     Immediately upon Plaintiff's arrival to NSCF he informed the intake
personnel and kitchen of his special dietary requirements i.e. the specifics of his kosher diet.

51.     Initially the kitchen failed to provide any manner of kosher diet to Plaintiff

despite Plaintiff exhausting tremendous effort to communicate his needs.

52.     Early in Plaintiff's arrival to NSCF, he received a meal that included meat and cheese in one sandwich. Plaintiff grieved this event and the unit officer called the kitchen in an attempt to seek intervention on the Plaintiff's behalf. The unit officer that called the kitchen on behalf of the Plaintiff was met with dismissal by the kitchen who insisted that the meal was kosher.

53.     Combining meat and dairy can never be kosher under any circumstance to a degree that some Jews have two sets of dishes, two separate refrigerators, two separate dishwashers and even two separate kitchens in their homes with one designated for meat and one for dairy, as it is essential that the two are never combined in any manner.

54.     Cynthia Mason who is one of the primary personnel responsible for kitchen operations at NSCF has been listed in prior lawsuits against the VTDOC regarding kosher diets and is duly informed as to the fundamentals of kosher.

55.     Plaintiff exhausted administrative remedies on this matter and filed civil action seeking intervention. See *23-CV-00226 Anatoly Kishinevski v Nick Deml et al*

56.     Before relief was secured, Plaintiff was released.

57.     Plaintiff exhausted significant supplemental efforts throughout the year, relentlessly to get VTDOC personnel to honor his kosher diet, but he was met with retaliation, deliberate indifference and gross negligence.

58.     The VTDOC insisted they were providing him a kosher diet, but ignored Plaintiff's correspondence which informed them that his kosher practice was not compatible with the Union Orthodox kosher diet they were providing.

59.     Plaintiff also experienced retaliation by various modes including the kitchen

sending him food intentionally for extended times periods that were opposite of some of the parameters he had shared with the kitchen about his diet. The retaliation was identified by Corrections Officers and other inmates that commented on this unprompted by Plaintiff. i.e. they were able to see plaintiff was being abused without plaintiff saying anything.

60.    Unable to secure food that was kosher by his practice, Plaintiff sustained severe caloric and nutrient intake which caused physical injury and extreme emotional distress.

61.    Plaintiff also incorporates a particular fluoride free toothpaste and use of hydrogen peroxide for oral care as part of his kosher hygiene practice.

62.    Plaintiff was relentless in his effort to give notice to VTDOC personnel about his need and request for toothpaste compatible with his kosher practice and was met with gross negligence, deliberate indifference and willful misconduct by VTDOC personnel.

63.    Defendant's sent Plaintiff in Administrative circles, denying him any meaningful solution or path to get to a solution. Defendant's acts included stealing Plainitff's mail and denying his ability to send outgoing mail, actively obstructing his attempts to notify the pertinent VTDOC personnel about the need for attention and a solution.

64.    Plaintiff's personal dentist sent a prescription to NSCF in an effort to help Plaintiff secure one aspect of his kosher hygiene practice and personnel at NSCF stole Plainitff's mail including the medical prescription without telling Plaintiff, never providing him a mail disposition form as required, violating federal law and also the respective VTDOC directives on mail procedures and medical procedures.

65.    The lack of kosher toothpaste and access to hydrogen peroxide which is also part of Plaintiff's kosher hygiene practice, was extremely disturbing emotionally for Plaintiff.

The emotional disruption Plaintiff experienced was compounded drastically by personnel at NSCF stealing and obstructing his mail which contained materials relevant to this topic.

66.     On December 28th, 2022 William Collins notified Plaintiff that there was a fluoride free toothpaste that was available through the Muslim catalog that was already approved. Plaintiff had engaged with William Collins many times on the topic of fluoride free toothpaste for the past year and was in shock upon hearing this information. Plaintiff asked William Collins why after a year of requesting fluoride free toothpaste was I being informed of this all of a sudden after a year of being deprived of toothpaste, to which he did not reply and just continued talking.

67.     Also on December 28th during the same conversation as ¶63, William Collins informed Plaintiff that his September 14th, 2022 religious accommodation form  for the toothpaste specific to Plaintiff's kosher practice (Auramere) had been approved. Plaintiff asked why he had not been notified if it had been approved two months prior, to which William Collins said, he did not know.

68.     William Collins stole mail from Plaintiff. When asked about it directly he lied to Plaintiff  stating he had no knowledge of the envelope. It was not until Plaintiff filed a lost or stolen property form on which it was pointed out that the exact path of the envelope could be tracked by following the cameras that the stolen envelope was "located". The envelope was never returned to Plaintiff and remains stolen.

69.     Plaintiff was deprived his right to exercise essential religious practices resulting in severe nutrient deficiency for the year he was detained.

70.     Plaintiff was denied access to kosher hygiene products and resulting in deprivation of toothpaste for an entire year.

71.    Defendant William Collins, Lori Madden (formerly Lori Perkins), Caleb Lefebvre, Cynthia Mason, John Doe(s) and Jane Doe(s) acted with gross negligence, deliberate indifference and willful misconduct which resulted in Plaintiff being deprived of adequate nutrition, the ability to exercise essential religious practices, being deprived of hygiene products, all of which resulted in physical and emotional harm to Plaintiff.

72.    Plaintiff's experience from his detention left Plaintiff feeling very traumatized and with the first hand perspective that VTDOC personnel operate with disregard for the rules and that dishonesty is by VTDOC personnel is not just tolerated, but encouraged.

73.    The acts of adversity by VTDOC personnel against Plaintiff during the time he was detained include his legal mail being stolen, his attempt to send outgoing legal mail to exhaust administrative remedies being blocked and his food was tampered with by VTDOC personnel.

74.    The gross negligence, deliberate indifference and willful misconduct of VTDOC personnel, experienced by Plaintiff during his detention, resulted in heightened sensitivity and amplified anxiety in response to acts of dishonesty and misconduct by those in control of Plaintiff's freedom.

75.    Following a conviction and sentencing hearing conducted by the Orange County Superior Court in Chelsea, VT, Plaintiff was released from detention on January 12th, 2023 and placed on probation. Defendant Edward Adams was assigned as Plaintiff's probation officer.

76.    Defendant Edward Adams has worked for the VTDOC for approximately two decades and formerly served as the superintendent of at least one VTDOC correctional facility.

77.     After numerous serious allegations of professional misconduct against Defendant Edward Adams, by co-workers and subordinates, his position of superintendent ended and he was given a position as a probation officer, which he holds currently.

78.     Defendant's career history suggests a lack of understanding of what constitutes professional and ethical behavior by a person in power, such as he had prior and has currently.

79.     With awareness of Defendant's career history, Plaintiff entered his working relation with Defendant feeling a significant sense of fear and concern that he would be exposed to and be the victim of further professional misconduct.

80.     Defendant has maintained an omnipresent subversive manner of engaging with Plaintiff and it has been a constant source of stress and fatigue for Plaintiff. Defendant on numerous instances presented a topic of inquiry as if it were a legal obligation, but upon further questioning by Plaintiff, the pressure on the topic was reduced with it then being clearly conveyed there was no legal obligation. This strategy of "preloading" topics with the suggestion of legal implications for lack of compliance is common behavior for Defendant Edward Adams and it is abusive of Plaintiff and causes undue emotional disruption.

81.     Plaintiff's anxiety about working with his probation officer (Defendant Edward Adams) and acute stress from his dishonest conduct remained present, increasingly so until a critical point in which Plaintiff short circuited emotionally and on September 18th, 2024 a contracted mental health services provider expressed genuine concern that Plaintiff was so distressed he could have a heart attack.

82.     The emotional short circuit was the result of a culmination of dishonest actions by Defendant Edward Adams which have been of detriment to Plaintiff in various

modes. The final and most recent, immediately preceding the September 18th event, was Plaintiff discovering that Defendant Ed Adams had been lying directly to Plaintiff for several months, intentionally misleading Plaintiff about a topic that resulted in significant lost energy and opportunity in litigation Plaintiff had invested literally several thousand hours working on pro se.

83.     Several weeks prior to incident in ¶17, Plaintiff was diagnosed with Adjustment Disorder (DSM-5 309.28 (F43.23)), with the primary stressor identified by the clinician as Plaintiff's relationship with the VTDOC, with whom Plaintiff is required to interface with via the Defendant.

84.     If this stressor is removed, the clinician stated he expects Plaintiff's symptoms of Adjustment Disorder, including heightened acute and chronic stress, to subside completely within a few weeks.

85.     Prior acts by Defendant Edward Adams include him telling Plaintiff that he is permitted to engage in an action,

86.     On November 13th, 2024 Plaintiff had a hearing at Orange County Superior Court which was a sentencing remand from the Vermont Supreme Court to address several of Plaintiff's probation conditions. Plaintiff had appealed some of his probation conditions and the Vermont Supreme Court recognized some of the conditions needed to be addressed.

87.     Prior to the hearing Plaintiff filed a motion to be granted counsel, which is a right, guaranteed at all stages in a criminal proceeding pursuant to the Vermont Constitution. The judge held the hearing without providing Plaintiff an attorney and state's attorney Colin Seaman failed to uphold his ethical obligation as an attorney in the state of Vermont. Instead of declining to participate in the hearing after learning Plaintiff had requested counsel, but

did not have counsel, Colin Seaman enthusiastically engaged in the hearing resulting in deprivation of Plaintiff's rights in multiple modes including his right to due process.

88.    Attorney Colin Seaman's action in ¶83 violates the Vermont Rules of Professional Conduct and also violates Plaintiff's constitutional rights.

89.    During the ¶82 hearing, Plaintiff mentioned on the record that Zachary Scott a.k.a. Effective Counseling Solutions LLC had observed Plaintiff to be so stressed that he was concerned that Plaintiff could have a heart attack.

90.    On November 20th, 2024, during the group therapy session that is run by Defendant Zachary Scott, which Plaintiff had attended for two up to that point, Zach Scott was very worked up in a way Plaintiff had never experienced.

91.    Zachary Scott had brought up the hearing and Plaintiiff expressed how the prosecutor had violated the Vermont Rules of Professional Conduct and how he was upset that had added probation conditions to Plaintiff and had denied him his right to counsel.

92.    Zachary Scott in an excited manner was telling Plaintiff, "you're over reacting", "it's not worth it", "just let it go" and numerous other dismissive statements about the significance of what had happened to Plaintiff during the hearing.

93.    Zachary Scott spent the entire 90min group talking to Plaintiff about his legal work, being worked up the entire time. Through the conversation it became apparent that Zachary Scott was very upset that during his hearing, Plaintiff had mentioned Zachary Scott's concern about Plaintiff having a heart attack from the stress of the VTDOC

94.    As Zachary Scott is contracted by the VTDOC and has informed the therapy group that he makes "much more than $120,000 per year", it was clear that Zachary Scott was upset because, even though his observation of Plaintiff was real and it was true, it

worked against the VTDOC's agenda and can jeopardize Zachary Scott's job i.e. there is an ethical breach in the relationship between the VTDOC and Effective Counseling Solutions LLC.

95.     In conversation with Plaintiff, Defendant Zachary Scott has also dismissed the seriousness of Defendant Edward Adams lying to Plaintiff.

96.     In one instance Plaintiff expressed being upset about Defendant Edward Adams lying to him, Zachary Scott replied stating to Plaintiff, "well you sued him before" as if Plaintiff having sued Defendant Edward Adams in a prior instance was justification for Plaintiff's probation officer to lie to him.

97.     On numerous instances Zachary Scott has made comments in reference to Defendant Edward Adams deceit to Plaintiff as not being a big deal and that the Plaintiff is overreacting.

98.     The impact of Defendant Edward Adams dishonesty has been very significant on Plaintiff's life and it has caused very serious emotional disruption for Plaintiff and also damage and interference with various legal processes.

99.     Acts by Defendant Edward Adams have usurped Plaintiff's right to due process in various instances, to great detriment of Plaintiff.

100.    On November 25th, 2024 Plaintiff notified Defendant Edward Adams' supervisor that he would be filing federal action against Defendant Edward Adams in his individual and that Plaintiff was requesting a new probation officer.

101.    On Dec 4th, 2024 Plaintiff was asked to arrive early to his weekly group therapy class run by Zachary Scott a.k.a. Effective Counseling Solutions LLC.

102.    During this meeting, Defendant Zachary Scott informed Plaintiff that he was

being put on probation from the weekly group therapy. Plaintiff was shocked by this, because up until that moment Plaintiff had only been given the impression by both Defendant Zachary Scott and Defendant Edward Adams, that Plaintiff was fully on track with his obligation to the group therapy.

103.    During the Dec 4th, 2024 meeting between Plaintiff and Defendant Zachary Scott, upon being informed he was being placed on probation inquired as to why. In response, Zachary Scott explained that the probation office had expressed concern to Zachary Scott about Plaintiff's "repeated pattern" of conflicts over the past six months, specifically.

104.    This reply ¶99 occurred nine days after Plaintiff informed the probation office of federal action pending against Plaintiff's probation officer, Defendant Edward Adams and only a few weeks after Defendant Zachary Scott became worked up about Plaintiff discussing Defendant Zachary Scott's heart attack concerns during the live court hearing.

105.    During the ¶99 meeting, Plaintiff expressed concern about this abrupt notice of failing to meet expectations for group. Defendant Zachary Scott's explanation of the reason why Plaintiff was being put on probation in group did not make sense as there were no events from the past six months that could constitute "patterns of conflict"

106.    Plaintiff, feeling concerned that this notice of being put on probation from the group therapy class was improper, unethically founded and was the probation office improperly influencing Defendant Zachary Scott's behavior, sought clarification both of the founding information to support this act.

107.    Since Defendant Zachary Scott was abruptly putting Plaintiff on probation in group and that there had been no indication prior that he had not been in conformance with the group expectations, Plaintiff requested that Defendant Zachary Scott could please provide

in writing exactly what will be expected in order for Plaintiff to meet performance expectations to fulfill his obligation group, so Plaintiff can quickly satisfy conditions and get off of probation from the weekly group therapy.

108.    This request ¶ **103** was to establish clearly Due Process moving forward so there was no question as to what was expected of Plaintiff.

109.    Very politely, Plaintiff requested Defendant Zachary Scott, in support of this notice or being put on probation, to also please provide Plaintiff with a list of events referenced from the "past six months" to establish "repeated patterns of conflict".

110.    Plaintiff asked this because there are no "repeated patterns of conflict" from the prior six months and it appeared that Defendant Zachary Scott had been repeating verbiage provided to him by another party from within the probation office without thinking carefully about the merit of this language and the implications of making such a statement.

111.    Plaintiff observed this event to be a combination of Defendant Zachary Scott feeling that Plaintiff's acts were threatening his job and that the probation office did not like receiving notice that there was a federal lawsuit pending.

112.    Plaintiff felt he was experiencing retaliation for First Amendment protected speech and action.

113.    Immediately after the meeting, while the group therapy was in session, Plaintiff carefully recorded exactly the information that Defendant Zachary Scott had spoken. That evening Plaintiff emailed this list to Defendant Zachary Scott.

114.    Defendant Zachary Scott replied expressing some degree of disagreement with Plaintiff's account of events from the meeting, but without offering any clarity in his response.

115.   By email December 6th, 2024 it was requested that Plaintiff meet with two administrators of the Hartford Probation and Parole Office, Jeff Percy and David Nesbitt on December 9th, 2024. Plaintiff agreed respectfully and when the meeting occurred, they informed Plaintiff that they would not be changing his probation officer and that Defendant Edward Adams would continue to be Plaintiff's probation officer and to plan to meet with him on Wednesday December 11th, 2024.

116.   Plaintiff expressed very simply that Defendant Edward Adams had been dishonest to Plaintiff on numerous instances and that the relationship was very bad for Plaintiff. In reply to this, District Manager David Nesbitt referred Plaintiff to the grievance process moving forward if Plaintiff had concerns. The meeting lasted exactly 15minutes, from 1:00-1:15pm.

117.   On December 10th, 2024 Plaintiff sent an email to Supervisor Jeff Percy and District Manager David Nesbitt appealing their decision not to change Plaintiff's probation officer. They did not reply.

118.   On December 11th, 2024 Plaintiff was asked to meet with Defendant Zach Scott early, which Plaintiff did, respectfully. In their prior meeting on December 4th, 2024 Defendant Zach Scott had committed to Plaintiff that he would provide him with a list of the events that constituted "repeated patterns of conflict" from the past six months and also clarity as to what would be expected of Plaintiff to meet performance expectations so he could fulfill his obligations to the group therapy and get off probation successfully, with no delays.

119.   Instead of providing these items to Plaintiff, Defendant Zachary Scott provided Plaintiff with a Notice of Suspension from the group therapy in which contained an

array of highly defamatory and unfounded language about Plaintiff. The letter cited an array

of events which are fictional and portrayed Plaintiff as suffering from severe mental illness.

120.    This letter ¶115 was an article of libel, created for the purpose of injuring the

Plaintiff.

121.    Throughout the two years of group therapy which Plaintiff attended which

was run by Defendant Zachary Scott, there had been numerous instances where Defendant

Zachary Scott explained to the participants within the group therapy class, Plaintiff included,

that nobody would ever be just kicked out of group therapy abruptly and that a person would

always receive a letter first defining where they may not be meeting group therapy

expectations and they would have ample opportunity to correct their performance.

122.    Plaintiff took careful note of this explanation as the group therapy class run by

Defendant Zachary Scott is a requirement for Plaintiff to fulfill his obligations to probation

and ultimately to the court that manages his case. It is a matter of Plaintiff's freedom if he is

fulfilling his fulfilling his obligations to the group therapy and Plaintiff takes this matter very

seriously, paying it full attention and care.

123.    Defendant Zachary Scott has acted unethically, suspending Plaintiff from a

court ordered therapy as an unethical act to protect his own personal interest and as act of

retaliation against Plaintiff.

124.    Defendant Zachary Scott's suspension letter is an instrument of dishonesty,

gross negligence, deliberate indifference, and severe professional misconduct i.e. gross

violation of ethical duty as a mental health professional. It contains information that is

fraudulent and manufactured entirely from no factual basis.

125.    The suspension letter make mention of Plaintiff suffering from

dermatillomania, which Plaintiff has never heard Defendant speak about prior, ever, nor has Plaintiff ever been diagnosed with such, nor does Plaintiff have any wounds on his face!

126.    The letter is libel and places Plaintiff in great danger on a fraudulent basis.

127.    Plaintiff has been seeing a separate therapist weekly on his own initiative and medical records from that therapist evaluation do not match the extreme description of Plaintiff in the suspension letter abruptly provided to Plaintiff after informing the probation office he is going to be suing his probation officer in Federal Court.

128.    Defendant Edward Adams' acts of lying to Plaintiff and providing false testimony on numerous instances had caused great harm to Plaintiff for which Plaintiff seeks redress.

129.    Defendant Edward Adams has provided testimony during hearings regarding Plaintiff's probation conditions on numerous instances for the purpose of securing an outcome to the benefit of the VTDOC or Vermont State's interest. He has admitted to Plaintiff in conversation that he has to support the VTDOC

130.    Defendant Edward Adams has told Plaintiff an action is permitted, then testified in a live hearing about how important it is that there is a probation conditions restricting Plaintiff from the action, and then after securing the probation condition, has against told Plaintiff it is fine if he engages in that activity.

131.    The VTSAS solicits testimony and or other conduct to VTDOC personnel and uses them as agents to violate the constitutional rights of probationers. The VTDOC personnel, who are not usually privy to or understand the legal principles, are unaware they are being used to violate the rights of the probationer wether in or out of the court room.

132.    Plaintiff experienced this as the VTSAS solicited testimony from a probation

officer which there was nothing from the record to support the language the probation officer was using and it was clear the probation officer had been coached as to how to answer the questions during a hearing.

133.    Since the event of ¶11, Plaintiff has met with his probation officer (the Defendant) approximately three times under duress.

134.    Plaintiff's requests for a new probation officer and the communicated negative impact the relationship with Defendant Edward Adams has on him have been ignored by Supervisor Jeff Percy and District Manager David Nesbitt.

135.    Plaintiff dreads the notion of having to interact with Defendant Ed Adams and it literally causes Plaintiff to experience tightness in his chest and shortness of breath.

## VII.    CLAIM FOR VIOLATION OF SUBSTANTIVE DUE PROCESS
### (14th Amendment 42 U.S.C. § 1983)

136.    Plaintiff re-asserts and re-alleges the factual allegations contained in ¶¶ 1-134.

137.    Plaintiff was placed on probation, which included conditions restricting him from various actions.

138.    Plaintiff proceeded pro se to seek modification of his probation conditions, aiming to achieve a balance between the government's interests and the restriction of Plaintiff's constitutional rights.

139.    Plaintiff spent thousands of hours studying law and working on the legal process in an effort to achieve a fair outcome. This extensive effort culminated in Plaintiff's case being heard by the Vermont Supreme Court.

140.    Defendant Edward Adams, who regularly met with Plaintiff throughout the process, was fully aware of the significant time and energy Plaintiff had invested in his legal

efforts.

141.    Plaintiff repeatedly inquired with Defendant Edward Adams about his relationship with or knowledge of the state's attorney working on Plaintiff's appeal. On each occasion, Defendant Adams denied knowledge of the state's attorney and, on one occasion, intentionally misled Plaintiff by falsely claiming confusion about which state's attorney was involved.

142.    Based on the false information provided by Defendant Adams, Plaintiff filed a document in the appeal process, relying on the representations made by Defendant Adams.

143.    In response, the state's attorney produced an email correspondence record that revealed Defendant Adams' statements to be entirely false.

144.    This revelation caused the collapse of Plaintiff's probation condition appeal, resulting in significant emotional distress for Plaintiff. Plaintiff had invested substantial time and effort into the process, only to discover that Defendant Adams had been lying to him for weeks.

145.    Defendant Adams' false statements, coupled with his failure to correct the misrepresentation, exposed Plaintiff to substantial harm. Defendant's conduct was egregious and violated Plaintiff's substantive due process rights under the 14th Amendment to the United States Constitution.

146.    Substantive due process protects individuals from government actions that are arbitrary or unjust to the extent that they shock the conscience or interfere with fundamental rights. Defendant's false statement about his relationship with the prosecutor, and his subsequent failure to correct the misinformation, were egregious and unreasonable, significantly impeding Plaintiff's ability to navigate the legal system in a fair and informed

manner.

147.    Defendant's actions amounted to an abuse of power in the following ways:
a. Defendant, a government official, misled Plaintiff on a critical legal matter that directly
impacted his case; b. Defendant's falsehood caused Plaintiff to take harmful legal actions
based on misinformation; and c. The consequences of Defendant's misconduct were far-
reaching, involving an extensive investment of time and effort, a failed motion, and
significant emotional distress.

148.    The fundamental fairness of the judicial process was severely undermined by
Defendant's actions, which exposed Plaintiff to unnecessary risks and harms that could have
been easily avoided if Defendant had fulfilled his professional duties.

149.    Defendant's conduct was arbitrary, unreasonable, and violated Plaintiff's
substantive due process rights under the 14th Amendment for the following reasons:
a. The conduct was extreme (lying to a probationer in such a critical legal matter); b. The
actions were reckless, with foreseeable negative consequences for Plaintiff's legal rights; and
c. Defendant's actions deprived Plaintiff of the ability to make informed decisions regarding
his legal case, with no legitimate government interest justifying the harm caused.

150.    Defendant's misconduct shocked the conscience of the Court, representing a
gross abuse of government authority and depriving Plaintiff of his right to fair and informed
legal proceedings.

151.    Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

152.    Defendant's conduct, including the false representations upon which Plaintiff
relied, caused Plaintiff to suffer severe emotional distress, exacerbating stress already
experienced by Plaintiff's relationship with the VTDOC.

153.    Defendant Edward Adams is personally liable by way of 12 V.S.A. § 5602(b) as his acts constitute gross negligence and willful misconduct.

154.    **Claim for Relief 1: Violation of Substantive Due Process**

Plaintiff seeks declaratory judgment that Defendant's actions violated Plaintiff's substantive due process rights under the 14th Amendment to the United States Constitution, as Defendant's false and misleading actions shock the conscience and severely hindered Plaintiff's ability to pursue justice.

155.    **Claim for Relief 2: Emotional Distress**

Plaintiff seeks compensatory damages for the emotional distress caused by Defendant's egregious misconduct, including the emotional harm resulting from reliance on Defendant's false representations. This is the event which ¶11 is referencing i.e. Plaintiff was so distraught by this even that Defendant Zachary Scott expressed concern Plaintiff could literally have a heart attack.

156.    **Claim for Relief 3: Injunctive Relief**

Plaintiff requests injunctive relief to prevent further violations of his due process rights, specifically ensuring that Defendants adhere to proper procedures in future probationary matters and provide truthful and transparent communications.

## VIII.    CLAIM FOR VIOLATION OF PROCEDURAL DUE PROCESS

157.    Plaintiff re-asserts and re-alleges the factual allegations contained in ¶¶ 1-156.

158.    Defendant Zachary Scott a.k.a. Effective Counseling Solutions LLC has violated Plaintiffs Procedural Due Process.

## IX.   RELIEF REQUESTED

WHEREFORE, Plaintiff request that the Honorable Court:

a.     Assume jurisdiction of this case;

b.     Declare that Defendants Zachary Scott and Effective Counseling Solutions LLC have violated Plaintiff's due process, that they have committed libel and fraud. Award compensatory and punitive damages.

c.     Declare that the VTSAS use of VTDOC personnel as agents for violating of probationer's due process and constitutional rights is procedure, policy or practice that is unconstitutional and unlawful i.e. promoting conduct of the VTDOC personnel who may not realize the actions solicited to them violate the probationer's rights, while the state's attorney is fully aware of the violation that is occurring.

d.     Declare that Defendant Edward Adams has intentionally misrepresented information to Plaintiff and award compensatory and punitive damages.

e.     Declare that Defendant Edward Adams has engaged in conduct that has deprived Plaintiff of substantive and procedural rights protected under the 14th amendment and award compensatory and punitive damages.

f.     Declare that VTDOC personnel Cynthia Mason, William Collins, Caleb Lefebvre, et al have acted with deliberate indifference, gross negligence and willful misconduct, depriving Plaintiff of his ability to exercise his First Amendment right to freedom of Religion, that their acts constitute negligent infliction of emotional distress, that they have violated federal law by stealing

and obstructing mail, award compensatory and punitive damages, order injunction that mail theft is not permitted under any circumstance by VTDOC personnel

g.    Declare that Cynthia Mason acted with willful misconduct and gross negligence resulting in intentional infliction of emotional distress by intentionally retaliating against Plaintiff by sending him moldy food or food he could not eat at all for extended time periods, resulting in Plaintiff suffer

h.    Declare that Defendants acts of issuing the suspension letter from the group therapy constitutes retaliation against First Amendment protected free speech and action. Award punitive and compensatory damages and order injunctive relief that participants in the group therapy must be provided with fundamental due process i.e. providing a uniform administrative or clinical procedure for putting a patient on notice if they are not fulfilling obligations of the group therapy.

i.    Grant such other and further relief as the Court deems just and proper.

Dated: December 19th, 2024

Respectfully submitted,

*Anatoly Kishinevski*
*pro se*

By: _____

Anatoly Kishinevski
713 HARTFORD AVE.
WHITE RIVER JUNCTION, VT 05001
Tel: 802-261-1776
fishmousebear3@gmail.com

28 of 29
Verified Complaint

## VERIFICATION

I, Anatoly Kishinevski, who is a resident of Vermont, USA, herein do hereby Swear, Depose and Declare under penalties of perjury that:

1.    I am the Plaintiff in the present case, a citizen of the United States, and a resident of Vermont.

2.    I have personal knowledge of myself, my activities, and my intentions, including those set out in the forgoing *Verified Complaint*, and if called on to testify I would competently testify as to the matters stated herein.

3.    I verify under penalty of perjury under the laws of the United States of America that the factual statements in this complaint concerning myself, my activities, and my intentions are true and correct

4.    I have read the foregoing pleadings by me subscribed and that the facts therein stated are true to the best of my knowledge, information and belief.

Subscribed and sworn to before me on
this 19th day of December , 2024

(Notary Print) EUCARIS MEDINA

(Notary Sign)

(Commission # or Seal) 157.0015851

(State) VERMONT

(Plaintiff Print) Anatoly Kishinevski

(Plaintiff Sign)

(Date) Dec 19th, 2024

EUCARIS MEDINA
Notary Public - State of Vermont
Commission # 157.0015851
My Commission Expires Jan 31, 2025

29 of 29
Verified Complaint

Jan 23rd 2022          Jew Letter II

To: Kitchen Officer

Cc: John Hardy, Case Worker; Bill Collins Volunteer Coordinator; Medical Department.

From: Anatoly Kishinevski, Incarcerate Individual # 164759

Subject: Request for Religion Compliant Meals

Dear Kitchen Officer et al.,

I arrived to Northern State Correctional Facility on Jan 14th. I am a 36 year old man that has dedicated majority of my life to religious studies including mainstream Christianity, Judaism, Islam and various orthodoxies of such. My studies have also included less commonly known or understood religions such as the Rastafari movement, the culture of the Dogon tribe and with particular the interest, the religious practice of Ancient Egypt, just as a few examples. I am however a committed follower of Judaism. I was born a Jew and embraced this heritage, culture, and way of life with great dedication and in the intellectual pursuit especially in the second half of my life (the past approximately 21 years). I am also a scientist by formal education and work experience with my special expertise being in the physics of electromagnetism (science of light) and general chemistry including solid state inorganic and organic chemistry. My actual degrees are in Glass Science and Materials Science.

By two separate modes of exploring consciousness and the existence of human life, which include various historical records and writings & through my absolute immersion in science, I have concluded that there absolutely is a creator. Evolutionary biology is a real thing, but man did not evolve from slime. Man was engineered by a supreme consciousness. Our bodies are a feat of remarkable and perfect engineering accomplished by G_d. Your heart, your brain, your nervous system, etc. are all bio systems of such an elegance and sophistication, we the human race could not even begin to attempt to design and construct such systems from scratch, let alone integrate them all into one package that can run, jump, repair itself when damaged, while also having a name and personality and ability to reproduce through an amazing self operating process, all of which the instructions for are stored in a single molecule we call DNA.

Jews There is unfortunately a lot of negative stereotyping about Jews (other religions have that this problem too) however once a person comes to learn what Judaism is they aren't often revel with interest. There is fundamental principle of Judaism is to or the maintain the absolute and most righteous relationship with God and to show give him respect in all aspects of life, as he is the absolute, and an This is often said or alternatively said as the duty of a Jew is to maintain the absolute highest level of spiritual health possible. Fundamental to being able to achieve optimal physical spiritual health, it is essential that one maintains optimal physical health from the outset. For it is said if the vessel is damaged then the contents are also comprimised and likely damaged, implying that there is a direct relationship between health of body and health of spirit (or body and God).

Judaism teaches that you are literally what you eat. What you eat is what you become as an individual, in your thoughts, your actions and in your spirit. It is the responsibility of the Jew to protect his mind and body from anything that may pollute

Cont next page          Pg 1

Jew Letter II

either of these, whether it be adulterated foods whether it be of toxic food or toxic thought. Examples of pollutants foods that have been adulterated by mans modification and life habits that are corrupt, such as violence and pornography must be avoided to preserve integrity of self and to sustain and grow spiritual health and a respectful relationship with God.

Christianity has the well Known Ten Commandments, Judiasm has 613 commandments, more commonly referred to as laws. The 613 Laws of Judiasm span many topics including business, relationships, food and religous obligations. A few From these Jewish laws is where the laws of Kosher practice (a Kosher diet) come from. These dietary laws are not for not arbitrary and did were not created as a whim, they are given to us. They exist for the purpose of ensuring cleanliness in diet, both physically and spiritually. I will give three examples. 3) If an animal suffers at all during slaughter it may not be consumed because the animals experience enters vs. 1) Dairy and meat are never to be consumed at the same time. This is because it is spiritually impure to bathe the Kinder in the mothers milk. It is disrespectful and this negativity enters us and impacts our actions. Generally Judaism teaches that we can live healthy lives with no meat and that meat is to only be consumed when extra energy is needed for doing "God's work" ie. in times of great trial or pressure to accomplish a particularly important goal. 2) Animals with cloven hooves are certain animals are not to be consumed including animals with cleaved hooves, such as deer and pigs. The reason is that these animals are regarded as unclean. They have much higher likelyhood of carrying dangerous parasites than animals that are permitted for consumption. The laws of Kosher are largely to ensure hygiene of what enters the body and protect us from harm.

q. Some of the 613 laws are obsolete in todays world and modern societies, however it is not permitted to make any changes or alter our religious text, the Torah. However additions in practice are not uncommon. An An example of this is salmon is no longer Kosher by decree of a particularly respected Rabbi. Micro plastics in our oceans is a topic that has caught the attention of Scientist around the world in the past decade. Due to man's careless actions we have saturated our world's water with tiny pieces of plastic that are so small they are being found INSIDE of individual cells of sea animals. A stereotypical and authentic favorite in the Jewish culture is bagels with Lox (smoked Salmon). The Rabbi that decided salmon is no longer Kosher reviewed the science and recognized that this partic- this animal is no longer pure because of it's environment and that the health implications of consuming these micro plastics is strong at best not acceptable.

q. It is not just the responsibility of Rabbis to make rulings on such topics, but it is also the responsibility of a Jew as an individual to ensure his own safety and to share Knowledge and discoveries made or developed as an individual, with his peers. It is the responsibility of the peers to listen thoughtfully and consider intellectually. There is great debate amongst the Jewish population on many of these topics. For example, the restriction of mixing meat and dairy, poses a nutural question. That is, how long should you wait after eating one before you can or should eat the other? Some sects Jews will say, "Just not in the same meal", while others will say "Never in the same day". I personally wait at least a day if not 2-3 as that assures me I have not comprimised this responsibility. There are varying opinions throughout any group of humans

Cont next page    Pg. 2

On any particular topic. This is summarized with a comical phrase

"Two Jews, Three Opinions"

I submitted a request form the day I arrived outling my dietary requests with respect to my religious faith. I submitted a duplicate request the next day on Jan 15th, 2022. I received no written response, however noted that the kitchen was providing me with Halal entres. The sentiment of this is greatly appreciated. I understand that this principle of dietary cleanliness is foreign for most. Unfortunately these Halal meals are ~~not something that I am able to consume in fact~~ not allowing me to maintain my right to freedom of Religion as there are many aspects of them which are impure, I can not knowingly toxify my body, in honor of my faith and with respect to myself.

I have eaten ~~almost not~~ very little since I have arrived, but the little bit I have consumed has injured me. Commencing the morning of Jan 25th, I will fast for 5 days to clean my body. I ask for your support in this fast by giving me ~20oz of ~~M~~ Organic black tea and two pieces of organic fruit for breakfast for this duration. That is all of the nutrition I will intake for these 5 days. Upon completion of this cleansing period I can put no other impure foods in my body, and politely request that you facilate my ability to resume eating within my religious confines.

<u>Foods that are impure</u> include, but are not limited to:

- Any food that is GMO (genetically modified)
- Any food that has a refined sugar or starch in it, or on it.
- Any food that has been adulterated with manmade ingredients or semi synthesized ingredients.
- Any food that contains canola, soy, cottonseed, in any form whether they are organic or not. The oils of
- Any food that is not certified organic or that the integrity of the source can not be verified
- Products first hand, that have fluoride in them, Tooth paste, mouth wash, etc.
- Any food or ingredient that contains aluminum (such as aluminum leavening agent) or water that was been treated using Aluminum Sulfate as a Defloculating agent. menicidol
- Any food that has been cooked on Teflon (non-stick pans and baking sheets)
- Any food that has been heated or cooked in a microwave.
- Any meal that contains dairy and meat combined.
- Dairy that is pastrized (Only raw milk cheese is permissable
- Any food or ingredient that has been canned (Glass jars are okay) ~~and/or preserved in sugar water within a can~~
- ~~Any fruit or vegetable that has been~~ that is preserved in a syrup or sugar water
- Rice is not pure, unless it is a wild rice from select regions

If you go into any grocery store and start reading ingredients you will find almost everything you touch has sugar, wheat, corn or canola oil as an ingredient. Most food items in a grocery store are impure by my scientific and religious discipline that I have sustained uninterrupted with great ~~discipline~~ care for the past 19 years. Literally this practice is central to my being and my religious beliefs.

I understand that this ~~presentation of~~ information is likely ~~overwhelming and that it is impossible to know~~ difficult to understand the reasoning

Cont. next page

Pg. 3

Of, and Maybe some will dismiss the merit of such strict dietary effort as obsession or some type of mental illness. The truth of the matter is I ~~have meditated and sought to entrance my state of awareness to~~ can explain in detail technically and spiritually the foundation of the restrictions I have just provided. I have also confirmed all of them through rigorous empirical evaluation by means of monitoring my own wellness through meditation and careful observation. The people that I have enlightened to these parameters of what can be consumed and that have adopted them have fully recognized the significance in observation of their own bodies, consciousness's and shifts in spiritual awarness.

After my 5 day Fast, please let it be clear, I am NOT going on a hunger strike. I infact hope to eat regularly and plan to in accordance with this doctrine of my ~~fustian~~ needs in order to observe, sustain and exercise my freedom of religion,

A quote that is claimed to have been translated from ancient Egyptian Heiroglyphs is " One third of what you eat keeps you alive. Two-thirds of what you eat keeps the doctor alive."

In the Requests forms I submitted on Jan 14th and Jan 15th, I included a very easy to accomodate solution. My expectation is not for people to preform aerobatics to fulfill my gentle demand. I also do not need anything complex The following dietary schedule is easy and will leave me at great peace for the duration of my stay here.

## Breakfast
- Two cups of cold/dry/uncooked Organic Oatmeal
- Two pieces of organic fruit
- Two organic eggs
- A cup of organic black tea.

## Lunch
Same as breakfast except replace one serving of fruit W/ organic green vegetable

## Dinner
- Organic Chicken or Three organic eggs
- Organic Quinoa or Oatmeal
- Two servings of organic fruit
- One serving of organic green vegetable

"Green vegetables" implies brocolii, greenbeans, kale, spinach, etc. Lettuce is NOT a green vegetable

Ideal fruits are Oranges, Dates, Apples Organic grapes and berries are not Permissable.

All Eggs can be boiled and th

Vegetables steamed w/ no oil or salt added and chicken

Quinoa is cooked the same as rice. Using a rice cooker is not permissable as they are lined w/ teflon.

And Non-stick pans are Not permissable. or aluminum.

Quinoa, vegetables, etc must be cooked in steel, iron, or glass. No oils or salts added.

Pg. 4

At approximately 1:30 p.m, Bill Collins arrived to the DA housing unit of NSCF where I, Anatoly Kishnievski, am currently housed, in the custody of the Vermont Department of Corrections. The Date is December 28th, 2022.

I submitted a request for toothpaste in compliance with my religious practice on or about September 14th, 2022. The accommodation form was received by Bill Collins as has been documented in prior emails and affidavits.

Today when Bill Collins entered my unit I asked him if he had received the certified mail that I attempted to send to him on Dec 22nd, 2022 which since placing in the mailbox of the DA unit has gone missing. There were two identical envelopes submitted at the same time. One to Lori Perkins and one to Bill Collins. The one addressed to Lori Perkins was denied by her with a date of Dec 27th i.e. she did not allow me to send my mail, illegally... my mail which explicitly stated it is legal mail was prevented from being sent. When I spoke to Bill Collins today, when I asked him about receiving the envelope in his mailbox, he presented to be clueless about the topic as if he had no awareness of it. I then explained to him I had sent identical pieces of mail to him and Lori Perkins at the same time and that I was aware that the one to Lori Perkins had been placed directly in her mailbox, she without opening it, denied it and it was placed in the DA mail box to be returned to me, which was hand delivered to me in the DA unit on Dec 27th, 2022 by CO Dubuque, at the podium of the middle tier.

At 1:40pm CO Matthew Meyers talked to me about my mail going missing and being inappropriately handled. He checked the mail log and said no mail to either Lori Perkins or Bill Collins had been entered in the mail log any time close to the 22nd of December, when the

(AAA) Continued on Page 2

Page 1

# AFFIDAVIT

I, Anatoly Kishinevski, the affiant herein do hereby Swear, Depose and Declare under penalties of perjury that the following statement is true and correct based on my personal knowledge and belief:

1.) Over the past approximately 5 weeks the affiant has experienced his gums to rapidly recede resulting in the roots of many of his bottom teeth becoming exposed, hence causing the affiant to be in great pain.

2.) The affiant is a 37 year old Jewish man that has always taken careful care of his body including

2022   Written December 27th, 2022 at approximately 2pm

**B** On 12/22/22 approx 1:35 pm CO DuBuque called me to the Podium (middle tier) in the DA unit at Northern State Correctional Facility and handed an envelope to me that ~~had~~ was addressed to superintendent Lori Perkins. The mail had been placed in the Delta building USPS mailbox on Dec 22nd. On the 22nd ~~when~~ it was placed in the mailbox it was inspected and approved by CO DuBuque prior to it being sealed before. There was a "check withdrawal/request form" attached to the envelope which stated explicitly contains legal document.

"DO NOT deliver by interdepartmental mail; Send only by first class certified w/ signature required"

When the mail was returned to me by CO DuBuque, it was still sealed and the check/withdrawal form had been marked denied, dated 12/27/22 and signed in the superintendent field with the reason for denial stated "signature not required"

CO DuBuque stated to me upon returning the mail to me that he believed ~~a super~~ it ~~had been~~ placed directly in her interdepartmental mailbox, she denied it and placed it in the Delta Alpha mailbox.

**AAA** Dec 28 continued                   Continued from Alternate Page - Page 1

A second identical envelope was dropped in the mailbox - the same day including specifications to be delivered only by Certified Mail signature required, except this one was addressed directly to William Collins. The contents of the envelopes were notarized affidavits regarding an urgent health issue regarding my lack of toothpaste and a chain of historical documents on the topic,

I submitted a Religious Accommodation Request Form on Sep 14th for toothpaste ~~and~~ (Fluoride and Sugar free in accordance with my Kosher practice) that I still have not received a response to; my teeth are being severely damaged.

Today in my exchange with Bill Collins he told me my Sep 14th request had been approved. I asked him why I was not notified and he told me he didn't know. He then told me there was other toothpaste that was available through the muslim catalogue that was something he could offer me and that it was fluoride free. I asked him if this was an option why was he mentioning it for the first time now and not a year ago when I first started asking for Fluoride free toothpaste. He just kept describing the product and ignored the question. I asked again, explicitly "Did you receive the envelope addressed to you? has it placed in your interdepartmental mailbox," while I looked him in his eyes and he told me "no". I told him it would be served to him next week.

he kept asking me about the envelope what it looked like, what it was for, etc., was it legal mail, etc.

Anatoly Kushinevski
#2559 Gleer 164759 - NSCF
2559 Glen Road
Newport, VT 05855

Aug 3rd, 2022

To: Cynthia Mason - NSCF ~~Kitchen Officer~~ FSS Food Services Supervisor
Cc: Leann Metzger - NSCF Kitchen Officer;
~~Lori~~ Lori Perkins - NSCF Superintendant;
~~Nd~~ Matthew Nault - VTDOC Director of Facilities Operations;

*hurting me severely.*
*The food*

Dear Ms. Cynthia Mason, et al.

~~that~~ The indifference you show me is ~~literally torture to me~~

I am having a literal crisis with my diet! It feels like and empirical
evidence suggest that you are intentionally retaliating ~~and or~~ against me,
~~discriminating me~~ and I am being subject to discrimination, to a degree that
i ~~On~~ I have kept a detailed record of events, ~~which upon~~ for an investigation, ~~I suspect
will~~ reveal and review by a fact finder, *I have experienced.* I suspect it will be
concluded that I am experiencing are not coincidences.

*Practice*

*which records of everything are backed up with*

~~that~~ I have from the moment of my arrival to NSCF, communicated to the kitchen that I *my*
maintain a particular Kosher ~~diet~~ which excludes consumption of refined carbo hydrates, *attorney,
entirely.* ~~I have submitted are a dozen detailed articles of correspondence to the NSCF kitchen and
also submitted this detailed.~~ This has been communicated to the kitchen exhaustively, and
has also been brought to the attention of the Director of Facilities Operations Matthew Nault
and the Commissioner of the VTDOC, Nicholas Deml. ~~All~~ Despite the unfortunate
choice of all involved parties to ignore my generous communications ~~to~~ explaining that the
laws of Kashrut, ~~and what constitutes Kosher practices,~~ *are* Or ~~is~~ not a singular homogenous
philosophy, ~~I still have the right~~ the Commissioner chose to resend that

*My records include
~~dates and~~ corrections
officers who have been
present and observed,
remarking on their own,
unprompted, that it
looks like I am being
retaliated against,*

~~Because~~ I ~~titter~~ do not eat bread at all, and you (the kitchen gives me 9-12 slices per day)
I wrote to the kitchen on June 20th ~~all~~ to ~~inform~~ reiterate that I do not
eat the bread and it primarly gets wasted. In this correspondence I presented
the basic arithmitic that since I have arrived to NSCF on Jan 14th, that
up until Jun 20th (150 days approx X 9 slices of bread per day) ≈ 1,400 ~~loaf~~ ~2,000 pieces of
bread have simply gone in the trash - I stated in this correspondence, to avoid mindlessly
wasting this bread, stop putting it in my trays. It has gone ~~almost~~ entirely to waste.
In this correspondence I reiterated that any food product with flour or sugar listed in the
ingredients, I do not eat, at all. Like a stepwise function

CCC

At appox 3pm on Dec 28th, 2022 I anatoly Kishnovski
spoke to CO Dubuque about my missing envelope. I
explained to him my exchange with Bill Collins roughly
90 minutes earlier. CO Dubuque told me he remembered
the two envelopes and signing them on Dec 22nd, including watching
He also told me that ~~he said~~ Bill Collins was    me deposit them in
likely lying to me and that on Dec 27th    the mailbox,
when he retrieved and delivered the envelope with
Lori Perkins name on it to me that he believes
he saw the other one in Bill Collins mailbox.
He told me when a supervisor came into our unit to
speak to them about the topic.

 Gmail

**Anatoly Kishinevski <fishmousebear3@gmail.com>**

---

## Follow up
1 message

---

**Anatoly Kishinevski** <fishmousebear3@gmail.com>                    Tue, Dec 10, 2024 at 11:02 PM
To: "Percy, Jeffrey" <Jeffrey.Percy@vermont.gov>, "Nesbitt, David" <David.Nesbitt@vermont.gov>

Mr. Nesbitt and Mr. Percy,

I am writing to you in continuation of our meeting yesterday. This correspondence is conduct protected by the First Amendment right to freedom of speech. Any action that occurs subsequent to and in relation to this correspondence, that affects me adversely, will be perceived as First Amendment retaliation. Me being placed on "probation" in group abruptly after the last email I sent expressing my concerns about working with Ed Adams is already perceived as such.

I am attempting to resolve an extremely serious matter and I believe it is possible there is some level of misunderstanding, so per this message I am going to clarify what I have experienced and what I am seeking and what I believe I am entitled to have. Nothing in this correspondence is sent with malice, anger, or projection of negativity. I am hoping that as administrators of the office which I am supervised by, that this information will be incorporated into reevaluation of my request for a different probation officer.

So it is clear, while detained I experienced egregious violations of my rights, to such a degree that I am still physically and emotionally impacted significantly. This may be hard to imagine, but I implore you to take these words for face value. I experienced my legal mail to be stolen, obstructed, deprivation of hygiene products and literal starvation.There is a radical stepwise transition in the thickness and color of the hair on my head from when I was released and was able to resume a normal nutrient profile. My year of detention was traumatic for me.

My experience at NSCF left me with extreme distrust for the VTDOC in all regards. This sentiment has been echoed by many experienced attorneys I have spoken to from Vermont. The VTDOC does not have the reputation it does for no reason. Zach Scott has progressively dismissed my experiences with the DOC as paranoia and as over reactions, which I think is a disservice to all parties. I have had a real experience and am reacting to them past and present.

Upon release from detention and learning that Ed Adams will be my supervising officer and learning of his trouble caused me great concern. I was discharged from one environment ridden with professional misconduct into another environment in which I am directly supervised by someone who has been the subject of a wide range of extremely serious allegations of misconduct, including allegations of sexually inappropriate conduct. In the two years I have been working with Mr. Adams I have experienced deceit from him in many instances and in many flavors, with the last incident being of tremendous detriment to me. It is not the job of the probation officer to lie to the probationer, under any circumstance. There have been numerous other exchanges in which I am left feeling shaken by my exchange with Mr. Adams.Working with him is harming me.

On Septemeber 18th 2024 Zach Scott observed me to be so distraught that he expressed genuine concern that I could have a heart attack. What I was distraught about is that I had spent literally thousands of hours working on my appeal and at the most important moment, experienced collapse in my efforts because my probation officer had lied to me. This is so very serious. At about the same time of this event, I was diagnosed with an acute stress disorder which the clinician from Clara Martin has noted that my primary stressor is the VTDOC, with emphasis on my relationship with Mr. Adams. To say it directly, I am having mental health problems because of my interactions with Mr. Adams.

Per this correspondence, I am renewing and continue my request for you to assign me a different supervising officer effective immediately. I am entitled to be supervised by someone that is honest and maintains strict adherence to the Vermont Rules of Professional Conduct. To be provided such will immediately allow me to relax and focus my energy on other important topics in my life which have been put on pause while I attempt to resolve this challenge. If you still decline to assign me a different probation officer, I will exercise all administrative and legal remedies to seek relief from this circumstance.

I will still meet with Mr. Adams as you have instructed me to do tomorrow, but it is being done under incredible duress and with harm to my emotional and mental health. I feel extremely uncomfortable around him and the lack of professional integrity he has demonstrated has caused irreversible damage.

For a reply, email is the most reliable way to reach me. I thank you for your time, genuinely. My goal is not to cause problems or challenges or anyone.

Anatoly Kishinevski

 Gmail

**Anatoly Kishinevski <fishmousebear3@gmail.com>**

---

## Check In - Chocmah Binah Daas

---

**Anatoly Kishinevski** <fishmousebear3@gmail.com>                    Wed, Dec 4, 2024 at 9:58 AM
To: "Scott, Zachary" <Zachary.Scott@partner.vermont.gov>
Cc: "Percy, Jeffrey" <Jeffrey.Percy@vermont.gov>

Hi Zach,

Yes. I can do that. I will be there at 1pm.

Also, please I am asking that you advocate within the office to assist me be reassigned a different probation officer, or at least a substitute for the interim period until this matter is resolved. I have recognized recently that Mr. Adams has been the single greatest source of stress in my life since my release. My relationship with him has caused me tremendous harm, past and continues to present until he is relieved from my file. I have been awake since 4am working on legal documents and I am tired to my core. Please relieve me of my burden.

He has not lied to me just once and if he has given you the impression of this, he is lying to you also. And even if it was just once, the notion that you don't consider this to be extremely serious is something that further causes concern to me. Mr. Adams has been dishonest with me, egregiously in a multitude of modes and instances. I literally can not handle it emotionally interacting with him any further.

Jeff Percy, you hold position of supervisor, which I believe means you are an administrator within the office, including supervisory status over the probation officers. Last week I made the request for Mr. Adams to be removed from my case and that I am assigned a different probation officer. Per this correspondence, I am renewing this request and I ask that you please facilitate reassignment of my supervision to a different probation officer. I have the right to be supervised by someone that maintains fundamental professional and ethical conduct. I ask that you please confirm by end of the day who my new supervising personnel is so that I may continue reporting and operating in compliance with all of my probation conditions. I will be forced to seek an emergency injunction from the federal court alternatively. This message is my attempt of exhausting administrative remedies prior to seeking intervention from the court.

Please kindly assign me to a different probation officer with no further delay.

Zach, I will be there at 1pm to meet with you.

-Anatoly
[Quoted text hidden]

 Gmail

**Anatoly Kishinevski <fishmousebear3@gmail.com>**

## Check In - Chocmah Binah Daas

**Percy, Jeffrey** <Jeffrey.Percy@vermont.gov>
To: Anatoly Kishinevski <fishmousebear3@gmail.com>
Cc: "Nesbitt, David" <David.Nesbitt@vermont.gov>

Wed, Dec 4, 2024 at 3:18 PM

As I responded last week before the Holiday, we would be discussing your case and I will respond to you as soon as I have updated information; hopefully by the end of this week. If there is information you need to share with us, please let me know.

Jeff Percy

Probation and Parole Supervisor

Hartford Probation and Parole

118 Prospect Street, Suite 200

White River Jct., VT 05089

Phone: 802-296-5510

Cell: 802-798-9017

**From:** Anatoly Kishinevski <fishmousebear3@gmail.com>
**Sent:** Wednesday, December 4, 2024 9:58 AM
**To:** Scott, Zachary <Zachary.Scott@partner.vermont.gov>
**Cc:** Percy, Jeffrey <Jeffrey.Percy@vermont.gov>
**Subject:** Re: Check In - Chocmah Binah Daas

**EXTERNAL SENDER: Do not open attachments or click on links unless you recognize and trust the sender.**
[Quoted text hidden]

 Gmail

**Anatoly Kishinevski <fishmousebear3@gmail.com>**

---

## Check In - Chocmah Binah Daas

---

**Anatoly Kishinevski** <fishmousebear3@gmail.com>                    Wed, Dec 4, 2024 at 3:22 PM
To: "Percy, Jeffrey" <Jeffrey.Percy@vermont.gov>
Cc: "Nesbitt, David" <David.Nesbitt@vermont.gov>

Thank you Jeff. The prior response you reference, I think I may not have understood. I appreciate you clarifying.

My goal is to maintain compliance and to be a great success story for all… at minimum.

Please forgive me for making extra work for you and your colleagues. I feel aggrieved by aspects of my relations with Mr. Adams and being supervised by him makes me very uncomfortable.

I wish you a good evening.

Sincerely,
Anatoly
[Quoted text hidden]

---

 **97BA8006-E7C6-4EEC-9595-1694D6A48D12.jpeg**
3508K

 Gmail

**Anatoly Kishinevski <fishmousebear3@gmail.com>**

---

## Check In - Chocmah Binah Daas

---

Anatoly Kishinevski <fishmousebear3@gmail.com>                                    Wed, Dec 4, 2024 at 8:34 PM
To: "Scott, Zachary" <Zachary.Scott@partner.vermont.gov>

Hi Zach,

I feel disappointed and a little heart broken by our meeting today. I wrote to you seeking to be understood, but the response I received from you was the opposite. I am feeling progressively misunderstood and it is a sad time.

So there is no confusion, here are the pieces of information I received from you today during our discussion and a few additional notes. If you disagree with any of the following, or if you believe there is misunderstanding on my part, please clarify and or correct as needed.

1. You started the 1:1 meeting by telling me that I have been in group for two years and there has been no progress and that you are placing me on probation from group because of this.
2. I did not hear you say "six months" initially, but later you clarified that there has been no progress specifically in the past six months and that was the reason for me being placed on probation from group.
3. I asked you exactly what obligation to group I have failed to meet. I asked this because I have received no indication or notice prior that I am not meeting expectations of group and in fact have been left with the opposite impression. Last time I met with Ed Adams, only several weeks ago, he asked me how group was going and I told him well... which is the belief I had for I had no reason to believe otherwise.
4. Either way, you have specified a time period of six months of no progress for me in group citing specifically "repeated patterns of conflict" as the problem and explanation for how I have not made any progress in group over the past six months.
5. I asked you if putting me on probation was the result of your sole evaluation and decision and you told me the probation office has expressed concern and that is the reason for me being placed on probation from group.
6. In the meeting I asked that you please provide for me in writing what events you are referring to which constitute "repeated patterns of conflict" over the past six months.
7. We briefly discussed my two prior landlords and how the latter especially, literally defamed me to the probation office.. which you seem to be indifferent to.
8. You then used the analogy of a "pen being greater than a sword" suggesting that my words and or the things I write are the weapon and problem.
9. I have also asked that you please provide to me in writing what is required of moving forward in order to be meeting expectations. Specifically I am asking for clear definition on what changes and or continued performance are needed by me to fulfill my obligations to group, including fixing the alleged behaviors resulting in me being placed on group probation for "repeated patterns of conflict".
10. You also stated to me that my behaviors that constitute "repeated pattern of conflict" of the past six months are the behaviors that are the reason I got in trouble i.e. my offense occurred. I do not understand the relation between these two and welcome explanation of this.

In summary, I ask that you please enlighten me as to what events in the past six months constitute repeated patterns of conflict and are the basis for me being placed on group probation. I can not think of more than possibly one.. so I am very curious to know. Having this information is critical for my understanding so that I am able to reflect and adjust accordingly.

Also, I am requesting that you also please provide in writing what the expectations are of me in order to correct the alleged shortcoming of my conduct over the past six months, and ultimately succeed.

This is literally a threat to my freedom. In consideration of the extremely serious nature of this matter, please support me per the request herein so that I may succeed with minimal loss of energy and sustained grief.

Generally, thank you for the time and energy you have given me.

"In life there are no problems, only opportunities." -unknown rabbi

-Anatoly

 Gmail

**Anatoly Kishinevski <fishmousebear3@gmail.com>**

---

## Check In - Chocmah Binah Daas
---

**Scott, Zachary** <Zachary.Scott@partner.vermont.gov>                    Fri, Dec 6, 2024 at 8:07 AM
To: Anatoly Kishinevski <fishmousebear3@gmail.com>

Anatoly,

This is not a comprehensive response and should not be interpreted as such.

I am sorry that you continue to feel misunderstood. I think there are some subtle and some not-so-subtle discrepancies between your accounting of our conversation and my own notes and memory. Most notably this is not a threat, it is simply notice of status. Also, this decision is my own and made by the DOC. I consult with DOC, and they have long expressed concerns, but I made this decision and never suggested it was made by them. Perhaps your hostility and paranoia about them is clouding your judgement on that matter. I think it is noteworthy that when offered to meet individually next week, or schedule a different time, you declined and asked that we table that for later discussion. I do not see that noted below. Lastly, as I told you at our meeting I will provide you with written notice prior to group next week. Please plan to arrive at 1pm and meet with me.

Regards

[Quoted text hidden]

 Gmail

**Anatoly Kishinevski <fishmousebear3@gmail.com>**

---

## Check In - Chocmah Binah Daas

---

**Anatoly Kishinevski** <fishmousebear3@gmail.com>                     Fri, Dec 6, 2024 at 9:13 AM
To: "Scott, Zachary" <Zachary.Scott@partner.vermont.gov>

I have not declined our 1:1 meeting. When we spoke about it I expressed that I would circle back on that topic by email.
My only reserve is the cost. I am not declining this 1:1 meeting and I will return to you in this topic shortly.
[Quoted text hidden]

 Gmail

**Anatoly Kishinevski <fishmousebear3@gmail.com>**

---

## Check In - Chocmah Binah Daas

---

**Anatoly Kishinevski** <fishmousebear3@gmail.com>                                  Fri, Dec 6, 2024 at 9:15 AM
To: "Scott, Zachary" <Zachary.Scott@partner.vermont.gov>

Please clarify.. your email has language in it that is not clear.

"Most notably this is not a threat, it is simply notice of status. Also, this decision is my own and made by the
DOC."

Are you saying this decision is the DOC's or your own as my clinician?
[Quoted text hidden]

 Gmail

**Anatoly Kishinevski <fishmousebear3@gmail.com>**

## Check In - Chocmah Binah Daas

**Scott, Zachary** <Zachary.Scott@partner.vermont.gov>                     Fri, Dec 6, 2024 at 9:27 AM
To: Anatoly Kishinevski <fishmousebear3@gmail.com>

Apologies. <u>NOT</u> made by the DOC.

[Quoted text hidden]

 **Gmail**

**Anatoly Kishinevski <fishmousebear3@gmail.com>**

## Check In - Chocmah Binah Daas

**Scott, Zachary** <Zachary.Scott@partner.vermont.gov>
To: Anatoly Kishinevski <fishmousebear3@gmail.com>

Sun, Dec 8, 2024 at 10:03 AM

Anatoly,

I have some schedule conflicts, I am not sure I will be back to the office at 1pm on Wednesday. Are you able to come in at 9am for a short meeting on Wednesday?

[Quoted text hidden]

 Gmail

**Anatoly Kishinevski <fishmousebear3@gmail.com>**

## Check In - Chocmah Binah Daas

**Scott, Zachary** <Zachary.Scott@partner.vermont.gov>                    Tue, Dec 10, 2024 at 10:45 AM
To: Anatoly Kishinevski <fishmousebear3@gmail.com>

Please plan on being at HAPP at 1245. I will work diligently to get back to the office so that we may meet. I have no other time this week.

[Quoted text hidden]

 Gmail

**Anatoly Kishinevski <fishmousebear3@gmail.com>**

---

## Federal Action

---

**Anatoly Kishinevski** <fishmousebear3@gmail.com>                                    Mon, Nov 25, 2024 at 10:48 AM
To: "Percy, Jeffrey" <Jeffrey.Percy@vermont.gov>
Cc: Shayda.Narsallah@vermont.gov, "Williams-Crossley, Sandra" <sandra.williams-crossley@vermont.gov>,
David.Fitts@vermont.gov, dholland@sedonlaw.com

Dear Jeff Percy,

In the past you have alleged not to have received emails from me, so in the event that this email does not make it to your attention directly, I ask that one of your colleagues cc'd on this email please immediately bring this matter to your attention. If you are out of the office, then whoever receives this message, please kindly forward it to the appropriate party.

I am tentatively scheduled to meet with Ed Adams today. A time has not been established as of this moment. I will still meet with Mr. Adams today as I am legally required to do per my probation order, however it will be done so under duress and with further injury to me.

Upon receipt of this email, I ask that you immediately remove Mr. Adams from all supervisory roles pertaining to me and my file and assign me a different probation officer. Mr. Adams has breached his ethical duties as my supervising officer and has engaged in actions, to my detriment, that are not within the scope of a probation officer's official duties. These actions are contrary to the probation officer's professional and legal responsibilities. I have sustained injury in a multiple of facets, which I am seeking corrective action of through federal intervention. He makes me feel threatened and I feel extremely uncomfortable in his presence. He is not an honest person. He asked me to judge him for the fruit he bears. All truth comes to light, as it has.

This email serves as notice of federal action that is being filed momentarily against Mr. Adams both in his professional and personal capacity, as is permitted by 12 VSA § 5602(b) in the event of willful misconduct, as has occurred. He will be put on full notice of the claims against him shortly, in due accordance with federal civil procedure.

There is a hearing pending for a federal emergency injunction to have him removed from my file, which notice of will be duly provided to pertinent parties.

**Per this correspondence, I ask the following:**

  1. **By email, confirm receipt of this message**
  2. **By email, please provide me explicit instruction as to if I need to meet with your subordinate, Mr. Adams, today. If indeed you request that I still meet with Mr. Adams today, then I would appreciate a meeting time of 3:30pm.**
  3. **By email, confirm if you will assign me an alternative probation officer effective immediately, per receipt of this correspondence and notice of pending federal action against Mr. Adams.**
  4. **If you are assigning me an alternative supervising officer, please facilitate my ability to meet/communicate with them so I may maintain my obligation to Hartford Probation and Parole and more generally, my probation order.**

You may also contact my attorney's office if you have any questions, Sedon and Associates, who are cc'd on this message.

So there is no confusion and there is nothing misconstrued, I am not refusing to meet with my probation officer. I will report to the probation and parole office as instructed. As I am en route to Burlington, I ask for a reasonable accommodation that it be toward the end of business hours for your office today or greatly preferred, in the morning tomorrow after I have had the opportunity to sleep.

So there is tangible chain of custody and record of all communications, please reply by email.

Respectfully,
Anatoly Kishinevski

 **Gmail**

**Anatoly Kishinevski <fishmousebear3@gmail.com>**

---

## Federal Action

---

**Anatoly Kishinevski** <fishmousebear3@gmail.com>                                      Mon, Nov 25, 2024 at 2:34 PM
To: "Percy, Jeffrey" <Jeffrey.Percy@vermont.gov>
Cc: "Nesbitt, David" <David.Nesbitt@vermont.gov>, "Shayda.Narsallah@vermont.gov" <Shayda.Narsallah@vermont.gov>,
"Williams-Crossley, Sandra" <Sandra.Williams-Crossley@vermont.gov>, "Fitts, David" <David.Fitts@vermont.gov>

Mr. Percy,

Thank you for your reply. I will remain on standby and I will reply to any correspondence from your office promptly, duly
so. Email is absolutely the most reliable way to reach me. I will continue to maintain my homeless check in with VCIC and
I will CC you on my emails to them heretoforth, until further instruction as to who I will be working with.

For your information, I work second shift at Upper Valley Produce in WRJ. My shift starts at 5pm and it is normal that work
ends anywhere from 10:30pm~1am depending on the volume of orders we have to fill i.e. pallets to pack.

I will continue to be sleeping in my car which will be parked in the driveway of 99 Depot St, Wilder, VT. I have a housing
arrangement pending with the owner of the property for which I will likely acquire a permanent housing for myself
sometime before this week is over. I will keep your office and VCIC duly informed of any changes. He is aware that I have
been in trouble and that general nature of my offense. I intend to disclose to him in full detail before this week ends, my
registry status, etc.

I do not mean to cause problems. The level of stress I have felt since approximately the end of the appeal process with
my probation conditions to present has been nearly unmanageable and I literally feel like I am going to have a heart
attack frequently. I was diagnosed with a stress disorder by my Clara Martin therapist for which he identified my primary
stressor is my relation with the VTDOC. In order to be okay, I need a different probation officer. Please.

Again, thank you for your energy. I genuinely don't mean to be a source of challenge.

-Anatoly Kishinevski

On Mon, Nov 25, 2024 at 2:12 PM Percy, Jeffrey <Jeffrey.Percy@vermont.gov> wrote:
> Mr. Kishinevski,
>
> We will plan on cancelling your appointment for today. Someone will reach out to you regarding an appointment
> for next week.
>
>
> Jeff Percy
>
> Probation and Parole Supervisor
>
> Hartford Probation and Parole
>
> 118 Prospect Street, Suite 200
>
> White River Jct., VT 05089
>
> Phone: 802-296-5510
>
> Cell: 802-798-9017

**From:** Anatoly Kishinevski <fishmousebear3@gmail.com>
**Sent:** Monday, November 25, 2024 10:48 AM
**To:** Percy, Jeffrey <Jeffrey.Percy@vermont.gov>
**Cc:** Shayda.Narsallah@vermont.gov <Shayda.Narsallah@vermont.gov>; Williams-Crossley, Sandra <Sandra.Williams-Crossley@vermont.gov>; Fitts, David <David.Fitts@vermont.gov>; Denise Holland <dholland@sedonlaw.com>
**Subject:** Federal Action

**EXTERNAL SENDER: Do not open attachments or click on links unless you recognize and trust the sender.**
Dear Jeff Percy,

In the past you have alleged not to have received emails from me, so in the event that this email does not make it to your attention directly, I ask that one of your colleagues cc'd on this email please immediately bring this matter to your attention. If you are out of the office, then whoever receives this message, please kindly forward it to the appropriate party.

I am tentatively scheduled to meet with Ed Adams today. A time has not been established as of this moment. I will still meet with Mr. Adams today as I am legally required to per my probation order, however it will be done so under duress and with further injury to me.

Upon receipt of this email, I ask that you immediately remove Mr. Adams from all supervisory roles pertaining to me and my file and assign me a different probation officer. Mr. Adams has breached his ethical duties as my supervising officer and has engaged in actions, to my detriment, that are not within the scope of a probation officer's official duties. These actions are contrary to the probation officer's professional and legal responsibilities. I have sustained injury in a multiple of facets, which I am seeking corrective action of through federal intervention. He makes me feel threatened and I feel extremely uncomfortable in his presence. He is not an honest person. He asked me to judge him for the fruit he bears. All truth comes to light, as it has.

This email serves as notice of federal action that is being filed momentarily against Mr. Adams both in his professional and personal capacity, as is permitted by 12 VSA § 5602(b) in the event of willful misconduct, as has occurred. He will be put on full notice of the claims against him shortly, in due accordance with federal civil procedure.

There is a hearing pending for a federal emergency injunction to have him removed from my file, which notice of will be duly provided to pertinent parties.

**Per this correspondence, I ask the following:**

1. **By email, confirm receipt of this message**
2. **By email, please provide me explicit instruction as to if I need to meet with your subordinate, Mr. Adams, today. If indeed you request that I still meet with Mr. Adams today, then I would appreciate a meeting time of 3:30pm.**
3. **By email, confirm if you will assign me an alternative probation officer effective immediately, per receipt of this correspondence and notice of pending federal action against Mr. Adams.**
4. **If you are assigning me an alternative supervising officer, please facilitate my ability to meet/communicate with them so I may maintain my obligation to Hartford Probation and Parole and more generally, my probation order.**

You may also contact my attorney's office if you have any questions, Sedon and Associates, who are cc'd on this message.

So there is no confusion and there is nothing misconstrued, I am not refusing to meet with my probation officer. I will report to the probation and parole office as instructed. As I am en route to Burlington, I ask for a reasonable accommodation that it be toward the end of business hours for your office today or greatly preferred, in the morning tomorrow after I have had the opportunity to sleep.

So there is tangible chain of custody and record of all communications, please reply by email.

Respectfully,
Anatoly Kishinevski

 **Gmail**

**Anatoly Kishinevski <fishmousebear3@gmail.com>**

## Safety Plan
1 message

**Adams, Edward** <Edward.Adams@vermont.gov>
To: Anatoly Kishinevski <fishmousebear3@gmail.com>

Wed, Dec 11, 2024 at 4:05 PM

We no longer ask #6. You can disregard that one.

Feel free to type up and if you want to discuss at our next meeting then I would be happy to do so.

📄 **Safety Plan.pdf**
343K

## Safety Plan

Name: _____    Date: _____

1. What is the <u>situation</u>? Note date, time, place and people. _____
   _____
   _____

2. What are the <u>benefits</u> to you and others of being in this situation? _____
   _____
   _____

3. What are the <u>risks</u> to you and others of being in this situation? _____
   _____
   _____

4. What would be the <u>warning signs</u> that your risk of reoffending was increasing? These include risky people, places, situations, thoughts, behaviors and feelings.
   _____
   _____
   _____
   _____
   _____
   _____

5. What are your <u>plans</u> to manage these risks? These include things you can do or say to yourself.
   _____
   _____
   _____
   _____
   _____
   _____
   _____

6. How <u>successful</u> do you think your plan will be on a scale of 1 (low) to 100 (high)? _____

*safety plan rev. 2-14*



Anatoly Krishinevski ▾
Submitter

## Business Information

Search > Business Search > Business Information



[ Back ]

| | |
|---|---|
| **Business Name**<br>**EFFECTIVE COUNSELING SOLUTIONS LLC** | **Business Type**<br>**Domestic Limited Liability Company** |
| **Election Type**<br>**N/A** | **Record Number**<br>**034380** |
| **Business Status**<br>**Active - In Good Standing** | **Designated Office (Street Address)**<br>**96 Woodlawn Drive, WHITE RIVER JCT, VT, 05001, USA** |
| **Designated Office Mailing Address(Optional)**<br>**96 Woodlawn Drive, WHITE RIVER JCT, VT, 05001, USA** | **Date of Formation**<br>**01/17/2012** |

### Annual Report Information

| | |
|---|---|
| **Report Status**<br>**No Due** | **Report Begins**<br>**01/01/2025** |
| **Fiscal Year End Month**<br>**December** | |

### Business Purpose (NAICS Codes)

None

### Agent for Service of Process Information

| | |
|---|---|
| **Agent Name**<br>**ZACHARY SCOTT** | **Agent Type**<br>**Individual** |
| **Status**<br>**Active** | **Resignation Date**<br>**None** |
| **Street Address**<br>**96 WOODLAWN DR, WHITE RIV JCT, VT, 05001 - 3332, USA** | **Mailing Address**<br>**96 WOODLAWN DR, WHITE RIV JCT, VT, 05001 - 3332, USA** |

### Principals Information (1)

| | |
|---|---|
| **Name**<br>**ZACHARY SCOTT** | **Capacity**<br>**Member (Owner)** |
| **Physical Address**<br>**96 Woodlawn Drive, WHITE RIVER JC, VT, USA** | **Mailing Address**<br>**None** |

### Filing History

| Filing Number | Filing Date | Effective Date | Filing Type | Actions |
|---|---|---|---|---|
| 3144677 | 01/08/2024 | 01/08/2024 | ANNUAL REPORT (2023) | 📄 |
| 3005548 | 01/30/2023 | 01/30/2023 | ANNUAL REPORT (2022) | 📄 |
| 2885132 | 02/15/2022 | 02/15/2022 | ANNUAL REPORT (2021) | 📄 |


VERMONT

fishmousebear3@gmail.com    Sign Out    ?

# [secure] Letter

SZ  **Scott, Zachary <Zachary.Scott@partner.vermont.gov>**    ⤷ Reply all | ⌄
Wed 12/11, 4:58 PM
Anatoly Kishinevski <fishmousebear3@gmail.com> ⌄

Encrypt: This message is encrypted. Recipients can't remove encryption.

Kishinevski Suspension ...    ⌄
150 KB

Anatoly,
I've sent this message secure for your added privacy as the attachment contains sensitive information.
Apologies for the inconvenience.
Regards,
Zach


Zachary Scott
Owner/Forensic Psychotherapist
Effective Counseling Solutions, LLC
SOV DOC Contractor

This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error please notify the sender. Additionally, Microsoft recommends the current or immediately previous version of your web browser: Internet Explorer, Safari, Chrome, and 🔒 Firefox. The Latest release versions of Chrome and Firefox can be found on Firefox's and Google's home pages respectively: http://www.mozilla.org/en-US/firefox/new/ and https://www.google.com/intl/en/chrome/browser/ For instructions on opening this email, please go to this webpage:
https://digitalservices.vermont.gov/sites/digitalservices/files/documents/Encryption-Instructions-Recipients.pdf

 **Effective Counseling Solutions, LLC**
PO BOX 4291
White River Junction, VT 05001
802.356.7251

December 8, 2024

Anatoly Kishinevski
Mailing Address Unknown
99 Depot St.
Wilder, VT 05088

## **Notice of Treatment Suspension**

Mr. Kishinevski:

This letter should serve as notice of your treatment suspension. Over the past several months I have observed increased pathology consistent with mental illness. The current state of your mental health appears to have a significant impact on your ability to access your sex offender treatment. For that reason, I am suspending your sex offender treatment so that you may invest your time and energy into stabilizing your mental health.

Consistently I have observed, and you have reported to be in, a state of mental duress. You report sleepless nights, night terrors, and feelings of persecution and distrust. You routinely make hyperbolic statements when describing your stressors. You have exhibited symptoms of paranoia and obsessive/perseverating thought. There appears to be a preoccupation with details and loopholes within the rules, and an inability to see the big picture. You are reluctant to examine how your behaviors intensify the problems in your life. You express belief that others are trying to harm you and then quickly engage in counterattack. Many of these symptoms have been evidenced in your numerous conflicts, which at this time appear patterned. These include conflicts with landlords, judges, state's attorneys, investors, community members, DOC personal, and group members. By my observation, these conflicts generally arise when one or more of the following occurs:

- An insistence that your interpretation of events is superior to others (group members, therapist, DOC staff, judge, etc.).
- You exhibit dichotomous thinking interfering with your ability to find middle ground, compromise, or ignore insignificant events.
- Your insistence that the conflict is the result of other's faults, flaws, or misunderstanding of yourself.
- You are instructed to do something that displeases you.

Additionally, I have observed that because you perseverate on issues and choose to engage in power struggles for minimal gain you cause yourself great agony and duress. It is observed that your conflicts do not resolve themselves in reasonable, or expected time frames, often intensifying when reasonable solutions are at the ready. At times, when you are given feedback which acknowledges your suffering but suggests a different perspective on the situation, your response is to dismiss that feedback by either stating that you are misunderstood or that the provider of the feedback is misinformed about some minor details that bear little to no significance. This insistence on pettifogging appears to lead to a progressing decline of your mental health and becoming a barrier to your (and others) sex offender treatment.

Because of this recurrent, and seemingly intensifying pathology, it appears that you are not suitable enough to effectively attend and access sex offender treatment. Subsequently, there are many dynamic risk factors that have yet to be fully considered, understood, or mitigated. These include:

- Having hostile and misogynistic attitudes as exhibited in the offense, by report of the victim, by report of an ex-girlfriend, and observed during your time in treatment.
- Deriving pleasure from physical or psychological suffering of another person.
- Seeking unreasonable power, control, influence over other people and systems and lashing out when you perceive to be harmed.
- A need to have power, control, or leverage in your relationships.
- A tendency to gravitate towards vulnerable people to meet your goals.
- A rejection that an individual can experience cognitive dissonance about their partner.

I sincerely want you to find peace and success. Your current levels of reported and observed duress indicate a need to suspend your sex offender treatment and focus on finding mental stability. You are expected to continue your mental health counseling. It is my expectation that before you return to sex offender treatment you accomplish the following objectives.

1. Receive a psychiatric evaluation.
    a. This evaluation would aide in diagnostics, as well as explore and inform you of treatment modalities (e.g., DBT, Psychodynamic Therapy, SSRIs).
    b. The evaluation should include feedback from multiple sources, including corrections personnel and this writer who have peripherally observed many conflicts in your life, engaged with you in meaningful conversation, and observed your interactions with others.
2. Engage in weekly mental health services for no less than six months.
3. Demonstrate improved stress management, which is maintained for a period of three months, and is observed by your mental health therapist. This would include, but is not limited to:
    a. Routine, healthy sleep and diet habits.
    b. Maintenance of a healthy landlord/tenant relationship.
    c. An absence of dermatillomania, resulting in sores on your face.
4. Observed reduction in cognitions and feelings of persecution by your mental health therapist.

5. Observed reduction in catastrophic or paranoid cognitions by your mental health therapist.
6. A written recommendation by your mental health therapist that you can access sex offender treatment services without significant disruption.

Your progress with these objectives will be reviewed by the treatment team at six months intervals. If there has not been sufficient progress it may be determined that your status be changed to termination. If after six months you believe that you have met these objectives, please notify a member of the sex offender treatment team (myself or PO) in writing that you would like consideration for re-entry into sex offender treatment.

Respectfully,

Zachary Scott, MA

ATSA Clinical Member

Cc: PO Ed Adams

**Disclosure of Staff Qualifications,
Definition of Unprofessional Conduct, and Complaint Process**

Vermont law requires mental health professionals to disclose to each client his or her professional qualifications and experience, those actions that constitute unprofessional conduct, and the method for filing a complaint or making a consumer inquiry. This must be done by the third appointment.

The Office of Professional Regulation provides Vermont licensees, certifications, and registrations for over 37,000 practitioners and businesses. Thirty-nine professions and occupations are supported and managed by this office.

Each profession or occupation is governed by laws defining professional conduct. Consumers who have inquiries or wish to obtain a form to register a complaint may do so by calling (802) 828-2875 or by writing to the Vermont Secretary of State, Office of Professional Regulation, 89 Main Street, 3rd floor, Montpelier, Vermont 05620-3402.

Upon receipt of a complaint, an administrative review determines if the issues raised are covered by the applicable professional conduct statute. If so, a committee is assigned to investigate, collect information, and recommend action or closure to the appropriate governing body.

All complaint investigations are confidential. Should the investigation conclude with a decision for disciplinary action against a professional's license and ability to practice, the name of the license holder will then be made public.

Complaint investigations focus on licensure and fitness of the licensee to practice. Disciplinary action, when warranted, ranges from warning to revocation of license, based on the circumstances. You should not expect a return of fees paid or additional unpaid services as part of the results of this process. If you seek restitution of this nature, consider consulting with the Consumer Protection Division of the Office of the Attorney General, retaining an attorney, or filing a case in Small Claims Court.

**Acknowledgement of Disclosure**

My signature acknowledges that I have been given the professional qualifications and experience of clinical staff, a listing of actions that constitutes unprofessional conduct according to Vermont statutes, and the method for making a consumer inquiry or filing a complaint with the Office of Professional Regulation.

_____    Feb 21, 2023
Client Signature or Authorized Representative    Date

_____    2/21/23
Provider's Signature    Date

*May 2015*

**Blank Page**

## Definitions of Unprofessional Conduct

Title 26, Vermont Statutes Annotated, Section 129a defines unprofessional conduct for all mental health professionals as:

(a) In addition to any other provision of law, the following conduct by a licensee constitutes unprofessional conduct. When that conduct is by an applicant or person who later becomes an applicant, it may constitute grounds for denial of a license or other disciplinary action. Any one of the following items, or any combination of items, whether or not the conduct at issue was committed within or outside the state, shall constitute unprofessional conduct:

(1) Fraudulent or deceptive procurement or use of a license.

(2) Advertising that is intended or has a tendency to deceive.

(3) Failing to comply with provisions of federal or state statutes or rules governing the practice of the profession.

(4) Failing to comply with an order of the board or violating any term or condition of a license restricted by the board.

(5) Practicing the profession when medically or psychologically unfit to do so.

(6) Delegating professional responsibilities to a person whom the licensed professional knows, or has reason to know, is not qualified by training, experience, education, or licensing credentials to perform them, or knowingly providing professional supervision or serving as a preceptor to a person who has not been licensed or registered as required by the laws of that person's profession.

(7) Willfully making or filing false reports or records in the practice of the profession; willfully impeding or obstructing the proper making or filing of reports or records or willfully failing to file the proper reports or records.

(8) Failing to make available promptly to a person using professional health care services, that person's representative, succeeding health care professionals or institutions, upon written request and direction of the person using professional health care services, copies of that person's records in the possession or under the control of the licensed practitioner.

(9) Failing to retain client records for a period of seven years, unless laws specific to the profession allow for a shorter retention period. When other laws or agency rules require retention for a longer period of time, the longer retention period shall apply.

(10) Conviction of a crime related to the practice of the profession or conviction of a felony, whether or not related to the practice of the profession.

(11) Failing to report to the office a conviction of any felony or any offense related to the practice of the profession in a Vermont district court, a Vermont superior court, a federal court, or a court outside Vermont within 30 days.

(12) Exercising undue influence on or taking improper advantage of a person using professional services, or promoting the sale of services or goods in a manner which exploits a person for the financial gain of the practitioner or a third party.

(13) Performing treatments or providing services which the licensee is not qualified to perform or which are beyond the scope of the licensee's education, training, capabilities, experience, or scope of practice.

(14) Failing to report to the office within 30 days a change of name or address.

(15) Failing to exercise independent professional judgment in the performance of licensed activities when that judgment is necessary to avoid action repugnant to the obligations of the profession.

(b) Failure to practice competently by reason of any cause on a single occasion or on multiple occasions may constitute unprofessional conduct, whether actual injury to a client, patient, or customer has occurred. Failure to practice competently includes:

(1) performance of unsafe or unacceptable patient or client care; or

(2) failure to conform to the essential standards of acceptable and prevailing practice.

(c) The burden of proof in a disciplinary action shall be on the state to show by a preponderance of the evidence that the person has engaged in unprofessional conduct.

(d) After hearing, and upon a finding of unprofessional conduct, a board or an administrative law officer may take disciplinary action against a licensee or applicant, including imposing an administrative penalty not to exceed $1,000.00 for each unprofessional conduct violation. Any money received under this subsection shall be deposited in the professional regulatory fee fund established in section 124 of this title for the purpose of providing education and training for board members and advisor appointees. The director shall detail in the annual report receipts and expenses from money received under this subsection.

(e) In the case where a standard of unprofessional conduct as set forth in this section conflicts with a standard set forth in a specific board's statute or rule, the standard that is most protective of the public shall govern. (Added

*May 2015*

1997, No. 40, § 5; amended 2001, No. 151 (Adj. Sess.), § 2, eff. June 27, 2002; 2003, No. 60, § 2; 2005, No. 27, § 5; 2005, No. 148 (Adj. Sess.), § 4; 2009, No. 35, § 2; 2011, No. 66, § 3, eff. June 1, 2011.)

### Rostered Psychotherapists who are Non-licensed and Non-certified.

Unprofessional conduct for rostered psychotherapists who are non-licensed and non-certified is defined by Title 26, Vermont Statutes Annotated, Section 4093 as:

 (a) Unprofessional conduct means the following conduct and conduct set forth in section 129a of Title 3:
(1) Providing fraudulent or deceptive information in an application for entry on the roster.
(2) Conviction of a crime that evinces an unfitness to practice psychotherapy.
(3) Unauthorized use of a protected title in professional activity.
(4) Conduct which evidences moral unfitness to practice psychotherapy.
(5) Engaging in any sexual conduct with a client, or with the immediate family member of a client, with whom the psychotherapist has had a professional relationship within the previous two years.
(6) Harassing, intimidating or abusing a client.
(7) Entering into an additional relationship with a client, supervisee, research participant or student that might impair the psychotherapist's objectivity or otherwise interfere with his or her professional obligations.
(8) Practicing outside or beyond a psychotherapist's area of training, experience or competence without appropriate supervision.
(b) After hearing, and upon a finding of unprofessional conduct, the board may take disciplinary action against a rostered psychotherapist or an applicant. (Added 1993, No. 222 (Adj. Sess.), § 17; amended 1997, No. 40, § 71; 1997, No. 145 (Adj. Sess.), § 61; 1999, No. 52, § 37.)

**Rostered Non-licensed and Non-certified Psychotherapist**

**Zachary Scott**

<u>Formal Education</u>

- Union Institute University, Master of Arts with Concentration in Counseling Psychology. December, 2012.
- College of St. Joseph, Bachelor of Arts, History & Secondary Education. 9/2000 to 5/2003.
- Stonehill College. 9/1997 to 5/1999 and 1/2000 to 5/2000.

<u>Training</u>
- Good Lives Model, 2/2019
- ATSA Risk Needs Responsivity for Sexual Offenders, 9/2018
- Aggression Interruption Training, 3/2017
- Risk, Needs, Responsivity Training Series, 2016
- Cognitive Behavioral Interventions for Substance Abusers, 10/2015
- DSM-V Changes and Additions, 5/2015.
- Completed training and designated as a Qualified Mental Health Professional, 5/2014.
- Personality Disorders in Social Work and Health Care, 3/2014.
- VTPSA Assessment Training, 9/2012.
- Thinking For a Change, 5/2012.
- Habits Of Mind, 5/2012.
- Current Issues in Assessing and Supervising Adult Sex Offenders, 4/2012.
- Cognitive Self Change for Facilitators, 7/2011.
- Pervasive Mental Illness and Substance Abuse Training Series, 1/2010-4/2010.
- The Neurobiology of Addiction, 10/2006.
- Strengthening Families Program Facilitator Training, 9/2006.
- Attachment Disorders, 4/2006.
- Second Annual Dartmouth Symposium on Substance Use, 5/2005.

<u>Experience in the Practice of Psychotherapy</u>
- Private Practice. Peer Supervision. 4/2015 to present.
- Vermont DOC Risk Reduction Program Interventionist. 9/2015 to present.
- Community Sex Offender Psychotherapist. Vermont Treatment Program for Sexual Abusers. Peer Supervision. 5/2015 to present.
- Mental Health/Substance Abuse/Offender/Crisis Clinician. Clara Martin Center. Supervised by Licensed Practitioners. 8/2004 to 11/2016.
- Children's Program Psychotherapist. Health Care and Rehabilitation Services. Supervised by Licensed Practitioners. 4/2015 to 7/2015.
- Incarcerated Sex Offender Psychotherapist. Vermont Treatment Program for Sexual Abusers. Supervised by Licensed Practitioners. 1/12 to 4/2015.
- Cognitive Self Change Facilitator, Clara Martin Center/Southern State Correctional Facility. Supervised by Licensed Practitioners. 6/2011 to 1/2012.
- Student Assistance Professional. Clara Martin Center/Thetford Academy. Supervised by Licensed Practitioners. 8/2004 to 5/2011.

<u>Scope of Practice</u>
- My focus is to help clients achieve better quality of life through mental health and forensic counseling therapies.

*May 2015*

***ecs***

**Effective Counseling Solutions, LLC**
PO Box 4291
White River Junction, VT 05001
802.356.7251

## TREATMENT AGREEMENT

I, __ANATOLY KISHINEVSKI_____, enter into this Treatment Agreement with Effective Counseling Solutions, LLC to allow them to provide me with treatment services for my sexually abusive behavior.

1.    I understand that the primary goal of treatment is to help me reduce my sexually abusive behavior, protect the community, and help repair harm that I have caused the victims of my sexually abusive behavior.

2.    All interactions with staff and group members must be respectful. Any threatening or intimidating statements or behaviors can result in a decision not to continue to provide treatment to any individual.

3.    I understand that other participants provide feedback during group treatment. Staff makes every effort to provide that all interactions are respectful, staff cannot be held responsible for the comments of group participants.

4.    I understand that one of the first goals of treatment is to establish an open and honest relationship with my therapist. I agree to be truthful during the course of my treatment.

5.    I will not tell any information about another client of this program to anyone outside the program.

6.    I understand that the audio and/or visual recording of group treatment is prohibited.

7.    I agree to be honest and accept full responsibility for my offenses and behavior Successful treatment depends on full acknowledgement of my sexually abusive behaviors, regardless of when they occurred, regardless of my plea in court.

8.    I agree to sign releases of information to the DOC so that staff can get information to help plan my treatment.

9.    I agree to attend all treatment sessions and attend on time. I understand that the only reasons I can miss or be late for a treatment session are if I have a verifiable medical or other personal emergency. I will notify treatment and DOC staff as soon as possible about anything that may make me miss or be late to a treatment session.

10.    I will pay my assigned fee at the time of each session as outlined in my fee agreement. Payment is due regardless of attendance; the therapist may use discretion when waiving fees (i.e. medical emergency, death of immediate family member, etc.). If I have accrued a balance equaling three or more sessions I understand I will be suspended from treatment and DOC will be notified.

11.    I will tell treatment staff if I am planning or have changed: my residence, my access to computer, my phone number or my employment status. I will complete a risk assessment on those changes if requested by staff.

12.    I will cooperate and actively participate in the treatment process. I understand that treatment on average consists of about two years of weekly group therapy sessions followed by about one year of bi-weekly group therapy sessions. I understand that my treatment may involve more or less treatment than the average.

sex offender treatment                    7/1/19                    client initials A.K.

2

13.    I understand that treatment is primarily provided through group therapy sessions, but may include occasional individual, couples, and family therapy sessions. I understand that treatment methods may include: talk therapy, writing, reading, role-play, and discussion, films, lecture, aversive conditioning, masturbation in the privacy of my own home, education, and support meetings with significant others.

14.    I understand that my treatment may focus on the following goals: (1) accepting responsibility for my abusive behaviors; (2) developing a support network of family and friends who can help me with my recovery; (3) changing thinking patterns that contributed to my abusive behaviors (4) understanding the impact of my behavior on people I victimized and others; (5) controlling my sexual arousal; (6) improving social skills related to my offending behavior such as developing healthy relationships and managing my emotions; and (7) identifying and learning how to avoid and manage risky situations.

15.    I understand that treatment involves certain risks and I may discuss these with treatment staff. I understand that I may find certain aspects of my treatment stressful. For example, discussing possibly embarrassing personal issues in treatment may result in my feeling anxious, nervous, upset, angry, guilty, ashamed, or depressed. Discussion of treatment assignments with my family and significant others may place stress on my relationships with these individuals. I will tell staff if I have any of these problems and understand that, if necessary, staff will help me with these problems.

16.    If I do not understand after staff have explained each treatment method I agree to ask for more information so that I can better participate in my treatment.

17.    I agree to complete and discuss weekly homework, including, but not limited to: check-ins, goal sheets, and risk logs, contact logs. I agree to complete core assignments as identified on my treatment plan.

18.    I understand that I may be asked to discuss my treatment assignments and progress with my probation/parole officer and other significant adults in my life.

19.    I understand that my offense behavior has an impact on my living partners. To help my living partners and myself in the recovery process I will actively encourage them to participate in treatment sessions if requested by treatment staff.

20.    I agree to discuss with my therapist my intent to escalate a relationship, such as starting to date, the decision to have a sexual relationship, living together, marriage, etc.

21.    I agree, if it is deemed appropriate by treatment staff, to make an apology to the victims of my sexual abuse and accept responsibility for my sexual abusive behavior.

22.    I agree to participate in ongoing assessment of my progress through psychological and physiological evaluation (i.e., polygraph) may be part of my treatment.

23.    I understand and agree to allow treatment staff to provide verbal and written reports to the treatment team (treatment provider, Department of Corrections, State's Attorney's, Department of Children and Families), as well as other individuals and agencies involved in my treatment. I understand that the information in reports provided by treatment staff may influence matters such as court decisions regarding modifications or revocation of existing court orders.

24.    I understand that research indicates that men who have completed specialized sex offender treatment programs have lower sexual re-offense rates than those who do not. I am also aware that the practice of mental health treatment is not an exact science and I acknowledge that no guarantees have been made to me about the results of assessments and treatment.

3

25.    I will not engage in use of illicit drugs. I agree to seek appropriate treatment for my drug use if a problem is identified by myself or staff.

26.    I will take medications prescribed by a physician as directed and inform staff of changes in my prescriptions.

27.    I will not engage in problem use of alcohol or marijuana. Problem use is considered use which interferes with obligations to work, family, treatment or personal commitments.

28.    Problem use of alcohol or drugs can lead to treatment probation, suspension, and/or termination.

29.    I will not buy, have, or use sexually stimulating materials relating to my risk as defined by treatment staff. I also understand that I am required to dispose of, or restrict my view of, any other material deemed by my therapist as sexually abusive or that interferes with my treatment and goal of stopping my sexually abusive behavior.

30.    I will not frequent establishments whose primary business pertains to sexually oriented or erotic materials. I will not have any involvement with a prostitute or any other anonymous sexual experiences.

31.    I will not have any type of contact with the persons I have victimized without the permission of treatment and DOC staff.

32.    I agree to avoid situations (locales, persons, or behaviors) associated with offending behavior, or those that place me at high risk of re-offending. If I have offended on a minor I will not linger, loiter, or spend time where minors are likely to be present without approval from treatment and DOC staff (e.g. schools, playgrounds, arcades).

33.    I agree to restrict contact with person(s), including other offenders from my treatment group, if directed by my therapist or Corrections staff. I will keep treatment staff informed of contact outside of treatment with persons who have offended.

34.    If I have sexually abused children (persons under the age of 18), I will not date individuals who have minor children (i.e., anyone under the age of 18) or have any type of contact with minors without the permission of treatment staff. No contact means no visits, phone calls, letters, and third party contact/messages. I agree not to reside in home where juveniles reside without permission from treatment staff.

35.    I understand and agree that any violation of the conditions of this agreement may be grounds for termination from the program at the discretion of the staff. I agree that staff may terminate my treatment for any other problem behavior not outlined above.

36.    I understand that I may attempt to contact my therapist, <u>Zachary Scott</u>, for emergencies by calling <u>(802) 356-7251</u>. I understand that if I am experiencing an emergency I may call my therapist. However, I understand that if my therapist cannot be reached, I am to contact my local community mental health agency, or go to my local hospital's emergency room, or call 911.

37.    I agree to abide by the following special conditions:



sex offender treatment                            7/1/19                      client initials A.K.

4

I have read or have had read to me and understand this Treatment Agreement. I have satisfactorily discussed with treatment staff any questions that I may have had about this Treatment Agreement. My signature indicates my voluntary consent to participate in all of the above.

Client Signature: _____    Date: Feb 21, 2023

---

I have fully explained this Treatment Agreement to the above named person and he has said that he fully understands it and consents. I have witnessed his signature above so indicating.

Staff: _____    Date: 2/21/23

Printed Name: Zachary Scott

sex offender treatment        7/1/19        client initials A.K.

*HAPP*

## Sex Offender Treatment Intervention and Progress Scale (SOTIPS)

**Individual:** Anatoly Kishenevski    **Scorer:** Zachary Scott

**Evaluation Date:** 7/1/23    **Setting:** ☑ Community    ☐ Residential

**Months in Weekly Treatment:** _____    **Time of Evaluation:**    ☐ Initial

**Months in Aftercare Treatment:** _____    ☑ During Treatment

**Total:** _____    ☐ End of Treatment

**Rating Guide** (use definitions in scoring manual):

0 = minimal or no need for improvement
1 = some need for improvement
2 = considerable need for improvement
3 = very considerable need for improvement

| Sexuality and Risk Responsibility | 0 | 1 | 2 | 3 |
|---|---|---|---|---|
| 1. Sexual Offense Responsibility | ☐ | ☑ | ☐ | ☐ |
| 2. Sexual Behavior | ☑ | ☐ | ☐ | ☐ |
| 3. Sexual Attitudes | ☑ | ☐ | ☐ | ☐ |
| 4. Sexual Interests | ☑ | ☐ | ☐ | ☐ |
| 5. Sexual Risk Management | ☐ | ☐ | ☑ | ☐ |

| Criminality | 0 | 1 | 2 | 3 |
|---|---|---|---|---|
| 6. Criminal and Rule-Breaking Behavior | ☑ | ☐ | ☐ | ☐ |
| 7. Criminal and Rule-Breaking Attitudes | ☑ | ☐ | ☐ | ☐ |

| Treatment and Supervision Cooperation | 0 | 1 | 2 | 3 |
|---|---|---|---|---|
| 8. Stage of Change | ☐ | ☑ | ☐ | ☐ |
| 9. Cooperation with Treatment | ☑ | ☐ | ☐ | ☐ |
| 10. Cooperation with Community Supervision | ☑ | ☐ | ☐ | ☐ |

| Self-Management | 0 | 1 | 2 | 3 |
|---|---|---|---|---|
| 11. Emotion Management | ☐ | ☑ | ☐ | ☐ |
| 12. Problem Solving | ☐ | ☑ | ☐ | ☐ |
| 13. Impulsivity | ☑ | ☐ | ☐ | ☐ |

| Social Stability and Supports | 0 | 1 | 2 | 3 |
|---|---|---|---|---|
| 14. Employment | ☐ | ☑ | ☐ | ☐ |
| 15. Residence | ☐ | ☑ | ☐ | ☐ |
| 16. Social Influences | ☐ | ☑ | ☐ | ☐ |

| | Sub-totals | 7 | 2 | 0 |
|---|---|---|---|---|
| | Total | | | 9 |

Copyright © 2013
R. McGrath, G. Cumming, & M. Lasher

## Sex Offender Treatment Intervention and Progress Scale (SOTIPS)

Individual: _Anatoly Kishenevski_          Scorer: _Z. Scott_

Evaluation Date: _7 | 1 | 24_          Setting: ☑ Community    ☐ Residential

Months in Weekly Treatment: _____          Time of Evaluation: ☐ Initial

Months in Aftercare Treatment: _____          ☑ During Treatment

Total: _____          ☐ End of Treatment

Rating Guide (use definitions in scoring manual):
0 = minimal or no need for improvement
1 = some need for improvement
2 = considerable need for improvement
3 = very considerable need for improvement

| Sexuality and Risk Responsibility | 0 | 1 | 2 | 3 |
|---|---|---|---|---|
| 1. Sexual Offense Responsibility | ☑ | ☐ | ☐ | ☐ |
| 2. Sexual Behavior | ☐ | ☑ | ☐ | ☐ |
| 3. Sexual Attitudes | ☑ | ☐ | ☐ | ☐ |
| 4. Sexual Interests | ☑ | ☐ | ☐ | ☐ |
| 5. Sexual Risk Management | ☐ | ☑ | ☐ | ☐ |

| Criminality | 0 | 1 | 2 | 3 |
|---|---|---|---|---|
| 6. Criminal and Rule-Breaking Behavior | ☑ | ☐ | ☐ | ☐ |
| 7. Criminal and Rule-Breaking Attitudes | ☑ | ☐ | ☐ | ☐ |

| Treatment and Supervision Cooperation | 0 | 1 | 2 | 3 |
|---|---|---|---|---|
| 8. Stage of Change | ☐ | ☑ | ☐ | ☐ |
| 9. Cooperation with Treatment | ☑ | ☐ | ☐ | ☐ |
| 10. Cooperation with Community Supervision | ☑ | ☐ | ☐ | ☐ |

| Self-Management | 0 | 1 | 2 | 3 |
|---|---|---|---|---|
| 11. Emotion Management | ☐ | ☑ | ☐ | ☐ |
| 12. Problem Solving | ☑ | ☐ | ☐ | ☐ |
| 13. Impulsivity | ☐ | ☑ | ☐ | ☐ |

| Social Stability and Supports | 0 | 1 | 2 | 3 |
|---|---|---|---|---|
| 14. Employment | ☐ | ☑ | ☐ | ☐ |
| 15. Residence | ☐ | ☑ | ☐ | ☐ |
| 16. Social Influences | ☐ | ☑ | ☐ | ☐ |

| | Sub-totals | 8 | 0 | 0 |
|---|---|---|---|---|
| | Total | | | 8 |

Copyright © 2013
R. McGrath, G. Cumming, & M. Lasher

Zachary Scott had expressed concern multiple times about me suing him

He put people on probation within group multiple times and explained to us that is always the process before being suspended. He assured us that there would always be a letter first.. and that is originally what he told me was going to happen.

Probation letter was ambiguous in its meaning – permission to represent self... instance of probation officer serving as agent for state's attorney's office

Lied to me about relationship with Evan Meenan (refer to affidavit)

false testimony about pornography, flash drives, knowing I had no restriction regarding vulnerable adults, but still testifying about its importance

RESTRAINING ORDER – merited by probation officer's acts of blatant acts of misconduct with disregard for the probationer's best interest

mislead me about relationship with prosecutor

mislead me about opinion on certain probation conditions prior to testifying

Told me pornography is fine after testifying that it was not

serves as agent to prosecutors office to bypass due process

Has continuously given me shifting guidance about what constitutes a significant relationship three dates, only concerned about females

Gave false testimony about vulnerable adults even though has acknowledged I have no restriction from vulnerable adults

ECH – Fist told me probation for "repeated pattern of conflict" and when question suspended me from group as his initial expression of repeated pattern of conflict has no merit and when asked to substantiate was unable to. He expressed the repeated pattern of conflicts were per concern expressed to him by probation, but then told me it was his decision. Zach was very upset the group immediately post my hearing and spent the entire group talking to me and not addressing any other person in the group tell me "it is not worth it", "just let it go "evidently distraught that his concern about my mental health had been vocalized in court, which he surly received lash back about.

Noah Rosenzweig expressed that he has never observed any misogynistic behavior from me nor anything of the nature of lashing out at people.

Steve Smith has expressed that he has only observed me to be a constructive presence in group for the entire two years he observed me.

Updating list of digital devices after changes was Ed Adams suggestion to me and his testimony was to support the DOC, not in he professional or personal opinion what is needed for me.

**Substantive due process violation** – there is some impeding internal variable that does not allow the DOC to make customized probation conditions

**Probation lied to me and I filed a motion based on this understanding** – damaged my extreme efforts with negligence to my emotional health, demonstrating willful misconduct and disregard for me as an individual both personally and professionally. This makes me feel afraid as it indicates that the person that supervises me and has control over my freedom is not honest. I have the right to be supervised by a probation officer who understands and maintains fundamental professional conduct.

**Lack of fulfilling Due Process** - Probation office, judges and prosecutor refuse to give written consent or clearly defined conditions in writing, but tell probationer that he has permission to do certain things

verbally. DOC does this intentionally so they can implement the condition as written to violate the probationer if they wish. This sort of supervisory scheme renders tremendous stress to the probationer as it is A.) not clearly known what actions may result in the loss of freedom of the probation officer B.) it creates a relationship dynamic in which the probation officer feels threatened by the supervising officer because the probationer knows that the probation officer knows what they are doing is improper, but they do this anyway C.) It is further upsetting because if the supervising office and probation officer are willing to give the probationer permission to do something verbally, why are they unwilling to commit this permission to writing

**Permission to represent myself** – Have continuously told me I have the right to participate but refuse to tell me I have permission to represent myself. This instills a sense of worry as it is not clear what I can not and cannot do. i.e. due process violation. Further the probation officer told me I would not get violated unless I did something very conniving and the state judge articulated her expectation as me demonstrating "reasonable actions".

- Judges comment about not getting into the reason why we can't customize conditions. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
-

**Declaratory judgment that DOC's actions are not in alignment with their published Vision** – Pg. 20 of Tortious Interference document

**Declaratory judgment that lying to probationers is willful misconduct** - Jeff Percy Lying to Me

**Flash Drives –** Ed Adams direct communication to me was not consistent with the communication provided to the prosecutor.

- Also mention when the prosecutor told me something Mr. Adams said and then Mr. Adams said, I didn't express that.
- That Mr. Adams said the prosecutor serves as his counsel and can speak on his behalf
- That in the actual proceeding the prosecutor did not represent accurately what the probation officer said i.e. made false representations to the court

**Pornography –** that the reason the probation office and prosecutors have pushed for this restriction is not with respect to my rehabilitation but is for the greater purpose of avoiding a precedent on this topic so that a. they can keep control and implement this condition without any obstacles b. it provides them an additional leverage point to violate a probationer.

**State attorneys use probation officers as agents to violate due process of probationers -** The prosecutors use the probation officers as a mechanism to deprive probationer's of their rights and due process with the probation officer likely not understanding the legal implications of the role that they are playing i.e. instructing an probation officer to adjust a probation condition verbally and or leading a probation officer to believe that this is appropriate or permissible action... when the prosecutor knows

that the probation officer does not understand the law and that what the prosecutor is encouraging is improper.

**The prosecutors solicit testimony to the probation officers** - who do not understand that they must represent their own personal professional position and that providing any other representation other than purely their own is in violation of the oath taken prior to testifying.

**Emotional Distress** – Zach Scott – heart attack

**Letters that use the word "participate"** - including last one that had Ed Adam's name on it, but that he told me just came from the State's attorney

**Asked supervisor for new probation officer** - and was not provided any affirmative response and told to wait until the coming week.

**Jeff Percy has also lied to me which is why exhaustion of remedies is not reasonable as the agency as a whole is dishonest.**



# Clara Martin Center
### Over 50 years of *People Helping People*

## Client Treatment Plan Report

### Client: KISHINEVSKI,ANATOLY    ID: 57487

| | | | | | |
|---|---|---|---|---|---|
| **Plan Date** | 8/30/2024 | **Plan Type:** | Treatment Plan | **Last Updated B** | DALE PUSHEE |
| **Plan End Date** | 2/28/2025 | **Plan Name** | | | |
| **Next Review Dat** | 2/28/2025 | **Treatment Plan Statu** | Final | | |

| | | | | |
|---|---|---|---|---|
| **Plan Author:** | DALE PUSHEE MS | **Approvers / Credentia** | WILLIAMS,MELANIE | LCMHC, PSYM |

### Client's Strengths And Abilities

Anatoly is goal-oriented and has a desire to engage in his own recovery. He is analytical, spiritual, conscientious, and values human connection. He is a scientist by trade and also has a firm understanding of auto mechanics.

### Client's Needs, Preferences And Cultural Considerations

Anatoly is Jewish by faith. He has no preference for a male or female clinician.

### Aftercare Planning/ Discharge Planning

Anatoly would know he is ready to move on from counseling if he has been able to learn new coping skills for his grief and the associated depression and anxiety that would improve his daily living and make meaning of his experiences.
Anatoly will use skills learned in treatment.
Anatoly will utilize natural supports and continue to expand his support network.
Anatoly will return to therapy as needed.
Anatoly will seek a higher level of care/use emergency mental health services/go to the ED when necessary.

---

**Problem: 1** From Problem Lis  Adjustment disorder with mixed anxiety and depressed mood

Adjustment disorder with mixed anxiety and depressed mood

Date Opened: 8/30/2024
Status:    Active

**Goal: 1**  Reduce and better manage feelings of grief and its impact in daily life

Client's Own Words  "I'm suffering from profound grief"

Date Opened: 8/30/2024
Status:    Active
Date Closed:
Rate of Progress Towards Go  No Progress

**Objective:**  Anatoly will verbalize feelings associated with the loss and identify how avoiding dealing with loss has negatively affected his life.
Anatoly will use therapy appointments to process grief and explore impact of grief in current daily life.
Anatoly will report improved symptoms 4 out of 7 days.

Date Opened: 9/13/2024
Status:    Active

**Intervention**  The clinician will provide a safe space for client to process grief. Clinician will provide skills training and utilize several modalities: CBT, Mindfulness, ACT, Existential Therapy, and Solution-Focused Therapy.

# Client Treatment Plan Report

### Client: KISHINEVSKI,ANATOLY   ID: 57487

| | | | | | |
|---|---|---|---|---|---|
| **Plan Date** | 8/30/2024 | **Plan Type:** | Treatment Plan | **Last Updated B** | DALE PUSHEE |
| **Plan End Date** | 2/28/2025 | **Plan Name** | | | |
| **Next Review Dat** | 2/28/2025 | **Treatment Plan Statu** | Final | | |

| | |
|---|---|
| **Modalities:** | Individual Therapy 1x a week for six months. |
| | Individualized Community Support 1 to 2 times per month for six months. |
| | Service Planning Coordination 2 to 4 times in six months. |
| **Date Opened:** | 9/13/2024 |
| **Status:** | Active |

▇ Reduce and better manage stress

**Client's Own Words** "I feel like I'm fighting for my life"

**Date Opened:** 8/30/2024
**Status:** Active
**Date Closed:**
**Rate of Progress Towards Go** No Progress

▇ Anatoly will learn and practice a minimum of three skills for emotion regulation. Anatoly will use therapy appointments to process emotional responses to stress and explore impact that stress has in current daily life. Anatoly will report improved symptoms 4 out of 7 days.

**Date Opened:** 8/30/2024
**Status:** Active

▇ The clinician will provide a safe space for client to process emotions. Clinician will provide skills training and utilize several modalities: CBT, Mindfulness, ACT, SFT, and Motivational interviewing.

| | |
|---|---|
| **Modalities:** | Individual Therapy 1x a week for six months. |
| | Individualized Community Support 1 to 2 times per month for six months. |
| | Service Planning Coordination 2 to 4 times in six months. |
| **Date Opened:** | 8/30/2024 |
| **Status:** | Active |

## Plan Participants

| Role | Participant Nam | Staff Name | Plan Author | Notification Required |
|---|---|---|---|---|
| STAFF | PUSHEE,DALE | PUSHEE,DALE | Yes | Yes |
| STAFF | WILLIAMS,MELANIE | WILLIAMS,MELANIE | No | No |

**Client was offered a copy of the treament p**   Offered and received copy of plan

Client Signature

Date

# DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS

FIFTH EDITION

# DSM-5™

psychotic features; delirium; substance/medication-induced disorders; and psychotic disorders due to another medical condition.

**Traumatic brain injury.**   When a brain injury occurs in the context of a traumatic event (e.g., traumatic accident, bomb blast, acceleration/deceleration trauma), symptoms of PTSD may appear. An event causing head trauma may also constitute a psychological traumatic event, and tramautic brain injury (TBI)–related neurocognitive symptoms are not mutually exclusive and may occur concurrently. Symptoms previously termed *postconcussive* (e.g., headaches, dizziness, sensitivity to light or sound, irritability, concentration deficits) can occur in brain-injured and non-brain-injured populations, including individuals with PTSD. Because symptoms of PTSD and TBI-related neurocognitive symptoms can overlap, a differential diagnosis between PTSD and neurocognitive disorder symptoms attributable to TBI may be possible based on the presence of symptoms that are distinctive to each presentation. Whereas reexperiencing and avoidance are characteristic of PTSD and not the effects of TBI, persistent disorientation and confusion are more specific to TBI (neurocognitive effects) than to PTSD.

## Comorbidity

Individuals with PTSD are 80% more likely than those without PTSD to have symptoms that meet diagnostic criteria for at least one other mental disorder (e.g., depressive, bipolar, anxiety, or substance use disorders). Comorbid substance use disorder and conduct disorder are more common among males than among females. Among U.S. military personnel and combat veterans who have been deployed to recent wars in Afghanistan and Iraq, co-occurrence of PTSD and mild TBI is 48%. Although most young children with PTSD also have at least one other diagnosis, the patterns of comorbidity are different than in adults, with oppositional defiant disorder and separation anxiety disorder predominating. Finally, there is considerable comorbidity between PTSD and major neurocognitive disorder and some overlapping symptoms between these disorders.

# Acute Stress Disorder

Diagnostic Criteria                                  **308.3 (F43.0)**

A. Exposure to actual or threatened death, serious injury, or sexual violation in one (or more) of the following ways:

  1. Directly experiencing the traumatic event(s).
  2. Witnessing, in person, the event(s) as it occurred to others.
  3. Learning that the event(s) occurred to a close family member or close friend. **Note:** In cases of actual or threatened death of a family member or friend, the event(s) must have been violent or accidental.
  4. Experiencing repeated or extreme exposure to aversive details of the traumatic event(s) (e.g., first responders collecting human remains, police officers repeatedly exposed to details of child abuse).

     **Note:** This does not apply to exposure through electronic media, television, movies, or pictures, unless this exposure is work related.

B. Presence of nine (or more) of the following symptoms from any of the five categories of intrusion, negative mood, dissociation, avoidance, and arousal, beginning or worsening after the traumatic event(s) occurred:

**Intrusion Symptoms**

  1. Recurrent, involuntary, and intrusive distressing memories of the traumatic event(s). **Note:** In children, repetitive play may occur in which themes or aspects of the traumatic event(s) are expressed.

2. Recurrent distressing dreams in which the content and/or affect of the dream are related to the event(s). **Note:** In children, there may be frightening dreams without recognizable content.
3. Dissociative reactions (e.g., flashbacks) in which the individual feels or acts as if the traumatic event(s) were recurring. (Such reactions may occur on a continuum, with the most extreme expression being a complete loss of awareness of present surroundings.) **Note:** In children, trauma-specific reenactment may occur in play.
4. Intense or prolonged psychological distress or marked physiological reactions in response to internal or external cues that symbolize or resemble an aspect of the traumatic event(s).

**Negative Mood**

5. Persistent inability to experience positive emotions (e.g., inability to experience happiness, satisfaction, or loving feelings).

**Dissociative Symptoms**

6. An altered sense of the reality of one's surroundings or oneself (e.g., seeing oneself from another's perspective, being in a daze, time slowing).
7. Inability to remember an important aspect of the traumatic event(s) (typically due to dissociative amnesia and not to other factors such as head injury, alcohol, or drugs).

**Avoidance Symptoms**

8. Efforts to avoid distressing memories, thoughts, or feelings about or closely associated with the traumatic event(s).
9. Efforts to avoid external reminders (people, places, conversations, activities, objects, situations) that arouse distressing memories, thoughts, or feelings about or closely associated with the traumatic event(s).

**Arousal Symptoms**

10. Sleep disturbance (e.g., difficulty falling or staying asleep, restless sleep).
11. Irritable behavior and angry outbursts (with little or no provocation), typically expressed as verbal or physical aggression toward people or objects.
12. Hypervigilance.
13. Problems with concentration.
14. Exaggerated startle response.

C. Duration of the disturbance (symptoms in Criterion B) is 3 days to 1 month after trauma exposure.

**Note:** Symptoms typically begin immediately after the trauma, but persistence for at least 3 days and up to a month is needed to meet disorder criteria.

D. The disturbance causes clinically significant distress or impairment in social, occupational, or other important areas of functioning.

E. The disturbance is not attributable to the physiological effects of a substance (e.g., medication or alcohol) or another medical condition (e.g., mild traumatic brain injury) and is not better explained by brief psychotic disorder.

## Diagnostic Features

The essential feature of acute stress disorder is the development of characteristic symptoms lasting from 3 days to 1 month following exposure to one or more traumatic events. Traumatic events that are experienced directly include, but are not limited to, exposure to war as a combatant or civilian, threatened or actual violent personal assault (e.g., sexual

violence, physical attack, active combat, mugging, childhood physical and/or sexual violence, being kidnapped, being taken hostage, terrorist attack, torture), natural or human-made disasters (e.g., earthquake, hurricane, airplane crash), and severe accident (e.g., severe motor vehicle, industrial accident). For children, sexually traumatic events may include inappropriate sexual experiences without violence or injury. A life-threatening illness or debilitating medical condition is not necessarily considered a traumatic event. Medical incidents that qualify as traumatic events involve sudden, catastrophic events (e.g., waking during surgery, anaphylactic shock). Stressful events that do not possess the severe and traumatic components of events encompassed by Criterion A may lead to an adjustment disorder but not to acute stress disorder.

The clinical presentation of acute stress disorder may vary by individual but typically involves an anxiety response that includes some form of reexperiencing of or reactivity to the traumatic event. In some individuals, a dissociative or detached presentation can predominate, although these individuals typically will also display strong emotional or physiological reactivity in response to trauma reminders. In other individuals, there can be a strong anger response in which reactivity is characterized by irritable or possibly aggressive responses. The full symptom picture must be present for at least 3 days after the traumatic event and can be diagnosed only up to 1 month after the event. Symptoms that occur immediately after the event but resolve in less than 3 days would not meet criteria for acute stress disorder.

Witnessed events include, but are not limited to, observing threatened or serious injury, unnatural death, physical or sexual violence inflicted on another individual as a result of violent assault, severe domestic violence, severe accident, war, and disaster; it may also include witnessing a medical catastrophe (e.g., a life-threatening hemorrhage) involving one's child. Events experienced indirectly through learning about the event are limited to close relatives or close friends. Such events must have been violent or accidental—death due to natural causes does not qualify—and include violent personal assault, suicide, serious accident, or serious injury. The disorder may be especially severe when the stressor is interpersonal and intentional (e.g., torture, rape). The likelihood of developing this disorder may increase as the intensity of and physical proximity to the stressor increase.

The traumatic event can be reexperienced in various ways. Commonly, the individual has recurrent and intrusive recollections of the event (Criterion B1). The recollections are spontaneous or triggered recurrent memories of the event that usually occur in response to a stimulus that is reminiscent of the traumatic experience (e.g., the sound of a backfiring car triggering memories of gunshots). These intrusive memories often include sensory (e.g., sensing the intense heat that was perceived in a house fire), emotional (e.g., experiencing the fear of believing that one was about to be stabbed), or physiological (e.g., experiencing the shortness of breath that one suffered during a near-drowning) components.

Distressing dreams may contain themes that are representative of or thematically related to the major threats involved in the traumatic event. (For example, in the case of a motor vehicle accident survivor, the distressing dreams may involve crashing cars generally; in the case of a combat soldier, the distressing dreams may involve being harmed in ways other than combat.)

Dissociative states may last from a few seconds to several hours, or even days, during which components of the event are relived and the individual behaves as though experiencing the event at that moment. While dissociative responses are common during a traumatic event, only dissociative responses that persist beyond 3 days after trauma exposure are considered for the diagnosis of acute stress disorder. For young children, reenactment of events related to trauma may appear in play and may include dissociative moments (e.g., a child who survives a motor vehicle accident may repeatedly crash toy cars during play in a focused and distressing manner). These episodes, often referred to as *flashbacks*, are typically brief but involve a sense that the traumatic event is occurring in the present rather than being remembered in the past and are associated with significant distress.

Some individuals with the disorder do not have intrusive memories of the event itself, but instead experience intense psychological distress or physiological reactivity when they are exposed to triggering events that resemble or symbolize an aspect of the traumatic event (e.g., windy days for children after a hurricane, entering an elevator for a male or female who was raped in an elevator, seeing someone who resembles one's perpetrator). The triggering cue could be a physical sensation (e.g., a sense of heat for a burn victim, dizziness for survivors of head trauma), particularly for individuals with highly somatic presentations. The individual may have a persistent inability to feel positive emotions (e.g., happiness, joy, satisfaction, or emotions associated with intimacy, tenderness, or sexuality) but can experience negative emotions such as fear, sadness, anger, guilt, or shame.

Alterations in awareness can include *depersonalization*, a detached sense of oneself (e.g., seeing oneself from the other side of the room), or *derealization*, having a distorted view of one's surroundings (e.g., perceiving that things are moving in slow motion, seeing things in a daze, not being aware of events that one would normally encode). Some individuals also report an inability to remember an important aspect of the traumatic event that was presumably encoded. This symptom is attributable to dissociative amnesia and is not attributable to head injury, alcohol, or drugs.

Stimuli associated with the trauma are persistently avoided. The individual may refuse to discuss the traumatic experience or may engage in avoidance strategies to minimize awareness of emotional reactions (e.g., excessive alcohol use when reminded of the experience). This behavioral avoidance may include avoiding watching news coverage of the traumatic experience, refusing to return to a workplace where the trauma occurred, or avoiding interacting with others who shared the same traumatic experience.

It is very common for individuals with acute stress disorder to experience problems with sleep onset and maintenance, which may be associated with nightmares or with generalized elevated arousal that prevents adequate sleep. Individuals with acute stress disorder may be quick tempered and may even engage in aggressive verbal and/or physical behavior with little provocation. Acute stress disorder is often characterized by a heightened sensitivity to potential threats, including those that are related to the traumatic experience (e.g., a motor vehicle accident victim may be especially sensitive to the threat potentially caused by any cars or trucks) or those not related to the traumatic event (e.g., fear of having a heart attack). Concentration difficulties, including difficulty remembering daily events (e.g., forgetting one's telephone number) or attending to focused tasks (e.g., following a conversation for a sustained period of time), are commonly reported. Individuals with acute stress disorder may be very reactive to unexpected stimuli, displaying a heightened startle response or jumpiness to loud noises or unexpected movements (e.g., the individual may jump markedly in the response to a telephone ringing).

## Associated Features Supporting Diagnosis

Individuals with acute stress disorder commonly engage in catastrophic or extremely negative thoughts about their role in the traumatic event, their response to the traumatic experience, or the likelihood of future harm. For example, an individual with acute stress disorder may feel excessively guilty about not having prevented the traumatic event or about not adapting to the experience more successfully. Individuals with acute stress disorder may also interpret their symptoms in a catastrophic manner, such that flashback memories or emotional numbing may be interpreted as a sign of diminished mental capacity. It is common for individuals with acute stress disorder to experience panic attacks in the initial month after trauma exposure that may be triggered by trauma reminders or may apparently occur spontaneously. Additionally, individuals with acute stress disorder may display chaotic or impulsive behavior. For example, individuals may drive recklessly, make irrational decisions, or gamble excessively. In children, there may be significant separation anxiety, possibly manifested by excessive needs for attention from

caregivers. In the case of bereavement following a death that occurred in traumatic circumstances, the symptoms of acute stress disorder can involve acute grief reactions. In such cases, reexperiencing, dissociative, and arousal symptoms may involve reactions to the loss, such as intrusive memories of the circumstances of the individual's death, disbelief that the individual has died, and anger about the death. Postconcussive symptoms (e.g., headaches, dizziness, sensitivity to light or sound, irritability, concentration deficits), which occur frequently following mild traumatic brain injury, are also frequently seen in individuals with acute stress disorder. Postconcussive symptoms are equally common in brain-injured and non–brain-injured populations, and the frequent occurrence of postconcussive symptoms could be attributable to acute stress disorder symptoms.

## Prevalence

The prevalence of acute stress disorder in recently trauma-exposed populations (i.e., within 1 month of trauma exposure) varies according to the nature of the event and the context in which it is assessed. In both U.S. and non-U.S. populations, acute stress disorder tends to be identified in less than 20% of cases following traumatic events that do not involve interpersonal assault; 13%–21% of motor vehicle accidents, 14% of mild traumatic brain injury, 19% of assault, 10% of severe burns, and 6%–12% of industrial accidents. Higher rates (i.e., 20%–50%) are reported following interpersonal traumatic events, including assault, rape, and witnessing a mass shooting.

## Development and Course

Acute stress disorder cannot be diagnosed until 3 days after a traumatic event. Although acute stress disorder may progress to posttraumatic stress disorder (PTSD) after 1 month, it may also be a transient stress response that remits within 1 month of trauma exposure and does not result in PTSD. Approximately half of individuals who eventually develop PTSD initially present with acute stress disorder. Symptom worsening during the initial month can occur, often as a result of ongoing life stressors or further traumatic events.

The forms of reexperiencing can vary across development. Unlike adults or adolescents, young children may report frightening dreams without content that clearly reflects aspects of the trauma (e.g., waking in fright in the aftermath of the trauma but being unable to relate the content of the dream to the traumatic event). Children age 6 years and younger are more likely than older children to express reexperiencing symptoms through play that refers directly or symbolically to the trauma. For example, a very young child who survived a fire may draw pictures of flames. Young children also do not necessarily manifest fearful reactions at the time of the exposure or even during reexperiencing. Parents typically report a range of emotional expressions, such as anger, shame, or withdrawal, and even excessively bright positive affect, in young children who are traumatized. Although children may avoid reminders of the trauma, they sometimes become preoccupied with reminders (e.g., a young child bitten by a dog may talk about dogs constantly yet avoid going outside because of fear of coming into contact with a dog).

## Risk and Prognostic Factors

**Temperamental.**    Risk factors include prior mental disorder, high levels of negative affectivity (neuroticism), greater perceived severity of the traumatic event, and an avoidant coping style. Catastrophic appraisals of the traumatic experience, often characterized by exaggerated appraisals of future harm, guilt, or hopelessness, are strongly predictive of acute stress disorder.

**Environmental.**    First and foremost, an individual must be exposed to a traumatic event to be at risk for acute stress disorder. Risk factors for the disorder include a history of prior trauma.

**Genetic and physiological.**   Females are at greater risk for developing acute stress disorder.

Elevated reactivity, as reflected by acoustic startle response, prior to trauma exposure increases the risk for developing acute stress disorder.

## Culture-Related Diagnostic Issues

The profile of symptoms of acute stress disorder may vary cross-culturally, particularly with respect to dissociative symptoms, nightmares, avoidance, and somatic symptoms (e.g., dizziness, shortness of breath, heat sensations). Cultural syndromes and idioms of distress shape the local symptom profiles of acute stress disorder. Some cultural groups may display variants of dissociative responses, such as possession or trancelike behaviors in the initial month after trauma exposure. Panic symptoms may be salient in acute stress disorder among Cambodians because of the association of traumatic exposure with panic-like *khyâl* attacks, and *ataque de nervios* among Latin Americans may also follow a traumatic exposure.

## Gender-Related Diagnostic Issues

Acute stress disorder is more prevalent among females than among males. Sex-linked neurobiological differences in stress response may contribute to females' increased risk for acute stress disorder. The increased risk for the disorder in females may be attributable in part to a greater likelihood of exposure to the types of traumatic events with a high conditional risk for acute stress disorder, such as rape and other interpersonal violence.

## Functional Consequences of Acute Stress Disorder

Impaired functioning in social, interpersonal, or occupational domains has been shown across survivors of accidents, assault, and rape who develop acute stress disorder. The extreme levels of anxiety that may be associated with acute stress disorder may interfere with sleep, energy levels, and capacity to attend to tasks. Avoidance in acute stress disorder can result in generalized withdrawal from many situations that are perceived as potentially threatening, which can lead to nonattendance of medical appointments, avoidance of driving to important appointments, and absenteeism from work.

## Differential Diagnosis

**Adjustment disorders.**   In acute stress disorder, the stressor can be of any severity rather than of the severity and type required by Criterion A of acute stress disorder. The diagnosis of an adjustment disorder is used when the response to a Criterion A event does not meet the criteria for acute stress disorder (or another specific mental disorder) and when the symptom pattern of acute stress disorder occurs in response to a stressor that does not meet Criterion A for exposure to actual or threatened death, serious injury, or sexual violence (e.g., spouse leaving, being fired). For example, severe stress reactions to life-threatening illnesses that may include some acute stress disorder symptoms may be more appropriately described as an adjustment disorder. Some forms of acute stress response do not include acute stress disorder symptoms and may be characterized by anger, depression, or guilt. These responses are more appropriately described as primarily an adjustment disorder. Depressive or anger responses in an adjustment disorder may involve rumination about the traumatic event, as opposed to involuntary and intrusive distressing memories in acute stress disorder.

**Panic disorder.**   Spontaneous panic attacks are very common in acute stress disorder. However, panic disorder is diagnosed only if panic attacks are unexpected and there is anxiety about future attacks or maladaptive changes in behavior associated with fear of dire consequences of the attacks.

**Dissociative disorders.** Severe dissociative responses (in the absence of characteristic acute stress disorder symptoms) may be diagnosed as derealization/depersonalization disorder. If severe amnesia of the trauma persists in the absence of characteristic acute stress disorder symptoms, the diagnosis of dissociative amnesia may be indicated.

**Posttraumatic stress disorder.** Acute stress disorder is distinguished from PTSD because the symptom pattern in acute stress disorder must occur within 1 month of the traumatic event and resolve within that 1-month period. If the symptoms persist for more than 1 month and meet criteria for PTSD, the diagnosis is changed from acute stress disorder to PTSD.

**Obsessive-compulsive disorder.** In obsessive-compulsive disorder, there are recurrent intrusive thoughts, but these meet the definition of an obsession. In addition, the intrusive thoughts are not related to an experienced traumatic event, compulsions are usually present, and other symptoms of acute stress disorder are typically absent.

**Psychotic disorders.** Flashbacks in acute stress disorder must be distinguished from illusions, hallucinations, and other perceptual disturbances that may occur in schizophrenia, other psychotic disorders, depressive or bipolar disorder with psychotic features, a delirium, substance/medication-induced disorders, and psychotic disorders due to another medical condition. Acute stress disorder flashbacks are distinguished from these other perceptual disturbances by being directly related to the traumatic experience and by occurring in the absence of other psychotic or substance-induced features.

**Traumatic brain injury.** When a brain injury occurs in the context of a traumatic event (e.g., traumatic accident, bomb blast, acceleration/deceleration trauma), symptoms of acute stress disorder may appear. An event causing head trauma may also constitute a psychological traumatic event, and tramautic brain injury (TBI)–related neurocognitive symptoms are not mutually exclusive and may occur concurrently. Symptoms previously termed *postconcussive* (e.g., headaches, dizziness, sensitivity to light or sound, irritability, concentration deficits) can occur in brain-injured and non–brain injured populations, including individuals with acute stress disorder. Because symptoms of acute stress disorder and TBI-related neurocognitive symptoms can overlap, a differential diagnosis between acute stress disorder and neurocognitive disorder symptoms attributable to TBI may be possible based on the presence of symptoms that are distinctive to each presentation. Whereas reexperiencing and avoidance are characteristic of acute stress disorder and not the effects of TBI, persistent disorientation and confusion are more specific to TBI (neurocognitive effects) than to acute stress disorder. Furthermore, differential is aided by the fact that symptoms of acute stress disorder persist for up to only 1 month following trauma exposure.

# Adjustment Disorders

## Diagnostic Criteria

A. The development of emotional or behavioral symptoms in response to an identifiable stressor(s) occurring within 3 months of the onset of the stressor(s).

B. These symptoms or behaviors are clinically significant, as evidenced by one or both of the following:

1. Marked distress that is out of proportion to the severity or intensity of the stressor, taking into account the external context and the cultural factors that might influence symptom severity and presentation.

2. Significant impairment in social, occupational, or other important areas of functioning.

C. The stress-related disturbance does not meet the criteria for another mental disorder and is not merely an exacerbation of a preexisting mental disorder.

D. The symptoms do not represent normal bereavement.

E. Once the stressor or its consequences have terminated, the symptoms do not persist for more than an additional 6 months.

*Specify* whether:

**309.0 (F43.21) With depressed mood:** Low mood, tearfulness, or feelings of hopelessness are predominant.

**309.24 (F43.22) With anxiety:** Nervousness, worry, jitteriness, or separation anxiety is predominant.

**309.28 (F43.23) With mixed anxiety and depressed mood:** A combination of depression and anxiety is predominant.

**309.3 (F43.24) With disturbance of conduct:** Disturbance of conduct is predominant.

**309.4 (F43.25) With mixed disturbance of emotions and conduct:** Both emotional symptoms (e.g., depression, anxiety) and a disturbance of conduct are predominant.

**309.9 (F43.20) Unspecified:** For maladaptive reactions that are not classifiable as one of the specific subtypes of adjustment disorder.

## Diagnostic Features

The presence of emotional or behavioral symptoms in response to an identifiable stressor is the essential feature of adjustment disorders (Criterion A). The stressor may be a single event (e.g., a termination of a romantic relationship), or there may be multiple stressors (e.g., marked business difficulties and marital problems). Stressors may be recurrent (e.g., associated with seasonal business crises, unfulfilling sexual relationships) or continuous (e.g., a persistent painful illness with increasing disability, living in a crime-ridden neighborhood). Stressors may affect a single individual, an entire family, or a larger group or community (e.g., a natural disaster). Some stressors may accompany specific developmental events (e.g., going to school, leaving a parental home, reentering a parental home, getting married, becoming a parent, failing to attain occupational goals, retirement).

Adjustment disorders may be diagnosed following the death of a loved one when the intensity, quality, or persistence of grief reactions exceeds what normally might be expected, when cultural, religious, or age-appropriate norms are taken into account. A more specific set of bereavement-related symptoms has been designated *persistent complex bereavement disorder.*

Adjustment disorders are associated with an increased risk of suicide attempts and completed suicide.

## Prevalence

Adjustment disorders are common, although prevalence may vary widely as a function of the population studied and the assessment methods used. The percentage of individuals in outpatient mental health treatment with a principal diagnosis of an adjustment disorder ranges from approximately 5% to 20%. In a hospital psychiatric consultation setting, it is often the most common diagnosis, frequently reaching 50%.

## Development and Course

By definition, the disturbance in adjustment disorders begins within 3 months of onset of a stressor and lasts no longer than 6 months after the stressor or its consequences have ceased. If the stressor is an acute event (e.g., being fired from a job), the onset of the disturbance is usually immediate (i.e., within a few days) and the duration is relatively brief (i.e., no more than a few months). If the stressor or its consequences persist, the adjustment disorder may also continue to be present and become the persistent form.

## Risk and Prognostic Factors

**Environmental.**   Individuals from disadvantaged life circumstances experience a high rate of stressors and may be at increased risk for adjustment disorders.

## Culture-Related Diagnostic Issues

The context of the individual's cultural setting should be taken into account in making the clinical judgment of whether the individual's response to the stressor is maladaptive or whether the associated distress is in excess of what would be expected. The nature, meaning, and experience of the stressors and the evaluation of the response to the stressors may vary across cultures.

## Functional Consequences of Adjustment Disorders

The subjective distress or impairment in functioning associated with adjustment disorders is frequently manifested as decreased performance at work or school and temporary changes in social relationships. An adjustment disorder may complicate the course of illness in individuals who have a general medical condition (e.g., decreased compliance with the recommended medical regimen; increased length of hospital stay).

## Differential Diagnosis

**Major depressive disorder.**   If an individual has symptoms that meet criteria for a major depressive disorder in response to a stressor, the diagnosis of an adjustment disorder is not applicable. The symptom profile of major depressive disorder differentiates it from adjustment disorders.

**Posttraumatic stress disorder and acute stress disorder.**   In adjustment disorders, the stressor can be of any severity rather than of the severity and type required by Criterion A of acute stress disorder and posttraumatic stress disorder (PTSD). In distinguishing adjustment disorders from these two posttraumatic diagnoses, there are both timing and symptom profile considerations. Adjustment disorders can be diagnosed immediately and persist up to 6 months after exposure to the traumatic event, whereas acute stress disorder can only occur between 3 days and 1 month of exposure to the stressor, and PTSD cannot be diagnosed until at least 1 month has passed since the occurrence of the traumatic stressor. The required symptom profile for PTSD and acute stress disorder differentiates them from the adjustment disorders. With regard to symptom profiles, an adjustment disorder may be diagnosed following a traumatic event when an individual exhibits symptoms of either acute stress disorder or PTSD that do not meet or exceed the diagnostic threshold for either disorder. An adjustment disorder should also be diagnosed for individuals who have not been exposed to a traumatic event but who otherwise exhibit the full symptom profile of either acute stress disorder or PTSD.

**Personality disorders.**   With regard to personality disorders, some personality features may be associated with a vulnerability to situational distress that may resemble an adjustment disorder. The lifetime history of personality functioning will help inform the interpretation of distressed behaviors to aid in distinguishing a long-standing personality disorder from an adjustment disorder. In addition to some personality disorders incurring vulnerability to distress, stressors may also exacerbate personality disorder symptoms. In the presence of a personality disorder, if the symptom criteria for an adjustment disorder are met, and the stress-related disturbance exceeds what may be attributable to maladaptive personality disorder symptoms (i.e., Criterion C is met), then the diagnosis of an adjustment disorder should be made.

**Psychological factors affecting other medical conditions.** In psychological factors affecting other medical conditions, specific psychological entities (e.g., psychological symptoms, behaviors, other factors) exacerbate a medical condition. These psychological factors can precipitate, exacerbate, or put an individual at risk for medical illness, or they can worsen an existing condition. In contrast, an adjustment disorder is a reaction to the stressor (e.g., having a medical illness).

**Normative stress reactions.** When bad things happen, most people get upset. This is not an adjustment disorder. The diagnosis should only be made when the magnitude of the distress (e.g., alterations in mood, anxiety, or conduct) exceeds what would normally be expected (which may vary in different cultures) or when the adverse event precipitates functional impairment.

## Comorbidity

Adjustment disorders can accompany most mental disorders and any medical disorder. Adjustment disorders can be diagnosed in addition to another mental disorder only if the latter does not explain the particular symptoms that occur in reaction to the stressor. For example, an individual may develop an adjustment disorder, with depressed mood, after losing a job and at the same time have a diagnosis of obsessive-compulsive disorder. Or, an individual may have a depressive or bipolar disorder and an adjustment disorder as long as the criteria for both are met. Adjustment disorders are common accompaniments of medical illness and may be the major psychological response to a medical disorder.

# Other Specified Trauma- and Stressor-Related Disorder

## 309.89 (F43.8)

This category applies to presentations in which symptoms characteristic of a trauma- and stressor-related disorder that cause clinically significant distress or impairment in social, occupational, or other important areas of functioning predominate but do not meet the full criteria for any of the disorders in the trauma- and stressor-related disorders diagnostic class. The other specified trauma- and stressor-related disorder category is used in situations in which the clinician chooses to communicate the specific reason that the presentation does not meet the criteria for any specific trauma- and stressor-related disorder. This is done by recording "other specified trauma- and stressor-related disorder" followed by the specific reason (e.g., "persistent complex bereavement disorder").

Examples of presentations that can be specified using the "other specified" designation include the following:

1. **Adjustment-like disorders with delayed onset of symptoms that occur more than 3 months after the stressor.**
2. **Adjustment-like disorders with prolonged duration of more than 6 months without prolonged duration of stressor.**
3. ***Ataque de nervios:*** See "Glossary of Cultural Concepts of Distress" in the Appendix.
4. **Other cultural syndromes:** See "Glossary of Cultural Concepts of Distress" in the Appendix.
5. **Persistent complex bereavement disorder:** This disorder is characterized by severe and persistent grief and mourning reactions (see the chapter "Conditions for Further Study").

# AFFIDAVIT – ECS II

I, Anatoly Kishinevski, Affiant herein and resident of Vermont, do hereby Swear, Depose and Declare under penalties of perjury that the following statements are true and accurate, to the best of my personal knowledge and belief:

1. I am on probation and I am supervised by the Hartford Probation and Parole office located at 118 Prospect Street, Suite 200, White River Junction, VT 05001

2. I attend a weekly sex offender (SO) treatment class at the address listed in the prior paragraph. The class is run by VTDOC contracted forensic psychotherapist Zachary Scott who operates the entity Effective Counseling Solutions LLC.

3. On September 18th, 2024 I attended the weekly SO class from approximately 1:30-3:00pm.

4. During the SO class we discussed my recent appeal with the Vermont Supreme Court regarding my probation conditions. Zachary Scott made a comment about how I had appealed my probation condition 104 (which restricts me from pornography use) even though he had heard me say prior I do not want to use pornography.

5. In response I stated to Zachary Scott that "those are not my words" and I explained to him that I never said "I don't want to use pornography", but I explained that I have "exercised not seeking of pleasure" and that is a primary reason why I have largely abstained from pornography use in my adult life.

6. Zachary Scott expressed to me during the class that if I want to use pornography it is fine and that I just need to make a safety plan prior (written exercise for mitigating relative risk) regarding that activity.

**Notary**

Subscribed and sworn to, before me, on

this _____day of _____, 20_____

Notary Print_____

Notary Sign_____

Commission No. _____

State_____

**Affiant**

Affiant Print_____

Affiant Sign_____

Date_____

# AFFIDAVIT – ECS I

I, Anatoly Kishinevski, Affiant herein and resident of Vermont, do hereby Swear, Depose and Declare under penalties of perjury that the following statements are true and accurate, to the best of my personal knowledge and belief:

1. I am on probation and I am supervised by the Hartford Probation and Parole office located at 118 Prospect Street, Suite 200, White River Junction, VT 05001

2. I attend a weekly sex offender (SO) treatment class at the address listed in the prior paragraph. The class is run by VTDOC contracted therapist Zachary Scott who operates the entity Effective Counseling Solutions LLC.

3. I have been attending the class weekly for approximately 18 months and I have established a close professional and personal rapport with Zachary Scott.

4. On September 18th, 2024 I attended the weekly SO class from approximately 1:30-3:00pm.

5. During the class I shared how upset I was about the recent results of my appeal with the Vermont Supreme Court and how the dishonesty of my probation officer affected the appeal process.

6. At the end of the class, after the other participants had left the conference room, Zachary Scott expressed genuine concern to me stating that "you could have a heart attack", referring to how much stress he observed me to be experiencing.

7. Zachary Scott told me that he can see that I have lost weight and that he cares about me and is concerned about me.

8. I expressed to him that what he is observing is correct and that I feel a nearly unmanageable level of stress and that I feel like I could have a heart attack. I shared with Zachary Scott that the day prior I told my private therapist (Dale Pushee of Clara Martin Center) I feel like I could have a heart attack from what I am experiencing.

**Notary**

Subscribed and sworn to, before me, on

this _____ day of _____, 20 ____

Notary Print_____

Notary Sign_____

Commission No. _____

State_____

**Affiant**

Affiant Print_____

Affiant Sign_____

Date_____

Affidavit – ECS I

**STATE OF VERMONT
SUPREME COURT**

State of Vermont,                                    DOCKET NO. 24-AP-052
        Appellee

        v.

Anatoly Kishinevski,
        Appellant

**AFFIDAVIT IN SUPPORT OF
MOTION FOR SANCTIONS AGAINST STATES ATTORNEY FOR VIOLATING
VERMONT RULES OF PROFESSIONAL CONDUCT AND VERMONT RULES
OF APPEALLATE PROCEDURE**

       **NOW COMES** Appellant pro se, Anatoly Kishinevski, who moves the Supreme Court pursuant to Rule 25(d)**(3)** of the Vermont Rules of Appellate Procedure to order showing of cause and to subsequently issue sanctions against State's Attorney Evan Meenan for violations of Rule 25(d)**(2)** of the Vermont Rules of Appellate Procedure and for violating Vermont Rules of Professional Conduct 3.1, 3.3, 4.1, and **8.4.**

       V.R.A.P. Rule 25(d)(2), which is a redirect to V.R.C.P. 11(b), requires that filings submitted to the Vermont Supreme Court be made in good faith, with proper legal support, and based on reasonable evidence or belief. Attorney Evan Meenan has violated these fundamentals by submitting an Appellee's Brief which omits material facts, contains misrepresentations of material information, and is founded on bad faith actions, contrary to the Vermont Rules of Professional Conduct.

**BACKGROUND**

       This appeal is the continuation of a series of post sentencing motions filed pro se by the Appellant who is seeking adjustments to his probation conditions so that an equitable balance between government interest and individual liberty interest is established. This appeal originates from criminal case 22-CR-00396 in which the Appellant/Defendant was represented by counsel up until the conclusion of sentencing. Prior to sentencing the Appellant expressed concern about some of the proposed probation conditions, but was advised not to address them at sentencing.

*"The most important thing at sentencing is determining whether the defendant will be incarcerated and, if so, for how long. Other matters, such as restitution and conditions of supervised release, are, appropriately, of secondary concern."* United States v. Martinez-Torres, 795 F.3d 1233

After sentencing, Appellant's counsel respectfully withdrew. The appellant proceeded pro se in an attempt to have his probation conditions modified. The Appellant is an accomplished scientist who in this experience operating as a pro se litigant, has found that it is a nearly insurmountable task to learn the applicable laws and rules of the Court(s) and to use them efficiently real time. Through this incredible challenge there have been numerous instances in which the usurping of the Appellant's rights by bad faith professional conduct is apparent, but the Appellant has either not had the skill or resource to immediately address these instances. This motion is submitted with the hope that the integrity of our precious checks and balances system will be nourished and preserved.

State's Attorney Evan Meenan, who is representing the Appellee, is responsible for various forms of misconduct as summarized in the instant motion and accompanying affidavit. ~~The affidavit is being presented in the format of a verified Complaint for Extraordinary Relief (Rule 21) to which the Supreme Court may wish to assign full consideration to.~~

~~*"The complaint was verified and is therefore treated as an affidavit in so far as it contains specific facts that the signer knows to be true."* SEE Pupecki v. James Madison Corp., 376 Mass. 212 and Relief. Kahn v. Garanzini, 411 F.2d 210, 212-213 (6th Cir. 1969); A Moore's Federal Practice par. 11.04, at 11-13 (2d ed. 1975); C. A. Wright & A.R. Miller, Federal Practice and Procedure § 1335, at 508 (1969).~~

## PRELIMINARY STATEMENT

The criminal case was resolved by a plea agreement and allegations contained in the record are not established facts, generally. Hence caution should be exercised in depriving the Appellant of his rights when implementing probation conditions, as the established record is minimal. A balance between state interest and the probationer's rights must be established with care and not via a brash effort by the state to seize the probationer's rights. The purpose of probation conditions is not to punish the probationer.

The deprivation of rights in implementing probation conditions is permitted only as much as necessary to achieve two sole goals which include   a.) to ensure public safety

and b.) to enable the offenders rehabilitation. 28 V.S.A. § 252(b)(18). No infringement of liberty greater than is needed to accomplish these two goals is permitted, nor should be pursued by an attorney who is operating with sincere commitment to criminal procedure and the prerequisite ethical standards prescribed by Vermont Rules of Professional Conduct.

In the Appellee's brief submitted by State's Attorney Evan Meenan, there are many demands for deprivation of the Appellant's rights, but the demands are unsupported by any technically or theoretically sound explanation of how the particular demands accomplish a need. This act of demanding deprivation of the Appellant's rights without properly substantiating the demands is in itself an attempted act of infringement of the Appellant's rights in violation of V.R.A.P. 25(d)(2) and the Vermont Rules of Professional Conduct 3.1, 3.3, 4.1, and 8.4. The state's attorney's extensive experience— having been admitted to practice law in Vermont since September 24, 2008, and having served in various high-profile state positions, including as Assistant Attorney General— constitutes an aggravating factor in his failure to adhere to rules and laws that are intended to ensure efficient administration of the Supreme Court's business.

## ARGUMENT AND MEMORANDUM OF LAW

V.R.A.P. Rule 25(d)(2), which is a redirect to V.R.C.P. 11(b), requires that all representations to the Court are in acknowledgement of and in compliance with the following:

### V.R.C.P. 11(b) - Representations to Court.

By presenting to the court (whether by signing, filing, submitting, or later advocating) a pleading, written motion, or other document, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:

(1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;

(2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;

(3) the allegations and other factual contentions have evidentiary

support, or, if specifically so identified, are likely to have evidentiary
support after a reasonable opportunity for further investigation or
discovery;

(4) the denials of factual contentions are warranted on the evidence or,
if specifically so identified, are reasonably based on a lack of
information or belief.

As prerequisites to being in compliance with V.R.C.P. 11(b) and applicable to the instant
motion are the Vermont Rules of Professional Conduct 3.1, 3.3, 4.1, and 8.4.

A lawyer's compliance with the Vermont Rules of Professional Conduct ensures
that they act ethically and professionally, with respect for the legal process and the rights
of all parties involved. It is professional misconduct for a lawyer to engage in
conduct involving dishonesty, fraud, deceit or misrepresentation. **Vt. R. Prof.
Conduct 8.4(c)**. Failure to comply with the Vermont Rules of Professional Conduct is
grounds for disciplinary investigation. An apparently isolated violation may indicate a
pattern of misconduct that only a disciplinary investigation can uncover. The Vermont
Supreme Court exercises administrative control of all the courts of the state, and
disciplinary authority concerning all judicial officers and attorneys at law in the state. Vt.
Const. ch. II, § 30.

### Ethical Violation 1 –State Attorney Evan Meenan lied to the Appellant and misrepresented a third party's professional opinion without consulting that party.

Prior to this appeal, there were two hearings held in response to the Appellant's
pro se motions to modify his probation conditions. Appellant's probation officer attended
both of these hearings which occurred at the Orange Unit Superior Court on 9/20/2023
and 1/10/2024. Following the 9/20/2023 hearing the Appellant met with his probation
officer on 9/21/2023 and had extensive discussion with the probation officer about his
probation conditions. (hereinafter referred to as "**the 9/21 meeting**"). The 9/21 meeting
lasted almost two hours.

During the 9/21 meeting, the probation officer meticulously reviewed each
probation condition with the Appellant explaining realistically what was expected of the
Appellant regarding his supervision and how probation violations occur. The probation
officer made a statement that such an overview of the conditions and probation process
by him with the Appellant should have probably been done sooner. The Appellant had,
up until the 9/21 meeting, thought that probation violations were black and white, for

which in practice, there was no grace region.

Upon conclusion of the 9/21 meeting, based on the explanation provided by the probation officer, the Appellant understood that for technical violations, the probation officer maintains a large degree of discretionary power as to if a violation (VOP) is filed. During the 9/21 meeting the Appellant also learned the probation officer exercises some discretionary power, formally or informally, to modify in practice the written language of the probation order, as the probation officer feels is reasonable.

The Appellant did not achieve the modifications he was seeking in either hearing and on 2/9/2024 filed a notice of appeal. On 2/27/2024 at 3:28pm, the Appellant sent an email (pg. 3, Exhibit A) to State's Attorney Evan Meenan proposing a simple settlement agreement which would allow the appeal to be dismissed. The proposal was that all parties stipulate to a single modification of Appellant's probation condition 107 and in exchange the Appellant would stipulate to the appeal being dismissed, to conserve energy and resources for all parties and not to belabor the Supreme Court. The Appellant cc'd his probation officer Ed Adams on the message.

On **2/27/2024** at **3:45 PM**, by email, Attorney Evan Meenan wrote to the Appellant and stated he would consult with the probation officer and State's Attorney Colin Seaman and that he would let the Appellant know (pg. 5, Exhibit A).

On **2/28/2024** at **8:58 AM** (pg. 8, Exhibit A), Attorney Evan Meenan replied to the Appellant and stated,

> "*I've consulted with both Mr. Adams and State's Attorney Seaman who are not willing to stipulate to your proposed amendment to probation condition 107.*"

The single modification proposed and requested by the Appellant in exchange for stipulating to the dismissal of the appeal was to probation condition 107 as follows:

**As Ordered at Sentencing:**
*I will not own, possess or use a camera, recorder, cell phone, or other electronic device that has recording capabilities, without prior permission of my Probation Officer or designee*

**Appellant's Proposed Revision:**
*I will provide my probation officer or designee with a list of any cameras, recorders, cell phones, or other electronic device that have recording capabilities*

*that are in my possession. I will report changes to this list within 24hrs.*

The Appellant was surprised by Attorney Evan Meenan's response for several reasons. First, the proposed revision of probation condition 107 allows the state to accomplish the same goals that they argue are necessary for supervision of the Appellant, but with less interference in the autonomy and liberty rights of the Appellant. The state is obligated to pursue the least restrictive means.

Secondly, agreeing to this proposed revision, in exchange for the rest of the appeal being dismissed, was a deal greatly in the state's favor, affording no loss to the state and helping to conserve expensive time and energy for all of those that are involved otherwise.

Lastly, the Appellant was surprised by Attorney Evan Meenan's response because the proposed revision was in fact originally suggested by the probation officer Ed Adams. When Attorney Evan Meenan replied by stating that Ed Adams was not willing to stipulate to "your" proposed amendment, he (Attorney Evan Meenan) did not realize he was misrepresenting an opinion that had been prior stated by Ed Adams in conversation with the Appellant.

On **2/28/2024** at **3:35 PM**., less than seven hours after Evan Meenan sent the email containing a statement on the probation officer's behalf; the Appellant and an acquaintance visited the probation officer. They met probation officer Ed Adams in the lobby of Hartford Probation and Parole for the primary purpose of the acquaintance serving a subpoena (Exhibit B) to the probation officer, securing his attendance at upcoming hearing for a civil matter in which the Appellant was the Plaintiff.

After the subpoena was served on Ed Adams, while the three parties were still in the lobby of Hartford Probation and Parole, they casually chatted for a minute. Wanting to understand the response received from Attorney Evan Meenan, the Appellant asked probation officer Ed Adams if it was really his professional opinion that requiring the Appellant to get permission prior to acquiring digital recording devices served any advantage over the Appellant simply providing updates of any changes within 24 hours.

The probation officer replied by stating something to the effect of, "I never said that is my opinion". The Appellant replied to the probation officer, "That is not what the state's attorney said (referring to the email from the morning)".

That moment Probation Officer Ed Adams realized that he had accidentally made a statement that contradicted the state's attorney and he made a facial expression that was a combination of mostly deep unhappiness combined with an emotion that was similar to anger. This event can be reviewed on the security footage from the Hartford Probation

and Parole lobby for the respective time and date. The exchange made the Appellant and his acquaintance concerned because of how upset the probation officer appeared and it was a topic they discussed as they were exiting the building.

At their next probation meeting the Appellant apologized and expressed that he had not intended to trick the probation officer into contradicting the state's attorney. Through subsequent discussions and questioning by the Appellant, over the next several months, it become clear that probation officer Ed Adams has never spoken to Evan Meenan and also does not know who he is. The Appellant has asked directly if the probation officer has ever spoken to state's attorney Evan Meenan to which the probation officer replied he did not recall ever doing so.

In summary, the state's attorney sent an email to the Appellant making a factual representation of the probation officer's opinion on the proposed modification and settlement agreement, meanwhile the probation officer is acknowledging that he has never even spoken to Evan Meenan and the opinion presented by Evan Meenan on behalf of the probation officer does not match the probation officer's prior expressed opinion.

Appellant's probation officer, Ed Adams, is a man with tremendous experience working for the VTDOC and has been working closely with the Appellant for nearly two years. By failing to consult with the probation officer and gather his professional opinion on the proposed modification to probation condition 107, State's Attorney Evan Meenan has neglected one of the most accurate reference points for professional insight which is needed to make an informed decision, which he is obligated to do. All legal filings must have verified merit. To state that one has consulted with the probation officer but actually not done so suggests the State's Attorney recognized the probation officer as a source of professional discretion, but wished to operate on his own prerogative.

The effect of this oversight is equivalent to the State's Attorney disregarding his professional responsibility to comply with all sections of V.R.C.P. 11(b) i.e. he has not fulfilled his obligation to complete "inquiry reasonable under the circumstances". The state's attorney Evan Meenan made a false statement to the Appellant in violation of Vt. R. Prof. Conduct. Rule 4.1 - Truthfulness in Statements to Others. Generally Evan Meenan has been dishonest contrary to the required ethical conduct of attorneys practicing in the State of Vermont.

**Ethical Violation(s) 2 – State Attorney Evan Meenan has knowingly made false representations of Appellant for which there is no factual basis.**

Attorney Evan Meenan has extensive experience representing the State of

Vermont in criminal proceedings, both at the trial court level and through the appeal process (Exhibit C). Spattered throughout the Appellee's brief he authored and submitted in the instant appeal, there are many defamatory statements made about the Appellant for which there is no factual basis to support these statements. There are not even facts of contention that could be argued to support some of the negative statements made by State's Attorney Evan Meenan. In other words, Attorney Evan Meenan has fabricated and purported highly prejudicial statements about the Appellant. The notion that the State's Attorney would engage in such conduct so comfortably and in the most serious of circumstances, is alarming.

**Example 1** – In the Appellee's brief on page 8, citing SCAV-25, Attorney Evan Meenan has written,

*"Appellant largely refused to participate in the PSI interview."*

What the cited source SCAV-25 actually says is:

*"The Defendant and his attorney declined to answer questions directly relating to the offense and they directed us to rely on statements already made in the psychosexual. The Defendant and his attorney had agreed to discuss only details necessary to score DOC assessments and to clarify statements around alcohol use during the interview."*

Attorney Meenan's statement, *"Appellant largely refused to participate in the PSI interview"* has a much more negative connotation compared to the original paragraph. The term "largely refused" suggests a significant level of non-cooperation or unwillingness to engage in the interview process. This framing implies a more obstructive or evasive stance.

In contrast, the original paragraph indicates that the Defendant and their attorney were selective about the topics they discussed, but they did participate in the interview, focusing on specific aspects deemed necessary. The original paragraph in the PSI indicates a strategic approach to the interview rather than outright refusal.

The state attorney's act is an attempt to portray the Appellant in a more negative light than warranted. This distortion of the original context is unethical and a form of defamation. This conduct is a violation of V.R.C.P. 11(b) and the overarching Vt. R. Prof. Conduct 3.1, 3.3, 4.1 and 8.4.

The true matter of circumstance, for which there may not be any written record, is that the state's attorney Dickson Corbett had stipulated to *questions from the DOC directly relating to the offense would be directed to statements already made in the psychosexual*. The DOC was informed of this stipulation in advance to the PSI interview and unfortunately did not represent the presence of the agreement in the PSI.

**Example 2** – In the Appellee's brief on page 7, item 6 of a numbered list, as authored by Attorney Evan Meenan, states:

"*6. Said if Paquette recants he will buy her a glass studio*"

The actual statement made in the letter referenced by the State's Attorney (SPC-31, ¶2) says:

"*Please let me make this up to you and buy you a Zaporozhet[1] and a glass studio. I cannot take anymore. I am suffering very badly and am in extreme danger. Every day my heart aches and I miss you.*"

The statement, "*Said if Paquette recants he will buy her a glass studio*," significantly distorts the content and tone of the actual letter referenced by the State's Attorney (SPC-31, ¶2).

The State's Attorney's version presents the Appellant in a predominantly negative light by reducing a complex and emotionally charged message to a mere transactional offer. This truncated statement lacks the essential context of the relationship between the parties and omits the significant emotional weight conveyed in the original letter.

The actual paragraph reveals a deep emotional investment and a plea for reconciliation. The Appellant expresses profound suffering, fear, and a heartfelt desire to make amends, which adds layers of personal anguish and vulnerability. This broader context is crucial for understanding the true nature of the communication and the Appellant's emotional state.

---

[1] A Zaporozhet a.k.a. ZAZ 965, is a micro car that was manufactured in Ukraine and was the "people's car" of the Soviet Union.

The State's Attorney's version intentionally disregards these critical aspects, thereby skewing the portrayal of the Appellant and failing to capture the full scope of the message's intent and emotional depth.

This is unethical conduct in violation of V.R.C.P. 11(b) and the overarching Vt. R. Prof. Conduct 3.1, 3.3, 4.1 and 8.4.

**Example 3** – In the Appellee's brief on page 10, ¶ 1, the state's attorney has written

*"Appellant didn't accept responsibility for his crimes during his allocution, instead saying "[t]his has been a very difficult experience for me" and "I am not upset with Arielle...I'm not angry even in the slightest bit." 1/12/23-TR-18-19."*

This is a particularly egregious act of misrepresenting the Appellant as the pages State Attorney Evan Meenan cites in the transcript are 18-19, which would suggest he read pages 13 and 16 along the way... and then presumably page 25 afterward, which all state to the contrary of attorney Evan Meenan.

1/12/23-TR-13
**State's Attorney Dickson Corbett:** *"By taking responsibility in this plea agreement, Mr. Kishinevski has spared Ms. Paquette from that experience and offered instead the more cathartic opportunity to explain to the Court the impact this offense has had upon her. In doing so, the State understands this as an important expression of the very empathy that was lacking at the time of the offense."*

1/12/23-TR-16
**Defense Counsel Attorney Dan Sedon:** *Their relationship in that period of time is documented like few things I've seen as an attorney. As well, there was extensive video documentation of their sex life. What this added up to was it allowed the attorneys some insight into the dynamics of this relationship. But it obviously created an extraordinarily intimate and sensitive body of evidence. That, and avoiding that, was what motivated the parties to find some basis to resolve the case and Mr. Kishinevski to take full responsibility for what he did.*

1/12/23-TR-25
**Presiding Judge, The Honorable Elizabeth Mann:** *Mr. Kishinevski had established*

*himself within the community before this as a respected member of the community. As we've noted, he had secured a number of patents. He was growing a business. And it is a very important factor that he has accepted responsibility for his conduct and that he did so in a very timely manner.*

Attorney Evan Meenan has quoted fragments of language and presented them in a manner intended to defame the Appellant. The fragments as presented do not carry the full context of the address given by the Appellant during the very emotional sentencing hearing. Full review of the record reveals without any question that the Appellant has taken full responsibility and is sorry with all of his being for his actions. This is another instance of unethical conduct by the State's Attorney in violation of V.R.C.P. 11(b) and the overarching Vt. R. Prof. Conduct 3.1, 3.3, 4.1 and 8.4.

## CONCLUSION

The three examples listed are a sample of many more instances of such conduct laden through the Appellee's brief. Due to time constraints only these three examples are listed. However, the presence of even these three examples is concerning and should be enough for professional inquiry to be made.

While the case record may in fact include negative information and language, this does not grant the State's Attorney the liberty to fabricate misrepresentations about the Appellant or any aspect of the proceedings. Such misrepresentations constitute professional misconduct and violate the ethical standards required of attorneys licensed in Vermont. The Appellant is entitled to a fair and honest process at every stage, including actions taken by the State. Any deviation from this standard is prejudicial to the Appellant and undermines the integrity of justice.

The Appellant requests sanctions against the State's Attorney in the form of the Appellee's brief being struck and remanded for revision to contain only facts purported in good faith and for the revised Appellee's brief to be verified with a certificate of compliance equal in substance and sentiment to:

### 12 V.S.A. § 5812. Oath to be administered to attorneys
*You solemnly swear that you will do no falsehood, nor consent that any be done in court, and if you know of any, you will give knowledge thereof to the judges of the court or some of them, that it may be reformed; that you will not wittingly, willingly or knowingly promote, sue or procure to be*

*sued, any false or unlawful suit, or give aid or consent to the same; that you will delay no man for lucre or malice, but will act in the office of attorney within the court, according to your best learning and discretion, with all good fidelity as well to the court as to your client. So help you God.*

I, Anatoly Kishinevski, the Appellant in the above captioned case, Affiant herein and resident of Vermont, do hereby Swear, Depose and Declare under penalties of perjury that the foregoing statements, twelve pages of information and Exhibits A,B,C are true and accurate, to the best of my personal knowledge and belief.

**Notary**

Subscribed and sworn to, before me, on

this 10th day of September , 20 24

Notary Print Christopher Rowell

Notary Sign

Commission No. 157.0002420

State Vermont

my Commission Expires:
Jan. 31, 2025



**Affiant**

Affiant Print Anatoly Kishinevski

Affiant Sign

Date Sep 10th, 2024

## AFFIDAVIT – Ed Adams I

I, Anatoly Kishinevski, Affiant herein and resident of Vermont, do hereby Swear, Depose and Declare under penalties of perjury that the following statements are true and accurate, to the best of my personal knowledge and belief:

1.  I am on probation and am supervised by the Hartford Probation and Parole office 118 Prospect Street, Suite 200 White River Junction, VT 05001

2.  I started probation on January 12th, 2023 and my probation officer from then until present is Ed Adams.

3.  On September 20th, 2023 I had a hearing at the Orange Unit Superior Court in which I represented myself to argue a motion for modification of my probation conditions.

4.  I subpoenaed Ed Adams prior to the September 20th, 2023 hearing and he came and testified during the hearing.

5.  At the end of the hearing we chatted briefly in the back of the court room and he told me that the hearing fulfilled my obligation to meet with him for that week and that we did not need to meet again before the week ended. I replied and told him that I would still come visit him in the morning if it was okay with him so that we could debrief generally and further discuss the events from the hearing.

6.  On the morning of Sep 21, 2023 I met in person with Ed Adams in his office and we went over my probation conditions in detail, carefully discussing each one including how violations could occur for each, generally.

7.  During the September 21, 2023 discussion, Ed Adams told me that regarding probation condition 107, that if I get new devices, just update the list of my devices within 24hrs and to notify him of the change. This was his instruction to me that he offered unprompted and unrequested by me. He provided this instruction to me calmly and casually with no evidence of concern on his part about this way of keeping track of my electronic devices, even though his instruction conflicted with the written language of the probation condition. i.e. the probation condition as written, contrary to his verbal instruction, required that I get permission from him in advance to acquiring new devices.

8.  During the Sep 21, 2023 meeting, upon reviewing probation condition 104, Ed Adams told me that it is fine if I use pornography as long as I talk about it in the weekly sex offender group and that it isn't aggressive pornography. His communication was calm

and the instruction he gave me did not indicate that he had any concern about me using pornography within the parameters he stated. This instruction by Ed Adams and his consent that I may use pornography was his own proposal and instruction, offered unprompted and unrequested by me.

9. On January 10th, 2024 there was a second hearing in response to additional motions filed by me to modify my probation conditions. During this hearing, while sworn in and on the stand, the prosecutor Colin Seaman questioned Ed Adams about various aspects of my probation conditions.

10. Ed Adams had been sworn in

11. gave testimony that was opposite to and in stark contrast with statements he had made to me as summarized in paragraphs 6 and 7 of this affidavit.

12. Specific to probation condition

13. The testimony that Ed Adams gave during the January 10th, 2024 hearing represented me in a very negative manner, presenting allegations from the record as established facts, even though they were not.

14. Oaths to witnesses 12 V.S.A. § 5810 Learn more
**Bailiff:** Would you raise your right hand please. Do you swear the evidence you're about to give relative to the case now under consideration shall be the truth, the whole truth and nothing but the truth under the pains and penalties of perjury?
**Ed Adams:** I do.
**Bailiff:** Please Be Seated.
14:15 of audio record

15. – HEARING - on probation conditions
February 9, 2024 – Filed Notice of Appeal with VT supreme court
Feb 27, 2024 - 3:32pm – I proposed to Evan Meenan by email that if they would stipulate to the change of a single probation condition, that I would be willing to dismiss my appeal. I expressed concern about unnecessarily consuming the state's resources. I cc'd my probation officer on this topic
Feb 27, 2024 – 3:45pm – Evan Meenan replied to me and stated he would review my proposal with Mr. Adams and Attorney Seaman and get back to me.
Feb 28, 2024 – 8:58am – Evan Meenan sent me an email stating "I've consulted with both Mr. Adams and State's Attorney Seaman who are not willing to stipulate to your proposed amendment to probation condition 107. I thought this was very peculiar because it was originally Mr. Adams that had proposed such an arrangement to me on Sep 21. Attorney Meenan must not realize that I maintain regular and detailed contact

with my probation officer Ed Adams and that I frequently visit him weekly, even though I am only required to meet with him 2nd and 4th Wednesday of each week. Feb 28, 2024 ~ 3:35p.m. Marty Sabo and I served a subpoena to Ed Adams for text messages to be used in docket 24-CV-00522. We were in the lobby of Hartford P&P and Ed Adams came into the lobby and Marty handed him the subpoena. We apologized for serving him the subpoena and chatted with him briefly. He seemed indifferent regarding the subpoena. I then said I had a quick question for him and asked, "regarding my restriction on digital recording devices, is it really your professional opinion that it's necessary for me to get your permission before acquiring a digital recording device instead of just notifying you when my device list changes." to which he replied, "I never said that is my opinion" to which I replied, that is not what the state's attorney said. As soon as I said this Mr. Adams made a face in which he looked very unhappy, literally frowning with significant emotion, almost like a frown that one would see in a cartoon rendering, but it was sincere… as he realized that his answer contradicted information that the state's attorney presented on his behalf. The facial expression Mr. Adams made was of great discontent and it left Marty and I feeling concerned and we talked about it as we left and I felt worried and a little scared that I had upset my probation officer and that maybe he felt that I had tricked him on purpose, which I hadn't. The exchange between Marty, me and Ed Adams can be recalled from the camera system and any audio recording that occurs in the lobby. During the exchange Mr. Adams was faced almost directly at the camera bubble in the lobby.

16. I worried about having upset Mr. Adams all week until I met with again on _____. I was concerned he thought I tricked him on purpose, which I did not. During that meeting, I said to him, I was really sorry I upset him. I did not mean any negativity by my inquiry and did not mean to upset him and my goal was not to trick him into contradicting the state's attorney.. and that it was complete just by chance that things happened that way. Mr. Adams told me he did not take negativity from it and explained that he state's attorney sort of serves as his counsel and is able to speak on his behalf.. in short, he acknowledged that the state's attorney acted on his behalf and made statements on his behalf.

17. I asked him about Dickson Corbett and then I asked him about Evan Meenan. He did not know who Evan Meenan was.

18. Because I wanted to make sure I understood Mr. Adams relationship (lack of, there was none) I continued to ask Mr. Adams about Evan Meenan over the next few months on various occasions. He continued to express no knowledge of Evan Meenan except on one point making a statement along the lines of "wasn't he involved in the matter that you dismissed a while ago, which was actually colin Seaman"

June 11, 2024 - Met with Ed Adams at Hartford P&P Record is in Text Messages 1776 –

19. June 26, 2024 – Met with Ed Adams after group

Pg. 3 of 1
Affidavit – ECS II

20. July 10,, 2024 - Met with Ed Adams at Hartford P&P Record is in Text Messages 1776 -

21. July 23, 2024 – Met with Ed Adams at Hartford P&P – I have increasingly come to visit Ed Adams and spend time socializing with him generally. As we have become more comfortable with each other, I have progressively developed dialogue with him on his role in the hearings he has attended. During this meeting I expressed to him that there is a significant contrast between the things that he says to me directly in the office and what he says during the hearings while on the stand. Specifically I stated it seems like the state's attorney must be prepping you and giving you specific instruction on what to say. I asked him if this was true. He did not answer the question, but stated in reply that when he is picking probation conditions for a person, there are set conditions that he has to choose from so conditions can not be catered directly for me and that he has to give answers that generally support the DOC and the general conditions. I made a comment about him not stating the truth while on the stand and he replied by saying that if he had been asked directly he would have answered directly to which I replied, the truth is written on our hearts. In this exchange it was made clear that the answer provided by Ed Adams during his testimony were answer solicited to him by the state's attorney and they were not his own free true responses, as they conflicted egregiously with conversations he and I had in private on numerous exchanges. Bava Kamma tractate on lying. Bava Kamma 72: False Witnesses

22.

23. we I can not give answers specific to your probation conditions because I only have

24. Aug 14, 2024 – During meeting in his office – We spoke generally about my pending appeal. I asked him directly if he had ever spoken to Evan Meenan about my probation conditions to which he stated explicitly, not that he did not recall ever doing so.

25. Alll statements made by Ed Adams during my motion hearings were solicited statements that he was coached to say by the state's attorneys. I asked him this and he confirmed it indirectly.

26.

**Notary**

Subscribed and sworn to, before me, on

this _____ day of _____, 20 _____

Notary Print_____

Notary Sign_____

Commission No. _____

**Affiant**

Affiant Print_____

Affiant Sign_____

Date_____

State_____

## AFFIDAVIT – Ed Adams II

I, Anatoly Kishinevski, Affiant herein and resident of Vermont, do hereby Swear, Depose and Declare under penalties of perjury that the following statements are true and accurate, to the best of my personal knowledge and belief:

1. I am on probation and am supervised by the Hartford Probation and Parole office 118 Prospect Street, Suite 200 White River Junction, VT 05001

2. I started probation on January 12th, 2023 and my probation officer from then until present is Ed Adams.

3. On September 20th, 2023 I had a hearing at the Orange Unit Superior Court in which I represented myself to argue a motion for modification of my probation conditions.

4. I subpoenaed Ed Adams prior to the September 20th, 2023 hearing and he came and testified during the hearing.

5. At the end of the hearing we chatted briefly in the back of the court room and he told me that the hearing fulfilled my obligation to meet with him for that week and that we did not need to meet again before the week ended. I replied and told him that I would still come visit him in the morning if it was okay with him so that we could debrief generally and further discuss the events from the hearing.

6. On the morning of Sep 21, 2023 I met in person with Ed Adams in his office and we went over my probation conditions in detail, carefully discussing each one including how violations could occur for each, generally.

7. During the September 21, 2023 discussion, Ed Adams told me that regarding probation condition 107, that if I get new devices, just update the list of my devices within 24hrs and to notify him of the change. This was his instruction to me that he offered unprompted and unrequested by me. He provided this instruction to me calmly and casually with no evidence of concern on his part about this way of keeping track of my electronic devices, even though his instruction conflicted with the written language of the probation condition. i.e. the probation condition as written, contrary to his verbal instruction, required that I get permission from him in advance to acquiring new devices.

8. During the Sep 21, 2023 meeting, upon reviewing probation condition 104, Ed Adams told me that it is fine if I use pornography as long as I talk about it in the weekly sex offender group and that it isn't aggressive pornography. His communication was calm

and the instruction he gave me did not indicate that he had any concern about me using pornography within the parameters he stated. This instruction by Ed Adams and his consent that I may use pornography was his own proposal and instruction, offered unprompted and unrequested by me.

9. On January 10th, 2024 there was a second hearing in response to additional motions filed by me to modify my probation conditions. During this hearing, while sworn in and on the stand, the prosecutor Colin Seaman questioned Ed Adams about various aspects of my probation conditions.

10. Ed Adams was sworn in prior to testifying by way of Oaths to witnesses 12 V.S.A. § 5810  The exact exchange, as the record reflects is as follows:

**Bailiff:** *Would you raise your right hand please. Do you swear the evidence you're about to give relative to the case now under consideration shall be the truth, the whole truth and nothing but the truth under the pains and penalties of perjury?*
**Ed Adams:** *I do.*
**Bailiff:** *Please Be Seated.*
14:15 of audio record

11. On February 9th, 2024 – I filed a notice of appeal with Vermotn Supreme Court

12. On February 27th, 2024 at 3:32pm, by email, I proposed to Evan Meenan that if they would stipulate to the change of a single probation condition, that I would be willing to dismiss my appeal. I expressed concern about unnecessarily consuming the state's resources. I  cc'd my probation officer Ed Adams on this topic.

13. On February 27th, 2024 at 3:45pm, Attorney Evan Meenan replied to me and stated he would review my proposal with Mr. Adams and Attorney Seaman and get back to me.

14. On February 28th, 2024 at 8:58am, Attorney Evan Meenan sent me an email stating:

"*I've consulted with both Mr. Adams and State's Attorney Seaman who are not willing to stipulate to your proposed amendment to probation condition 107.* "

15. I thought this was very peculiar because it was originally Mr. Adams that had proposed such an arrangement to me on September 21st, 2023.

16. Prior to filing the notice of appeal regarding the results from the January 10th, 2024 hearings, I consulted with Ed Adams on two separate occasions to inquire as to if he had any personal or professional opposition to me proceeding with my appeal. I had

concern that the appeal process could possibly be a disruption to him in some manner I may not be privy to or be able to anticipate and I was attempting to operate with a maximum level of consideration for Ed Adams.

17. In each instance I asked Ed Adams about his opinion, thoughts and or preference if I were to move forward with the appeal process he expressed to me that he was "ambivalent" and that he supported me in my legal pursuits.

18. During one of these conversations I asked him about Dickson Corbett and what his opinion of him was. I expressed tremendous admiration to Edward Adams about Dickson Corbett. This included my sharing with Ed Adams that I thought that Dickson Corbett was literally a genius and that the address he gave the court during my sentencing was a literary masterpiece.

19. In reply to my inquiry about Ed Adams perspective of Dickson Corbett, he explained to me that he has very limited interaction with the prosecutors, typically only communicating with them briefly during  VOP proceedings.

20. I inquired directly to Ed Adams about his opinion of Attorney Evan Meenan and what it has been like working with him

21.  then I asked him about Evan Meenan. He did not know who Evan Meenan was.

22. Because I wanted to make sure I understood Mr. Adams relationship (lack of, there was none) I continued to ask Mr. Adams about Evan Meenan over the next few months on various occasions. He continued to express no knowledge of Evan Meenan except on one point making a statement along the lines of "wasn't he involved in the matter that you dismissed a while ago, which was actually colin Seaman"

June 11, 2024 - Met with Ed Adams at Hartford P&P Record is in Text Messages 1776 –

23. June 26, 2024 – Met with Ed Adams after group

24. July 10,, 2024 - Met with Ed Adams at Hartford P&P Record is in Text Messages 1776 -

25. July 23, 2024 – Met with Ed Adams at Hartford P&P – I have increasingly come to visit Ed Adams and spend time socializing with him generally. As we have become more comfortable with each other, I have progressively developed dialogue with him on his role in the hearings he has attended. During this meeting I expressed to him that there is a significant contrast between the things that he says to me directly in the office and what he says during the hearings while on the stand. Specifically I stated it seems like the state's attorney must be prepping you and giving you specific instruction on what to say. I asked him if this was true. He did not answer the

question, but stated in reply that when he is picking probation conditions for a person, there are set conditions that he has to choose from so conditions can not be catered directly for me and that he has to give answers that generally support the DOC and the general conditions. I made a comment about him not stating the truth while on the stand and he replied by saying that if he had been asked directly he would have answered directly to which I replied, the truth is written on our hearts. In this exchange it was made clear that the answer provided by Ed Adams during his testimony were answer solicited to him by the state's attorney and they were not his own free true responses, as they conflicted egregiously with conversations he and I had in private on numerous exchanges. Bava Kamma tractate on lying.

26.

27. we I can not give answers specific to your probation conditions because I only have

28. Aug 14, 2024 – During meeting in his office – We spoke generally about my pending appeal. I asked him directly if he had ever spoken to Evan Meenan about my probation conditions to which he stated explicitly, not that he did not recall ever doing so.

29. statements made by Ed Adams during my motion hearings were solicited statements that he was coached to say by the state's attorneys. I asked him this and he confirmed it indirectly.

30.

**Notary**

Subscribed and sworn to, before me, on

this _____ day of _____, 20_____

Notary Print_____

Notary Sign_____

Commission No. _____

State_____

**Affiant**

Affiant Print_____

Affiant Sign_____

Date_____

 Gmail

**Anatoly Kishinevski <a.kishinevski@gmail.com>**

---

## Obstruction of Correspondence
3 messages

---

**Anatoly Kishinevski** <a.kishinevski@gmail.com>                    Wed, Jan 11, 2023 at 11:13 AM
To: William.Collins@vermont.gov
Cc: Dan Sedon <dansedon@sedonlaw.com>, dholland@sedonlaw.com, David Hoose <dhoose@strhlaw.com>, Front Desk <frontdesk@abenakidentalcare.com>, chad.fontaine@vermont.gov, ronaldo.dwyer@vermont.gov, brigham.reese@vermont.gov

Dear Mr. Collins,

Attached to this email are the contents of the envelope in your possession that I have been told you have not opened.

I placed this envelope and an identical one in the DA unit mailbox on December 22, 2022 to be sent to you and Laurie Perkins via certified mail. Once mail is placed in those mailboxes, it is USPS mail.

All aspects of how my mail has been handled have been illegal. See 18 USCS 1702 "Theft or Receipt of Stolen Mail" and 18 USCS 1708 "Obstruction of Correspondence." These are federal offences that each carry up to five years for violation thereof. Additionally, the manner in which my mail has been handled is in violation of VTDOC Directive #409.05.

Please return this envelope (my property) to me by the end of the day today, 5:00 pm. Please do not dismiss the severity of this matter. Generally the way my mail has been handled here at NSCF has been out of compliance with federal law. This is a systemic issue that results in and facilitates the abuse of incarcerated individuals. Research has been done as to how to rectify these illegal actions. The next steps are to file formal complaints with the federal bureau of investigation and the USPIS.

There are many people in federal prisons who say "I didn't feel like a criminal. All I did was move a decimal point.". You may not regard your actions as serious, but they are. CC'd on this message are my dentist and two attorneys.

Anatoly Kishinevski
Jew, Scientist, and Human Being

---

**4 attachments**

📄 **20230110112711366.pdf**
203K

📄 **20230110112614744.pdf**
91K

📄 **20230110112750974.pdf**
876K

📄 **20230110112641824.pdf**
288K

---

**Mail Delivery Subsystem** <mailer-daemon@googlemail.com>                    Wed, Jan 11, 2023 at 11:13 AM
To: a.kishinevski@gmail.com

 **Message blocked**

Your message to **ronaldo.dwyer@vermont.gov** has been blocked. See technical details below for more information.

The response from the remote server was:

550 5.4.1 Recipient address rejected: Access denied. AS(201806281)

Final-Recipient: rfc822; ronaldo.dwyer@vermont.gov
Action: failed
Status: 5.4.1
Remote-MTA: dns; vermont-gov.mail.protection.outlook.com. (104.47.64.110, the
 server for the domain vermont.gov.)
Diagnostic-Code: smtp; 550 5.4.1 Recipient address rejected: Access denied. AS(201806281)
Last-Attempt-Date: Wed, 11 Jan 2023 08:13:26 -0800 (PST)

---------- Forwarded message ----------
From: Anatoly Kishinevski <a.kishinevski@gmail.com>
To: William.Collins@vermont.gov
Cc: Dan Sedon <dansedon@sedonlaw.com>, dholland@sedonlaw.com, David Hoose <dhoose@strhlaw.com>, Front
Desk <frontdesk@abenakidentalcare.com>, chad.fontaine@vermont.gov, ronaldo.dwyer@vermont.gov,
brigham.reese@vermont.gov
Bcc:
Date: Wed, 11 Jan 2023 08:13:10 -0800
Subject: Obstruction of Correspondence
----- Message truncated -----

---

**Anatoly Kishinevski** <a.kishinevski@gmail.com>                                    Sun, Jan 15, 2023 at 9:45 PM
To: fishmousebear3@gmail.com

# Forwarded Conversation
## Subject: Obstruction of Correspondence
-------------------------
[Quoted text hidden]
----------
From: **Mail Delivery Subsystem** <mailer-daemon@googlemail.com>
Date: Wed, Jan 11, 2023 at 11:13 AM
To: <a.kishinevski@gmail.com>
[Quoted text hidden]
---------- Forwarded message ----------
From: Anatoly Kishinevski <a.kishinevski@gmail.com>
To: William.Collins@vermont.gov
Cc: Dan Sedon <dansedon@sedonlaw.com>, dholland@sedonlaw.com, David Hoose <dhoose@strhlaw.com>, Front
Desk <frontdesk@abenakidentalcare.com>, chad.fontaine@vermont.gov, ronaldo.dwyer@vermont.gov,
brigham.reese@vermont.gov
Bcc:
Date: Wed, 11 Jan 2023 08:13:10 -0800
Subject: Obstruction of Correspondence
----- Message truncated -----

---

**4 attachments**

**20230110112711366.pdf**
203K

**20230110112614744.pdf**
91K

**20230110112750974.pdf**
876K

**20230110112641824.pdf**
288K

# M Gmail

**Anatoly Kishinevski <a.kishinevski@gmail.com>**

---

## Obstruction of Correspondence

---

**Anatoly Kishinevski** <a.kishinevski@gmail.com>
To: fishmousebear3@gmail.com

Sun, Jan 15, 2023 at 9:45 PM

## Forwarded Conversation
**Subject: Obstruction of Correspondence**
------------------------

[Quoted text hidden]
----------
From: **Mail Delivery Subsystem** <mailer-daemon@googlemail.com>
Date: Wed, Jan 11, 2023 at 11:13 AM
To: <a.kishinevski@gmail.com>
[Quoted text hidden]
---------- Forwarded message ----------
From: Anatoly Kishinevski <a.kishinevski@gmail.com>
To: William.Collins@vermont.gov
Cc: Dan Sedon <dansedon@sedonlaw.com>, dholland@sedonlaw.com, David Hoose <dhoose@strhlaw.com>, Front Desk <frontdesk@abenakidentalcare.com>, chad.fontaine@vermont.gov, ronaldo.dwyer@vermont.gov, brigham.reese@vermont.gov
Bcc:
Date: Wed, 11 Jan 2023 08:13:10 -0800
Subject: Obstruction of Correspondence
----- Message truncated -----

---

**4 attachments**

📄 **20230110112711366.pdf**
203K

📄 **20230110112614744.pdf**
91K

📄 **20230110112750974.pdf**
876K

📄 **20230110112641824.pdf**
288K

# AFFIDAVIT

I, Anatoly Kishinevski, the affiant herein do hereby Swear, Depose and Declare under penalties of perjury that the following statement is true and correct based on my personal Knowledge and belief:

1.) The affiant is a 37 year old Jewish man that has always taken careful care of his body including meticulous oral hygiene and maintaining good nutrition consisting of exclusively organic food, in accordance with his Kosher dietary practice.

2.) Over the past approximately 5 weeks the affiant has experienced his gums to rapidly recede resulting in the roots of many of his bottom teeth becoming exposed, hence causing the affiant to be in great pain.

3.) The affiant did not have problems with his gums receding or the roots of his teeth being exposed prior to arriving to NSCF and entering the custody of the VTDOC on January 14th, 2022.

4.) The affiant is having difficulty talking and eating because of the amount of pain he is in. Brushing his teeth is nearly impossible as it causes the affiant excruciating pain and the sensation that his gums are tearing, even if brushing is done very gently using a soft bristle toothbrush.

5.) Approximately 5 weeks ago the affiant was not in any pain and the roots of his teeth were not exposed. The onset of the problem happened very rapidly.

6.) The affiant met with the resident dentist of NSCF on December 15th, 2022 at approximately 8:45 A.M.. The dentist's name is Ron Caric and the affiant believes he is an employee of Vital Core Health Strategies which is the medical contractor the VTDOC uses to provide health care to individuals in its custody. During his meeting with dentist Ron Caric the affiant expressed concern about his gums receding, how quickly it had occured and that they are continuing to recede. The affiant also stated to dentist Ron Caric

that he, the affiant, was experiencing great pain as a result of his gums receding and the roots of his teeth becoming exposed. The dentist Ron Caric responded to the affiant simply stating, "It's normal for this to occur at your age." The affiant repeated expression of concern about how rapidly onset of this problem had occured, explicitly stating that 5 weeks ago the affiant did not have this problem. Dentist Ron Caric lightly acknowledged this short time frame and responded, "sometimes things happen" and he repeated "It is normal".

7.) Ron Caric's responses to the affiant's concerns were given after Ron Caric gave a very quick visual examination (less than 60 seconds) of the affiant's mouth using a high intensity light. Ron Caric's attitude and efforts appeared dismissive as was marked by his very brief examination of the affiant's mouth and the single sentence responses he provided when addressing the affiant's concerns. Ron Caric demonstrated no concern about the rapid onset of the affiant's receding gums problem, nor did Ron Caric demonstrate concern or offer any help, remedy or acknowledge--ment to the affiant's expression of being in great pain.

8.) The affiant stated concern to dentist Ron Caric that the symptoms he was experiencing may be symptoms of mal-nutrition. The affiant briefly explained to dentist Ron Caric that since his, the affiant's, arrival to NSCF that the VTDOC had not honored or supported his Kosher dietary practice and for the entire time the affiant has been in VTDOC custody he has been in a chronic state of calorie and nutrient deficiency. Ron Caric made no acknowledgement of the presented notion, that the problem with the affiant's gums could be caused by mal--nutrition, and responded ambiguously, "It's completely normal".

9.) The affiant saw dentist Ron Caric on September 22nd, 2022 and had his teeth cleaned in that meeting. On September 22nd, during this meeting, the affiant's gums were normal and healthy.

On September 22ⁿᵈ, 2022 the affiant's gums were not receding or receded, no roots were exposed and he was not experiencing any pain. VCHS staff member Alysha Grenier was present and assisting dentist Ron Caric on September 22ⁿᵈ while he cleaned the affiant's teeth.

10.) On several instances in the past 3 weeks, while inspecting his gums in a mirror, the affiant discovered his gums to be bleeding.

11.) The interface between the affiant's teeth and gums (gumline) is red and inflamed.

12.) The affiant met with VCHS R.N. Reese on Dec 9th, 2022 and she took measurements of his vital signs and talked to him about his gums.

13.) The affiant met with VCHS L.P.N. Michelle on the morning of December 15th, before seeing dentist Ron Caric. L.P.N. Michelle took measurements of the affiant's vital signs.

14.) From the time the affiant met with R.N. Reese on December 9th to the time he met with L.P.N. Michelle on December 15th, his gums receded significantly with pain scale increasing from a 2-6 to a continuous 8 at rest, a 9-10 during eating and talking and a 10 while brushing.

15.) The affiant's chronic pain from his receding gums is very stressful and it is disturbing his ability to eat and be well. The pain extends deep into his lower jawbone and he is afraid of his teeth falling out.

16.) The affiant is having his health neglected by the VTDOC and VCHS and is in immediate danger of permanant harm to his body.

Subscribed and sworn to before me on
this 28 day of DEC, 2022
(Month)        (Year)
(Notary Print) John Hardy
(Notary Sign)
(Commission#) 157.0006186
(State) Vermont   Exp 1/31/2023

(Affiant Print) Anatoly Kishinevski
(Affiant Sign)
(Date) Dec 28, 2022

Pg 3 of 3  —  Receding Gums

which was still attached, had the "Denied box checked. The second envelope, which had been addressed to Bill Collins, was not returned to me. On December 28th I saw Bill Collins in my unit and asked him if he received it. He denied knowing what I was talking about and denied receiving a manila envelope in his mailbox. I do not have it. It was not returned to me. No disposition form or confiscation form was provided to me. My mail has been illegally impeded and a legal process has been illegally impeded. A CO told me they believe they saw this envelope in

**VERMONT Department of Corrections**

**REPORT OF LOST OR DAMAGED PROPERTY**

Incarcerated Individual Name: _____  DOB: _____  Facility: _____

| Description of Property (Must include size and complete description): | Value Alleged By Incarcerated Individual |
|---|---|

On Dec 22nd I placed two pieces of mail in the DA mailbox. They were 9x12 manila envelopes. One was addressed to Lori Perkins and the other was addressed to Bill Collins. The envelopes had identical contents e.g. affidavits and correspondence records regarding a medical issue I'm waiting for administrative action on. Both envelopes were signed by the same CO at the same time prior to placing them in the mailbox. Both envelopes had inmate check withdrawal slips on them marked for postage. The inmate check withdrawal slips were filled out with identical information, instruction, and formatting of text which stated explicitly and boldly: A) The envelopes contained a legal document B) Send ONLY by certified first class with signature required and C.) Do NOT deliver by interdepartmental mail. On Dec 27th the envelope addressed to Lori Perkins was returned to me unopened. The inmate check withdrawal form

Total Estimated Value: _____

Incarcerated Individual Signature: *Austin Hill*    Date: Dec 29th, 2022

Received By (Staff Name Printed): CO11 Reese    Signature: _____    Date: 12-29-22

---

☐ Ownership NOT Verified

☐ Ownership Verified

Does claim involve another Facility:  ☐ Yes ☐ No

Investigation Assigned To: _____

SOS Signature: _____

Date: _____

*Once signed by the SOS, the facility has fifteen (15) business days to investigate and resolve a claim of lost or damaged property.*

*If the claim involves another facility, the time period for resolution may be extended an additional fifteen (15) days.*

Investigating Staff's Findings:

Date: _____

Investigating Staff Name: _____    Investigating Staff Signature: _____

Based on the information above, I have decided to take the following action regarding this report of lost or damaged property:

☐ Replacement Denied  ☐ Replacement Approved

Replacement Date: _____

☐ Reimbursement Denied  ☐ Reimbursement Approved

Reimbursement Date: _____

If denied, list why: _____

Superintendent Signature: _____    Date: _____

I hereby acknowledge I have received the lost or damaged item(s) listed on this form or replacement item(s) of like value or reimbursement and have NO FURTHER CLAIM TO THE ITEMS LISTED AS LOST OR DAMAGED ABOVE.

Incarcerated Individual Name: _____    Incarcerated Individual Signature: _____

Staff Signature (Witness): _____    Date: _____

WHERE IS MY PROPERTY? This is not acceptable. Please provide a prompt response.

[Right margin handwritten text:] Bill Collins mailbox on the 27th but I didn't see Bill Collins promptly return it. Either confirm delivery of this envelope to Bill Collins or promptly return it. Home As it is this moment my mail has been illegally diverted. Resulting in the theft of my property and legal documents. I spoke to Sgt about this on the evening of the 28th and he told me he would review the security footage to find out where it went.

Anatoly Kishinevski
#164759 – NSCF
2559 Glen Road
Newport, VT 05855

Dec 22nd, 2022

Lori Perkins – Superintendant
William Collins – Volunteer Service Coordinator
Northern State Correctional Facility
2559 Glen Road
Newport, VT 05855                    (Manual copy 2 of 3)

Dear Ms. Perkins and Mr. Collins,

I hope you are both well. You are strongly encouraged to review the enclosed and provide a response to my Sep 14th Religious Accomodation Form, with no further delay.

You have allowed harm to come to me. It is not acceptable. The law applies to you also and you are not following it.

You may be sued both in your individual and official capacity.

Respectfully,

Anatoly Kishinevski

# AFFIDAVIT

I, Anatoly Kishinevski, the affiant herein do hereby swear, Depose and Declare under penalties of perjury that the following statement is true and correct based on my personal knowledge and belief:

1.) The affiant is a 37 year old man that has been in the custody of the VTDOC since January 14th, 2022.

2.) The affiant is a Jewish scientist that maintains a strict Kosher practice that prohibits the use of fluoridated products, e.g. fluoridated toothpaste, Teflon cookware, medications and drugs in which the molecule contains a fluorine (fluoride) atom or atoms.

3.) The affiant's Kosher practice also prohibits ingesting refined sugars and refined carbohydrates.

4.) The affiant had never used fluoridated (fluoride) toothpaste in his adult life prior to arriving to NSCF on January 14th, 2022.

5.) The affiant began asking for fluoride free and sugar free tooth-paste (specifically Auramere or Vicco brand, which are in accordance with his religious practice) immediately upon arriving to NSCF. His requests were made both in writing and verbally to an array of VTDOC and VCHS staff including, but not limited to, correctional officers, case workers, the former NSCF superintendant Scott Martin, former Security Operation Specialist Caleb Lefebvre, Religious & Volunteer Service Coordinator William (Bill) Collins, former P.A. Desai, P.A. Cory LeBlanc, Health Services Administrator Susan Kupiec. The affiant was either ignored or denied and referred to another party in all instances, effectively being sent in admin-istrative circles and receiving no help or solution.

6.) On or about September 14th, 2022 an Inmate Religious Accomodation Form was submitted to Bill Collins and Lori Perkins, who are both employees of the VTDOC. They hold the positions of Religious & Volunteer Service Coordinator and Superintendant, respectively. The submitted form was a request for a fluoride free and sugar

Free toothpaste that is compliant with the affiant's Kosher practice.

7.) On October 5th, 2022 the affiant met with Bill Collins in his office and the affiant's pending Inmate Religious Accomodation Form was discussed in detail. Bill Collins told the affiant that he had researched the affiant's request and all the information contained within the submitted form carefully and that he had submitted all of the information he collected to the Superintendant, Lori Perkins, for review. Bill Collins complimented the affiant on the thoroughness of the information provided and stated he had learned a lot in the process of reviewing the affiant's request for fluoride free toothpaste.

8.) On October 6th, 2022 an email was delivered to Lori Perkins on behalf of the affiant. The email stated and summarized the affiant's statutory and constitutional right to toothpaste that is compliant with his religious practice. A copy of the original Inmate Religious Accomodation Form from September 14th, 2022 was attached to the email in PDF format. Recipients of this email also included the affiant's personal dentist D.M.D. Matthew Heimbach of Abenaki Dental, one of the affiant's attorneys Dan Sedon of Sedon & Associates and the very kind paralegal of Sedon & Associates, Denise Holland. It was intended that Bill Collins be included on this email, but a mistake was made and his email address was entered incorrectly. A copy of the email from October 6th, 2022 is attached to this affidavit.

9.) On or about October 7th or 8th Superintendent Lori Perkins visited Delta Alpha (DA) which is unit the affiant was housed at the time the email from October 6th was sent. The affiant saw Lori Perkins walking through the unit, but did not know who she was. When Lori Perkins got closer to where the affiant was standing, in the area in front of cells 11 and 12, the affiant politely said hello to her and asked her if she was a new supervisor. Lori Perkins responded stating she was the superintendant. The affiant

was grateful for this serendipitous opportunity to discuss his need for toothpaste and he introduced himself stating his full name and that he was the one that had sent her an email on October 6th. Lori Perkins body language immediately shifted from amicable to furious. She had a very angry look on her face and the affiant felt threatened by the way she was looking at him. Fearing that he could be "dragged" to solitary confinement in retaliation for saying even one more word, the affiant, as politely and gently as possible, asked Lori Perkins if she could please give him permission to get the toothpaste he needed. Lori Perkins responded that the affiants request had been forwarded to the appropriate parties for review. The affiant stated in response that he was suffering badly without toothpaste and she repeated her prior response, that the affiant's request had been forwarded to the correct personnel for review. The affiant felt that Lori Perkins did not care that he had been deprived of toothpaste for the past approximately 8 months. Lori Perkins did not present or offer any concern that the affiant was suffering as he was being deprived of basic hygiene products.

10.) On October 19th, 2022 a second email regarding the pending Inmate Religious Accomodation Form was sent to Lori Perkins on behalf of the affiant. The email included additional information pertaining to the affiant's request for toothpaste. The email also contained information and a response, to a prior Inmate Religious Accomodation Form regarding a request for hydrogen peroxide, that Lori Perkins had rejected with an unfounded and apparently arbitrary reasoning and explanation. Attached to the October 19th email were copies, in PDF format, of both of the Inmate Religious Accomodation Forms (both the pending one for toothpaste and the rejected one for hydrogen peroxide). The October 6th email was included in the email message history i.e. the October 19th email was a forwarded copy of the October 6th

email with additional information and pertinent content. The correct email address was used for Bill Collins. Also included as recipients were the former and current Health Service Administrators Amanda Nagell and Susan Kupiec, VCHS presiding physician Steve Fisher, dentist Ron Caric, nurse and dental assistant Alysha Grenier and Security Operations Specialist (former) Caleb Lefebvre.

11.) On October 20th, 2022 Bill Collins passively acknowledged receiving the October 19th email in a face to face exchange with the affiant while commisary orders were being distributed to inmates. While standing on opposite sides of a folding table, Bill Collins greeted the affiant while placing the plastic bag contain-ing the affiant's commisary order on the table for him to inventory and verify was complete. The affiant greeted Bill Collins in return and then asked Bill Collins if he had read the email that was sent to him the night before. Bill Collins facial expression immediately changed from smiling and pleasant to one of mild frustration and irritation and he stated to affiant, "just focus on checking your commisary", offering no further communication. It was clear the topic of the email was something Bill Collins wanted to avoid and he was not happy it had been raised by the affiant. A copy of the email from October 19th, 2022 is attached to this affidavit.

12.) On October 27th, 2022 at approximately 1:30p.m. Bill Collins was visiting the DA unit which is where the affiant is currently housed and was housed on October 27th, 2022. The affiant spoke to Bill Collins and expressed to him that he was suffering badly without toothpaste and that his mouth was sustaining injury as he had been deprived of basic hygiene products for over 9 months. The affiant asked when he would receive a response to his Inmate Religious Accomodation Form requesting access to fluoride free toothpaste. Bill Collins replied to the affiant stating that he thought an answer was ready or that

an answer would be ready very soon. The affiant reiterated to Bill Collins that he was suffering badly without toothpaste and asked for him to please check on the status of his request and to please let him know. Bill Collins acknowledged the affiants request for an update and told the affiant he would check on the status and would let him know. The aforementioned conversation can be verified by reviewing the security camera footage of the area in front of Cell 14.

13.) To date, no response of any kind has been provided to the affiant, either from Bill Collins or Lori Perkins, and both are aware the affiant is suffering harm to his health as a result of not having toothpaste.

14.) Oral hygiene has always been a top priority to the affiant and being deprived of oral hygiene products e.g. toothpaste, is causing the affiant extreme stress, to a degree that he has had nightmares about this topic on August 18th and 20th, September 17th and 18th, October 24th and 25th. The affiant feels anxiety about this topic (lack of toothpaste) continuously and it is fatiguing him mentally and harming him emotionally.

15.) The affiant has experienced his gums to recede significantly since entering VTDOC custody on January 14th, 2022. The affiant's gums have receded so much that the roots of many of his teeth have become exposed and he is in chronic pain (8 on 1-10 pain scale) and it is affecting his ability to talk, eat and sleep well. The affiant did not have problems with his gums receding prior to entering VTDOC custody.

16.) Out of desperation to prevent harm to his teeth, the affiant attempted to use very small quantities of fluoride toothpaste on several occasions, from approximately mid February 2022 to present. On each instance the affiant attempted use of fluoride toothpaste he suffered an acute adverse reaction that included insatiable thirst, dry mouth, headache, pain and discomfort in

his esophagus and stomach. On April 27th, 2022 the affiant met with P.A. Cory LeBlanc to discuss various health concerns of the affiant. The affiant explained to the physicians assistant Cory LeBlanc how in desperation to prevent harm to his teeth he had used small amounts of fluoridated toothpaste on several instances, but had experienced an adverse reaction each time. P.A. Cory LeBlanc was aware that the affiant does not use Fluor-idated toothpaste, in accordance with his religious practice, and that prior to coming to NSCF, the affiant had never used fluoridated toothpaste in his adult life. In response to the affiant describing the adverse reactions he experienced in his attempts to use fluoridated (Fluoride) toothpaste, P.A. Cory LeBlanc remarked with interest and intrigue that the affiant's body "must not be use to it", referring to fluoridated toothpaste. In this exchange P.A. Cory LeBlanc conceded it was reasonable for the affiant to be provided access to fluoride free toothpaste, in consideration of all aspects of the affiant's request. P.A. Cory LeBlanc told the affiant he would look into what solutions might be possible and he would try to get him a fluoride free toothpaste, possibly Vicco or Auramere as affiant has been requesting. P.A. Cory LeBlanc told the affiant he would follow up with him. P.A. Cory LeBlanc never followed up with the affiant as he had committed to doing and no solution was ever offered to the affiant.

17.) On November 14th, 2022 the affiant spoke to nurse Alysha Grenier on the middle tier of the DA unit at approximately 4 p.m. Alysha Grenier confirmed receiving the October 19th email and stated she had read it. She made statements to the affiant encouraging him "to keep pushing" and to keep working to get what he needs. Alysha Grenier is always very kind and does her job well.

18.) Former Security Operations Specialist Caleb Lefebvre referred the affiant to Bill Collins to request approval for the toothpaste

he needs. This referral was provided to the affiant most recently in writing on or about August 1st, 2022. A copy of the correspondence and referral from SOS Caleb Lefebvre is attached to this affidavit.

19.) Bill Collins has demonstrated his ability to approve Inmate Religious Accomodation Forms independently and in a timely manner on no less than three prior instances when the affiant submitted requests for a yarmulka, a Torah and accomodation for holiday

20.) There are many sects of Judaism and there is no central agency that defines or enforces what constitutes "Kosher". Some Jews may accept as Kosher what other Jews may not accept as Kosher, and vice versa. The VTDOC continues to rely on the Union Orthodox hechsher symbol as an indicator and baseline for what is Kosher or not, in their application of policies for addressing and accomodating Jewish individuals in their custody. The affiant has on numerous instances, through an array of means, com-municated to the VTDOC that he does not accept the Union Orthodox Kosher certification and foods or products certified as Kosher by Union Orthodox are not Kosher by his practice.

21.) The affiant is being harmed in all aspects of his being by the negligence of all privy to, and aware of, the pending request as described herein this affidavit.

Subscribed and sworn to before me on this 22ND day of DECEMBER, 2022    (Affiant Print) Anatoly Kishinevski
(Month)    (Year)
(Notary Print) SCOTT MOORE    (Affiant Sign) Anty ____
(Notary Sign) ____    (Date) December 22nd, 2022
(Commission #) 157.0012350
(State) VT

 Gmail

**Anatoly Kishinevski <a.kishinevski@gmail.com>**

## Religious Accommodation - Toothpaste

**Anatoly Kishinevski <a.kishinevski@gmail.com>**                                    Thu, Oct 6, 2022 at 7:48 PM
To: lori.perkins@vermont.gov
Cc: Front Desk <frontdesk@abenakidentalcare.com>, Collins.William@vermont.gov, Dan Sedon
<dansedon@sedonlaw.com>, dholland@sedonlaw.com

Dear Ms. Lori Perkins,

I come in peace and I really just want to be able to take care of my body. Please can you respond constructively with no more delay. Very kindly, thank you.

I had an in depth discussion with Mr. Bill Collins yesterday. He told me that he forwarded you information on this topic for your consideration. Title 28 VSA 803 is very clear. It states that exercise of my religious beliefs is permitted. It does not state it is to your discretion to decide if my religious belief is valid. The attached document exhaustively explains my religious stance and perspective. It is the law by statute that you must give me access to this hygiene product as I have been requesting for the last nine months. If you are not going to give me permission to purchase this product, please can you explain to me why you are exempt from following the law. There are many people who choose what laws they want to follow and which ones they want to disregard, often assigning their own creative justification as to why the law does not apply to them. Sometimes the word criminal is used to describe these people.

When I arrived to NSCF I had a minor problem with one tooth that I had been successfully managing without it progressing for several years. As I've been deprived of oral hygiene products my tooth has progressed to the point that on August 11th the dentist here, Ron Caric, said that if something wasn't done soon, my tooth would be lost. This is not acceptable. I'm being injured. CC'd on this letter is my dentist who can testify as to the history of my oral care. Also CC'd is one of my attorneys.

Pursuant to Title 28 V.S.A.§ 803, Chapter I Article 3 of the Vermont Constitution and the RLUIPA 42 U.S.C. §§ CC-1 through CC-5, you MUST provide me access to toothpaste in accordance with my religious practice, either Vicco or Auramere brand. It is the law. You are allowing harm to come to me by preventing me access to this hygiene product as I have been requesting since my arrival to NSCF on Jan 14th, 2022.

See attached.

Respectfully,

Anatoly Kishinevski

### § 803. Exercise of religious beliefs

(a) An inmate at any correctional facility shall have the right of free exercise of his or her religious beliefs...

(b) Such exercise of religious beliefs as is permitted by subsection (a) of this section may be restricted only upon a determination by the commissioner that the exercise would interfere unreasonably with the maintenance of discipline and security at the correctional facility.

(c) The supervising officer of any correctional facility shall have the authority to compensate any clergyman selected by him or her to conduct visitations and carry out other services at the facility. (Added 1971, No. 199 (Adj. Sess.), § 20.)

**2 attachments**

📄 **VTDoc-Toothpaste.pdf**
4080K

📄 **Toothpaste.pdf**
562K

12/4/22, 5:19 PM                                    Gmail - Religious Accommodation - Toothpaste

 Gmail                                      **Anatoly Kishinevski <a.kishinevski@gmail.com>**

---

## Religious Accommodation - Toothpaste

---

**Anatoly Kishinevski <a.kishinevski@gmail.com>**                          Wed, Oct 19, 2022 at 5:45 PM
To: lori.perkins@vermont.gov, williams.collins@vermont.gov, Front Desk <frontdesk@abenakidentalcare.com>, Dan Sedon
<dansedon@sedonlaw.com>, dholland@sedonlaw.com
Cc: skupiec@vitalcorehs.com, anagell@vitalcorehs.com, sfisher@vitalcorehs.com, agrenier@vitalcorehs.com,
Rcaric@vitalcorehs.com, Caleb.Lefebvre@vermont.gov

The message below was sent to you on October 6th. Serendipitously, you visited my unit (DA) less than 48 hours later. I
was grateful to have the opportunity to meet you in person although it was very brief. I asked you if I was going to be able
to get the toothpaste that I need and I also expressed that I am truly having a problem. In that exchange you told me that
the matter had been forwarded to the appropriate personnel for review. Here we are now on October 19th and I have still
not received a response. What I'm experiencing is literally torture to me. My oral hygiene is suffering severely and on
August 11th the dentist Ron Caric told me that if something wasn't done soon then one of my teeth would be lost. I have
been having nightmares about this topic and unable to sleep. Do you understand that it is agonizing that I am unable to
take care of my God given precious body? I feel terrified by the circumstance, I'm trapped.

Title 28 V.S.A. § 601 (1, 2, 3) generally states that YOU, the supervising officer of the facility, are responsible for retaining
in confinement in <u>accordance with the law</u> (inmates), to enforce provisions of law for <u>care of inmates</u>, to take proper
measures to protect <u>safety of inmates</u>. The law is explicit that you are responsible for the safety and care of inmates.

The Vermont DOC resident handbook, that was just published on October 14th 2022, states numerous commitments by
the DOC regarding treatment of inmates that I have not experienced or observed since entering custody of the DOC
January 14th 2022. On page 2 in the section titled Non-Discrimination it states DOC policy is to treat all persons in a
respectful, curtious, and professional manner while maintaining safety and security. I do not feel I've experienced the
DOC maintaining my safety.

 On page 3 in the Intake section it states that it is important to tell health services staff about any health and dental
problems you (inmate) may have.  I did this exhaustively regarding my dental issues and have been ignored almost
entirely. The small amount of attention I have been given has been ineffective and insufficient and it took 8 months to
receive when I got my teeth cleaned by Ron Caric.  In my meeting with Ron Caric on September 22nd he told me he
didn't have time to do anything more than clean my teeth as there were 70 to 90 inmates with more serious dental issues
and he literally didn't have time to address my needs.

On page 28 of the VT DOC handbook in the Medical Services section it states the VT DOC recognizes that good
healthcare is important to well-being and positive adjustment in the facility. Therefore, healthcare services are provided to
maintain the health of all incarcerated individuals. These services include medical, dental, and mental health services.

I have experienced the absolute opposite of all of these things listed above. I have had to wait 8 months to be seen by the
dentist, then was told the dentist is too busy to help me. My legal right to freedom of religion and my need for basic oral
hygiene products have not been respected. As a consequence I am sustaining significant physical harm to my body (my
teeth) and in a perpetual state of extreme stress. This overall equation is so out of balance that it's hard to believe.

Upon intake I was very careful to explain to medical staff that I had a dental issue that required daily use of hydrogen
peroxide to prevent progression of. See attached for detailed description. On March 4th I met with the Dentist Dr Patel
and she gave me a basic oral examination. She acknowledged that one of my teeth had a tiny bit of decay and conceded
that regular use of hydrogen peroxide would be sufficient and effective for preventing progression of my problem. This is
what I had been doing for several years prior to arriving at NSCF which is documented by my personal dentist in my
dental records (my dentist is CC'd on this message). Dr. Patel ordered hydrogen peroxide for me so I could maintain my
oral hygiene, but after my meeting with her I did not see her again. I asked the nurses numerous times for access to
hydrogen peroxide and they told me I needed a doctor's order. I tried relentlessly through respectful and appropriate
efforts to get someone from VCHS/VTDOC to give me the doctor's order, and I received no response or help. I wrote to
my dentist about what was happening and he mailed me a prescription / doctor's order to give me access to hydrogen
peroxide. This prescription, which constitutes privileged mail, was seized without my knowledge by VCHS/MSCF
personnel and was not returned to me until I threatened to file a criminal complaint. See attached.

I also delivered the prescription to you, Lori Perkins, and HSA at the time Amanda Magell via certified mail. See attached.
Included in the envelopes were a detailed description for my need of the hydrogen peroxide. I received no response from
medical, which they are legally obligated to provide pursuant to Title 28 V.S.A. § 801 (e)(3)and(e)(5)(A). This therapy is

12/4/22, 5:19 PM                                    Gmail - Religious Accommodation - Toothpaste

medically necessary to prevent the onset or worsening of a condition. Also in the certified envelope I sent to you was included an inmate religious accommodation request form which explained my need for hydrogen peroxide and it's overlap with my religious beliefs which are sincerely held. In the response you gave me dated July 26, 2022 you stated an array of hazards associated with hydrogen peroxide then simply said it is not allowed. See attached. Ironically in every bathroom here at NSCF is a spray bottle of hydrogen peroxide solution. It is in fact the only cleaning product that inmates have access to and every time they sit on the toilet they use hydrogen peroxide to clean the seat. The commercial name of this particular product is H2Orange2. Envirox concentrate 117 which the active ingredient is 3.95% hydrogen peroxide and is diluted down to 0.5% to 2% concentration before it is distributed to the inmate population. This H2Orange2 product includes a toxic denaturing agent and is in fact significantly more hazardous than the 1.5% concentration colgate peroxyl prescription that you told me is not allowed even though it is medically necessary to prevent progressive injury to myself. Your explanation for why my prescription cannot be filled is unfounded.

Furthermore and to close on this topic all of the toothpaste that is available to inmates is highly toxic and has an explicit poison control warning on the package. These fluoridated toothpastes are dangerously toxic. The toothpaste I am requesting, either Vico or Auramere brand, offer 0 toxicity and a person could eat an entire tube with no adverse problems. The argument that either of these toothpastes I'm requesting contain hazardous chemicals or ingredients cannot be used, it is simply not the case.

I politely demand with no further delay and no further harm to my being that you provide me with access to the Colgate Peroxyl and allow me to purchase toothpaste in accordance to my personal and religious needs and practice. The law and VT DOC policies cannot be written any more explicitly than they are. It is an obligation to comply with no further delay. I would like to inform you that as this event has resulted in physical harm to me, all involved party members maybe sued both in their official capacity and individual capacity including for damages. If the VTDOC general council has not informed you, you are personally liable for the injury I am sustaining. I hate that I have to write these messages. They take incredible time and effort and generous help from my support on the outside. I just want basic hygiene products so I can take care of my body. CCd on this message is one of my attorneys.

Do not retaliate against me in any form. I know my rights and I have not violated any policy in this effort to secure and protect my health and safety.

Kindly, Sincerely, Genuinely,

Anatoly Kishinevski
Jew & Scientist

Over these three does God weep everyday: Over him who is able to study the law but neglects it; over him who studies it amid difficulties hard to overcome; and over the ruler who behaves arrogantly toward the community he should protect.

Chaggigah, Fol. 5, Col. 2

————— Forwarded message —————
From: **Anatoly Kishinevski** <a.kishinevski@gmail.com>
Date: Thu, Oct 6, 2022 at 10:48 PM
Subject: Religious Accommodation - Toothpaste
To: <lori.perkins@vermont.gov>
Cc: Front Desk <frontdesk@abenakidentalcare.com>, <Collins.William@vermont.gov>, Dan Sedon <dansedon@sedonlaw.com>, <dholland@sedonlaw.com>

[Quoted text hidden]

**7 attachments**

📄 **VTDoc-Toothpaste.pdf**
     4080K

📄 **Toothpaste.pdf**
     562K

📄 **HydrogenPeroxideRequestAndPrescription.pdf**
     1312K

📄 **HydrogenPeroxidePrescriptionCertifiedDelivery.pdf**
     1292K

**DoctorPatelHydrogenPeroxideLetter.pdf**
641K

**HydrogenPeroxidePrescriptionIntercepted.pdf**
577K

**DentalMedicalRequestResponseMarch11th2022.pdf**
147K

1-Aug.-2022

Mr. Kishinevski,

I took the time to review your request for the fluoride-free toothpaste. In response to your request, I will refer you to Bill Collins, who is out Volunteer Services Coordinator, as he is better suited to answer your questions regarding ordering religious-based items. If you need special toothpaste to meet your medical needs, I will refer you to our medical department.

Respectfully,

SOS Lefebvre

*Pursuant to Title 28 V.S.A. 803, Chapter 1 Article 3 of the VT Constitution AND RLUIPA 42 U.S.C. §§ 2000 cc-1 through cc-5, you MUST accomodate this request for Fluoride and sugar free toothpaste, in accordance with my Kosher practice.*

## INMATE RELIGIOUS ACCOMMODATION REQUEST FORM *It is the law!*

If more than one inmate is filing a request, each inmate must submit a form. If this is a group request, information must be submitted to the facility Volunteer Services Coordinator who will compile information about the group request and foward the information to the Department of Corrections Facilities Executive and the facility Superintendent. **NOTE:** Do not use this form to request a religious diet. See administrative directive #354.05, Inmate Alternative Diets, for the correct form. Please attach additional pages if needed.

**Inmate Name:** Anatoly Kishinevski    **DOB:** Feb 14, 1985    **Date:** Sep 14, 2022
**Name of Religion:** Judiasm

1. Describe, in detail, your religion's basic tenets or beliefs which you feel require that you be provided with the requested accommodations: "all Divine precepts, without exception, are purposeful, aiming at the perfection of the body and soul, since a pure spirit can dwell only in a pure body" Ibid., XXXL "the welfare of the body can be secured only if it is pursued in a manner prescribed by the Torah in which the laws aiming at this end are treated most carefully and most minutely" Pg.9 The Divine Commandments by Nissan Mindel

2. Give a detailed description of the requested accommodation or property source: I do not ingest Fluoride as it serves no natural biological role in the human body. Hence, I do not use Fluoridated toothpaste or any toothpaste with added sugar. In accordance with my Kosher practice I have used either Vicco or Auramere brand Ayurvedic Fluoride free toothpaste my entire adult life. I have been without toothpaste since I arrived to NSCF on Jan 14th, 2022 and my teeth are being severely damaged and hurt. Please give me permission to purchase one of these two toothpastes.

3. List any publications, which explain the religious significance of the requested accommodation. Provide a copy of the publication(s) to the Volunteer Services Coordinator. I am a Jewish scientist and I believe that Fluoride is a toxin to the human body. Fluorine is the only element with a stronger electronegativity than oxygen, so anywhere oxygen is bound in a molecule, Fluorine (Fluoride) can displace it. This is called oxidative stress which is what commonly mentioned "antioxidants" in food try to protect us against. Fluoride in the body does exactly the opposite of antioxidants.
"But however great the literary value of a code may be, it does not invest it with the attribute of infallibility, nor does it exempt the student from the duty of examining

4. Is there a recognized governing body for this Faith Group? If so, please provide contact each information. Paragraph on its own merits, and subjecting it to the same rules of interpretation that were always applied to tradition" - Professor Solomon Schechter Studies in Judiasm

**Inmate Signature:** Anatoly K.    Sep 14, 2022

**Superintendent Signature:** _____    **Date:** _____

**Comments and/or Recommendation:** ☐ **Approved**    ☐ **Denied** *(& Reason - Use back if needed.)*

**Facilities Executive Signature:** _____    **Date:** _____

**Comments and/or Recommendation:** *(Use back if needed.)*

Cc: Facility Volunteer Services Coordinator, Property Officer, Caseworker, Inmate, Inmate Core File

June 27, 2022

Hi Cory,

I hope you are doing excellent. I have immediate medical concerns and am delivering this correspondence to you with the hope that you can help me. I generally feel like I have not received the medical and health care I need since my arrival to NSCF on Jan 14th, 2022. This is informal correspondence and precludes more formal action on my part in which I will place liability on you both in your personal capacity and official capacity. I will also place liability on the administrators of VCHS and the administration of the DOC. I will ensure that culpability is secured in this process. I don't mean for this to be threatening. I am simply being objective and attempting to secure the medical support I need. I think you are a super nice guy and genuinely appreciate you and our exchanges. I have identified you to be the individual with the sole power to help me. I genuinely come in peace, but I need help without any further delays. My concerns and requests are as follow in descending order of priority.

1.) Severe pain in my right testicle - Since I saw you in early May and we discussed swelling and pain in my right testicle, the pain and swelling have persisted. The pain is significant and fluctuates in intensity between a 6-9 on a 1-10 scale, 10 being most serious. It is majority of the time on the higher end of the scale and is severe to the degree that I am having troubles sleeping. If I push on it there are very tender parts and I feel extreme pain almost to the degree that I want to throw up. The pain radiates up into my abdomen on my right side and on at least one instance I could feel the pain, nerve pain, in my right toes. My right testicle is harder than my than my left and it is swollen. When I shower, the right side of my scrotum is noticeably redder and it is clear there is extra blood flow to the right side of my scrotum as my body is trying to rectify whatever the problem is. There is something very wrong and it is not going away. I am in chronic pain. I want a testicular ultrasound ordered for me with no further delay. If what I am experiencing is some type of testicular cancer, I do not want to find myself in mortal danger because of a slow or absolute lack of response from you or your employer. Please take this correspondence serious. I need whatever the problem is I am suffering from to be addressed with no further delay. I feel scared. You would feel scared also if you were in my position.

2.) When I saw you last, we discussed that I have not had toothpaste since I arrived to NSCF on Jan 14th, 2020. We discussed that I am a Jewish scientist and for religious reasons I do not use fluoridated toothpaste and that the only toothpaste on commisary is fluoridated. Sodium fluoride, which is the active ingredient in fluoridated toothpaste, is an FDA regulated drug, which I am entitled to decline use of in parallel to my religious practice. The problem is for the entire duration I have been here at NSCF, I have not been able to access a fluoride free toothpaste and my oral hygiene is suffering very badly as a result. Out of desperation I have used a fluoridated toothpaste on three instances and on all three

Pg. 1 of 3

instances had a headache ensue for several hours afterward. My research in the past week confirmed there is a sensitive subpopulation of individuals that get headaches from fluoride exposure. I am requesting medical approval and permission to purchase a sugar free and fluoride free toothpaste, specifically either Vicco or Aurathere brand. You told me when we met last that you would check on this, but I never heard from you since. Again, my teeth are sustaining severe injury by not having access to toothpaste. I have the right to exercise freedom of religion pursuant the Free Exercise Clause of the First Ammendment of the U.S. Constitution, The Religious Land Use and Institutionalized Persons Act (RLUIPA) and Title 28 Vermont Statutes Annot. § 803. My request for accomodation must be granted or you and any involved parties will absolutely be liable for damages. SEE Goodnow V. Palm, 2003 U.S. Dist. LEXIS 8980  For your convenience you can contact the Community Legal Information Center at the Julien and Virginia Cornell Library in South Royalton, VT and they can email you the case I cited for your review. The plaintiff in this case was incarcerated here at NSCF and was awarded  $100,000 **in damages**  for neglect by the medical contractor at the time to provide care to a dental issue he was suffering from.
* Also SEE Williams V. Annucci, 2013 U.S. App. LEXIS 18670

3.) Lastly, I am 100% certain I am not getting an adequate nutrient profile. I am missing 2-3 meals a day because the kitchen and DOC have failed to date, to recognize my religious dietary practice and I am unwilling to toxify my body with adulterated food. Nutrients I am NOT getting enough of are Calcium, Magnesium, Zinc, Copper, D and Iron, at minimum. I know that I am not getting enough of these vitamins because of the way I feel, how I am sleeping and that I have wounds on my body that are not healing. I take the vitamins from commisary, but it's chemical profile is very limited. I attached the label from the commisary multi-vitamin for your interest and discussion purposes. I am very concerned about the deficit of the above mentioned nutrients. PLEASE will you put in an order so that I can take these supplements. I recognize that blood work was done and that I did not test low for any nutrients. I would like to state that I fundamentally reject western medicine and I manage my wellness through strict principles that are deeply routed in my religious practice. Upon careful review of medical literature one will find that screening procedures used by VCHS are not 100% statistically accurate. Even more critical to consider is that once a person starts to test low for certain nutrients, they have entered a state of depletion of their body's stores of these nutrients. It is a crime against the individual to use such a technique to determine when dietary supplements are needed. I do not want to wait until I have depleted my body's stores. I have for for my entire adult life exercised extreme care to keep my body clean and optimally balanced. Please help me sustain this. I plead with you for your understanding and help. If not already a principle you are aware of, our blood has to maintain a very precise pH of approx 7.3-7.3 (I don't remember exact value). The skeleton is our bodies reserve of minerals and electrolytes and it rapidly releases **and** absorbs

minerals into and out of our blood in order to keep our blood pH exactly correct. Our skeleton is our bloods buffering system. With awareness of this dynamic in our bodies, I have intentionally built up the nutrient cache in my skeleton as much as possible over the past ~20 years through great care in what I consume, tuning the input of certain foods and utilizing carefully selected high quality supplements. I would like to have permission to buy the supplement Bone-Up by Jarrow and I would like an iron supplement. Please help me. I can feel my body is being harmed progressively by the environment I am trapped, I am suffering overwhelming durress and it is literally torture mentally knowing that my body chemistry is being skewed from the perfect stoichiometry I tuned it to be. When you consider the skeletons role in buffering blood chemistry it becomes apparent why waiting until a person has detectable low levels is too late.

As you acknowledged when we met last and you took my blood pressure, I may be one of the healthiest guys at the facility. I think my blood pressure was 102 over 72? Do you remember this?

Please Cory. I beg you for your help upon delivery of this correspondance

Thank you greatly for your time,

Anatoly Kishinevski

Material Scientist, Chemist, Jew

"One third of what you eat keeps you alive. Two thirds of what you eat keeps the doctor alive."

Please help me. I am pleading with you.

LABORATORY TESTED ✓ QUALITY GUARANTEE

Nothing beats feeling your healthy best. That's why we create top-quality wellness products at an incredible value. You deserve to enjoy the best of health and happiness, always!

— The Sundance Family

**DIRECTIONS:** For adults, take one (1) coated tablet daily, preferably with a meal.
**WARNING:** If you are pregnant, nursing, taking any medications, planning any medical or surgical procedure or have any medical condition, consult your doctor before use. If any adverse reactions occur, immediately stop using this product and consult your doctor. If seal under cap is damaged or missing, do not use. Keep out of reach of children. Store in a cool, dry place.

**NO**

NON-GMO

Carefully Manufactured by
Sundance Vitamins, LLC
Ronkonkoma, NY 11779 USA
©2021 Sundance Vitamins, LLC

SD11180
B11160 C

OUR
PLEDGE

LET YOUR HEALTH SHINE

GLUTEN FREE
NON-GMO

**SUNDANCE** VITAMINS

## ONE DAILY ESSENTIALS

**MULTIVITAMIN FORMULA**

**High Potency**

1 PER DAY

**60** COATED TABLETS

DIETARY SUPPLEMENT

### Supplement Facts

Serving Size: 1 Coated Tablet
Servings Per Container: 60

| Amount Per Serving | | %Daily Value |
|---|---|---|
| Vitamin A | 900 mcg | 100% |
| (as Vitamin A Acetate and Beta-Carotene) | | |
| Vitamin C (as Ascorbic Acid) | 60 mg | 67% |
| Vitamin D (as D3 Cholecalciferol) | 20 mcg (800 IU) | 100% |
| Vitamin E (as d-Alpha Tocopheryl Acetate) | 3.3 mg | 22% |
| Thiamin (Vitamin B-1) | 1.5 mg | 125% |
| (as Thiamin Hydrochloride) | | |
| Riboflavin (Vitamin B-2) | 1.7 mg | 131% |
| Niacin (as Niacinamide) | 20 mg | 125% |
| Vitamin B-6 (as Pyridoxine Hydrochloride) | 2 mg | 118% |
| Folate | 833 mcg DFE (500 mcg Folic Acid) | 208% |
| Vitamin B-12 (as Cyanocobalamin) | 6 mcg | 250% |
| Pantothenic Acid | 10 mg | 200% |
| (as d-Calcium Pantothenate) | | |
| Calcium (as Calcium Carbonate and Dicalcium Phosphate) | 45 mg | 3% |

Other Ingredients: Cellulose (Plant Origin), Vegetable Magnesium Stearate, Croscarmellose, Vegetable Stearic Acid, Starch, Silica, Cellulose Coating.

Note, no iron, no zinc, almost no calcium, no magnesium and no trace copper. The amount of vitamin D is less than I should be taking

 **Gmail**

**Anatoly Kishinevski <a.kishinevski@gmail.com>**

---

## Human Rights Violation - II # 164759
2 messages

---

**Anatoly Kishinevski** <a.kishinevski@gmail.com>      Sat, Aug 27, 2022 at 9:37 PM
To: Caleb.Lefebvre@vermont.gov
Cc: John.Hardy@vermont.gov, Collins.William@vermont.gov, anagell@vitalcorehs.com, lori.perkins@vermont.gov, max.titus@vermont.gov, Emily.Carr@vermont.gov, "nicholas.deml@vermont.gov" <nicholas.deml@vermont.gov>, Dan Sedon <dansedon@sedonlaw.com>

Dear SOS Caleb Lefebvre, et al.

This email is being sent by the help of one of my legal assistants. This entire message is my statement, verbatim. You may regard this as correspondence directly between you and I. The individuals CC'd on this message have been selected deliberately. A hard copy of this letter and the relevant attachments will also be delivered to you and all included parties.

You have allowed harm to come to me and I will not tolerate it.

I have been detained at NSCF since Jan 14th, 2022. As a detainee I am not supposed to be punished. I am supposed to be afforded the presumption of innocence and treated accordingly.

Instead, what I have experienced and continue to experience are egregious violations of my religious and human rights. What I am experiencing is not just unpleasant to me, it is literally torture. Assign utter credence to the aforementioned and the attachments to this message.

Respectfully,

Anatoly Kishinevski
Jew & Scientist

---

**5 attachments**


**Gravesite.jpg**
400K


**IMG-8751.JPG**
569K

**VTDoc-Toothpaste.pdf**
4080K

 **SOSLetter.pdf**
113K

 **Modification of glass cell wall by rubidium vapor - Happer Kishinevski .pdf**
474K

---

**Mail Delivery Subsystem** <mailer-daemon@googlemail.com>                                        Sat, Aug 27, 2022 at 9:37 PM
To: a.kishinevski@gmail.com



## Message blocked

Your message to **Collins.William@vermont.gov** has been
blocked. See technical details below for more information.

The response from the remote server was:

```
550 5.4.1 Recipient address rejected: Access denied. AS(201806281)
```

Final-Recipient: rfc822; Collins.William@vermont.gov
Action: failed
Status: 5.4.1
Remote-MTA: dns; vermont-gov.mail.protection.outlook.com. (104.47.65.110, the
 server for the domain vermont.gov.)
Diagnostic-Code: smtp; 550 5.4.1 Recipient address rejected: Access denied. AS(201806281)
Last-Attempt-Date: Sat, 27 Aug 2022 18:37:42 -0700 (PDT)

---------- Forwarded message ----------
From: Anatoly Kishinevski <a.kishinevski@gmail.com>
To: Caleb.Lefebvre@vermont.gov
Cc: John.Hardy@vermont.gov, Collins.William@vermont.gov, anagell@vitalcorehs.com, lori.perkins@vermont.gov,
max.titus@vermont.gov, Emily.Carr@vermont.gov, "nicholas.deml@vermont.gov" <nicholas.deml@vermont.gov>, Dan
Sedon <dansedon@sedonlaw.com>
Bcc:
Date: Sat, 27 Aug 2022 21:37:24 -0400
Subject: Human Rights Violation - II # 164759
----- Message truncated -----

Charlie Piotrowski
#164759 — NSCF
2559 Glen Road
Newport, VT 05855

Aug 15th, 2022

To: Caleb Lefebvre            SOS                    NSCF
Cc: John Hardy               CSS                    NSCF
    William (Bill) Collins   VSC                    NSCF
    Amanda Nagell            HSA                    VCHS/NSCF
    Cory LeBlanc             P.A.                   VCHS/NSCF
    Lori Perkins             Superint.              NSCF
    Max Titus                Admin. Dir. Hlth. Srvc. VTDOC
    Emily Carr               Gen. Cnsl.             VTDOC
    Nicholas Deml            Commisioner            VTDOC

Dear SOS Caleb Lefebvre,

I am responding to your Aug 1st correspondence to me on the topic of fluoride free toothpaste. My hope is we can resolve this matter immediately, with no further loss of time or energy. I am being deprived of basic hygiene products while my constitutional and statutory rights are being blatantly violated. These violations come at the cost of physical injury and pain to me. I have not had toothpaste since my arrival to NSCF on Jan 14th, 2022 and I am sustaining injury as a consequence.

My choice to avoid use of fluoridated products (toothpaste, etc.) is due to two overlapping considerations on my part, which ultimately converge as one practice. I am a Jewish scientist devout in my faith and accomplished in my career. I have a publication in one of the leading physics journals in the world with the former National Science Advisor who is an individual that reports directly to the President of the United States. I have numerous patents and have worked in some of the most prestigious research environments in the world. All of my communications come from careful thought and a well informed position.

Fluorine (fluoride) serves no natural biological role in the human body and is extremely toxic. Look at the tube of any fluoridated toothpaste and you will see a disclaimer that states:

"Warning If more than used for brushing is accidentaly swallowed, get medical help or contact a Poison Control Center right away."

Do you comprehend how serious this really is? The toothpaste tube is warning you if more than a pea size amount is swallowed, "Contact a Poison Control Center right away" !!! Every time you brush your teeth with fluoridated tooth-

-paste you are poisoning yourself. Just because you may not notice the symptoms, and the FDA and ADA give the impression it is safe, I can assure you the implications of chronic ingestion of fluorine (fluoride) is not negligible. In this composition I will not give you a detailed exposé on the safety of fluoridated products, but I will state avoiding use of them is part of my Kosher practice and has been since approximately 2001.

While it may not be common for Jews to avoid fluoride in their Kosher practice, at this point in history, this is simply explained by a lack of awareness of its influence on our physiologies and spiritual purity. When an action or food that had historically been considered Kosher is identified to no longer be safe, clean, moral or spiritually pure, it may be proclaimed as no longer Kosher. For example, some Jews no longer accept salmon as being Kosher because of microplastics in the oceans which can be found inside of individual cells of sea life. There are many topics and foods which there are debates about through-out different Jewish communities and sects as to whether or not they are considered Kosher. To clarify, there is no singular homogenous authority on what constitutes Kosher and what doesn't. There are certainly fundamental rules and principles that ALL observant Jews agree on, such as to NEVER mix meat and milk. A classic joke that portrays the dynamic and complex subtleties of Kosher practice and Jewish culture is:

"Two Jews, three opinions."

For more on the complicated topic of Kosher practice, see The Jewish Dietary Laws by Samuel Dresner.

Maimonides is one of the great philosophers of Jewish law:

"Classifying the commandments in his own way into fourteen groups, Maimonides makes it clear that all Divine precepts, without exception, are purposeful, aiming at the perfection of the body and soul, since a pure spirit can dwell only in a pure body."
                                    Ibid., xxxi

From The Divine Commandments by Nissan Mindel:

"Through the observance of the Torah and mitzvot, a Jew purifies his own earthly body, enabling him to connect with G-d, and at the same time he also purifies his "share" in this world, and prepares it for its highest perfection in the World-to-Come when the spirit of evil will be eradicated, and "The glory of G-d will be revealed," and "All the earth will be filled with G-d's glory."
                                    Ibid., ch. 37

From the third book of the Torah, <u>Leviticus</u>:

"Thou shalt be holy for I the Lord thy G-d am holy."
<u>Lev. 19:2</u>

In your Aug 1st correspondence to me, you refer me to Bill Collins, NSCF Volunteer Services Coordinator and state:

"... as he is better suited to answer your questions regarding ordering religious-based items."

Mr. Caleb Lefebvre, I do not have any questions regarding ordering "religious-based" items. I am asking for your cooperation, with no further energy loss or suffering on my part, to help me acquire a basic hygiene product which is my right to have access to. I am simply asking you to grant me in writing, permission to purchase from any vendor you designate or approve, a fluoride free and sugar free toothpaste, specifically either Auramere or Vicco brand. I have evaluated and tried dozens of fluoride free toothpastes and the two I have specified are the only two with acceptable chemistry and performance.

Furthermore, I have already consulted with Bill Collins on this topic and he referred me to you for approval to order from an outside vendor. I wrote to Bill Collins at the beginning of February and he did not respond. While I was in quarantine in EC, before I was cleared to enter general population on approximately Feb 15th, Bill Collins had come to EC and I briefly had the opportunity to speak to him about my request for fluoride free toothpaste. He told me to put a request in to the SOS (you). This is what prompted me to forward my request to your attention on Mar 1st, which you denied with no explanation and no offering of resolution. When we spoke about this topic on July 4th you told me you remembered talking with me about my request several months ago. In your response to my Mar 1st request to you, you wrote that my request was:

"respectfully denied."

What is respectful about depriving someone of critical hygiene products, resulting in physical injury to them and placing them in a state of extreme distress? This is not a minor matter to me. It is so disruptive that I feel like I am being tortured and I can not sleep well at night. This is a serious issue that you are treating with indifference. Try going without toothpaste for 6-7 months. It is a horrible experience at minimum. In your Aug 1st correspondence to me you also wrote:

"If you need special toothpaste to meet your medical needs, I will refer you to our medical department."
(NTOP - Toothpaste)                    p. 2 of 4

Mr. Caleb Lefebvre, since my arrival to NSCF on Jan 14th I have engaged with the medical department to an exhaustive degree in desperation to get toothpaste. I have been sent in circles by them, encountered numerous dead ends and have been given hollow commitments that remain unfulfilled with an obvious air of indifference, which is what I have experienced in my exchanges with you also. Medical tells me, when they do respond, that approval needs to come from DOC. The responses I have received from DOC (NSCF personnel) when a response has been provided, have in most instances redirected me back to the medical department. I have been sent in circles and encountered dead ends for 7 months while I suffer mentally and physically, while my precious human body, my G-d given irreplaceable teeth, sustain damage.

In case it is not clear, fluoride in toothpaste is added as a chemical called sodium fluoride. Read any tube of fluoridated toothpaste and you will find "Drug Facts". Sodium fluoride is an FDA regulated drug. I have the right to decline use of any FDA regulated drug. I also have the right to basic hygiene products. Both of these rights have been affirmed by every medical personnel I have spoken to while detained here at NSCF.

Substances that the FDA has identified as requiring regulation as drugs are substances which have some sort of risk associated with them when introduced into or onto the human body. The risks may be side effects, some of which can be very serious. A substance that is a regulated FDA drug must follow protocols in order for distribution and sale of the substance to be permitted. Included in these protocols is, the risks and side effects of using the drug must be compiled concisely and published explicitly so that a consumer has direct access to this information. This is done so a consumer can evaluate the risks associated with use of a substance and decide for themselves if they choose to accept the risks. This is called informed consent. Human beings in the United States, with very few exceptions, have the unrevocable right to exercising informed consent. You have the right to informed consent, as do I.

On April 22nd I met with staff nurse Ms. JoAnn Erdman. In that meeting I discussed with her how I was suffering because I do not use fluoridated toothpaste and that the only toothpastes available to inmates, including from commisary, are fluoridated. She conceded that I have both the right to decline the use of any drugs offered to me and that I also have the right to basic hygiene products, which includes toothpaste. I asked her to please give me medical approval to purchase either Vicco or Auramere brand fluoride free toothpaste or to please provide me with fluoride free and sugar free toothpaste. She told me she could not and that approval had to come from DOC. Nurse Alysha Grenier

was present for the whole exchange.

On April 27th I met with VCHS/NSCF P.A. Cory LeBlanc about a health concern unrelated to my teeth. We talked in detail about how I am suffering as a detainee at NSCF as my Jewish (Kosher) dietary practice is not being respected by the jail and I can feel my body being contaminated and it is torture to me. We also discussed how in exercising purity of my body, for my entire adult life I have exerted extreme care to only consume water I was certain is unadulterated. I shared with him that I have always avoided municipal water as it is never sufficiently pure. I expressed concern to him about the trace arsenic in the water supply to NSCF (this is a fact stated on the Newport municipal water report) and how my bladder has been aching since I arrived to NSCF. I informed him that I have heard other inmates say the same thing about noticing their bladders aching since arriving to NSCF. He listened to everything I said carefully and seemed intrigued. In his response one of the statements he made was:

"This (NSCF) is definitely the wrong place for you."

He acknowledged that confinement at NSCF was not cohesive to my ability to maintain the high state of purity and wellness that is integral to my religious practice.

P.A. Cory LeBlanc then gave me a medical exam which included taking my blood pressure. When he finished making the measurement he exclaimed:

"Wow. You might be the healthiest guy out of the whole facility!"

He made this remark because the reading of my blood pressure gave an excellent value. If I remember correctly it was 102/72. I reiterated to him that as a Jewish scientist, I regard my body as a delicate chemistry set which was engineered by G-d and given to me by G-d, and for the past 20 years I had treated it very carefully. The human body is sacred and I treat it so, incorporating my advanced understanding of chemistry, biology and physics into my Kosher practice. Science and G-d always converge when a certain level of understanding is reached. For my entire adult life I have been meticulous in caring for my body, treating it like a delicate machine, which it is.

Towards the end of my meeting with P.A. Cory LeBlanc on April 27th I brought up my need for fluoride free toothpaste. I explained to him that in my Kosher practice fluoridated products of any and all types are unacceptable and that I had not used fluoridated toothpaste for over 20 years prior to arriving to NSCF. With a type of emotion I cannot

describe with words, I told P.A. Cory LeBlanc that in desperation to prevent permanent injury to my teeth that I had used a very sparing amount of fluoridated toothpaste on several instances over the past few weeks. On each instance I used the fluoridated toothpaste I experienced insatiable thirst immediately afterward and then I would get a headache that persisted for roughly two hours. P.A. Cory LeBlanc thought the reaction I had to fluoridated toothpaste was interesting. He said to me slowly, as if he was actively contemplating the implications of what I had just shared with him as he spoke:

"That's interesting... your body must not be used to it (fluoridated toothpaste)."

He was genuinely intrigued. I watched the expression on his face as he continued to ponder the reaction of my virgin physiology to fluoridated toothpaste. I also find the response of my body to be interesting, but it doesn't surprise me given the toxicity of sodium fluoride and that my body has not been exposed to it since the tail end of puberty about 20 years ago, when I was 16-17 years old.

P.A. Cory LeBlanc acknowledged I have the right to decline use of FDA regulated drugs and that I also have the right to basic hygiene products. He recognized that providing a solution was appropriate. He took my plea for help and he told me he would see if he could find a solution for me and that he would let me know. Over a month passed and I did not hear anything from him. In June I was called to AC to receive legal mail. I saw P.A. Cory LeBlanc in the hallway on the way and I stopped him politely and asked if he had been able to secure a solution for me on the fluoride free toothpaste topic. He simply told me he didn't have a solution for me and without offering any other help or guidance, he walked away.

If you are comfortable consenting to use of fluoridated toothpaste, that is your discretionary right. I am not comfortable consenting to use of fluoridated toothpaste and I do not consent to use of fluoridated toothpaste. Ingesting the element fluorine in any form, whether as a fluoride ion or bound in a molecule, violates my Kosher dietary practice. I do not accept the risks associated with use of fluoridated toothpaste and demand that, with no further delay and with no further injury to my body, you provide me access to fluoride free and sugar free toothpaste. It is my human right to have access to basic hygiene products. Please tell me what vendor is approved for me to order either Vicco or Auramere brand toothpaste. I have been suffering for 7 months and you are violating my rights. —Anatoly Kishinevski

State of Vermont
Department of Corrections
Northern State Correctional Facility

**Incarcerated Individual Request Form**

(Original of
Two Copies)
5/12/22
*[signature]*

To: _Ms. Amy Tardif_
(Name and Title of Staff Member)

Date: _May 12th, 2022_

SUBJECT:    (State Briefly, but completely, the problem on which you desire assistance.)

＊ MAIL LOG DISCREPANCIES – Dear Ms. Tardif, I received my mail log today.
Thank you very much for your help. Upon inspecting my mail log I have
noticed several discrepancies. Please can you promptly respond to this
correspondence and provide explanation for the following:
＊ 1.) On April 22nd, 2022 the mail log shows mail from my dentist's office,
Abenaki Dental Care was received by NSCF (addressed to me) with you being
the receiving officer. To date I have not received this mail and I was not
aware it had arrived until I reviewed my mail log today. This mail is
from a medical provider and should have been treated as privileged
mail and opened in front of me, per VT DOC directive #409.05. I have
been expecting this mail and have been wondering why it had not arrived
~~ACTION REQUESTED:    (State exactly how you believe your request may be handled, what you think should be done.)~~
Yet. If delivery of my mail has been interrupted per action of any
NSCF staff or personnel, please immediately provide me a completed
Notice of Rejection/Disposition of Mail form documenting this act and
the reason. Impeding USPS mail out of compliance with directive #409.05
is a federal offense.
＊ 2.) On April 19th, 2022 I deposited no less than Qty. 3 pieces of mail with
stamps in the Delta building U.S. mail box. The mail log only shows one of
these pieces of mail. Why are the other pieces of mail missing from the log?
If transit of my mail has been interrupted by NSCF please promptly provide me
with a Notice of Rejection/Disposition of Mail form documenting this event
in accordance with directive #409.05 and with respect to my due process.
                                    Thank you greatly for your help.

_Anatoly Kishinevski_                _DA_          _[signature]_
(Print Name Here)              (Living Unit)        (Signature of Requester)

---

DISPOSITION:    (Staff Response.)

all medical/dental mail goes to medical
not directly to you. Medical should be informed
3RD shift enters all mail – we only apply
postage and send out in the mail

_[signature]_                              _5/16/22_
(Signature of Staff)                        (Date)

To: Northern State          CC: Sedon & Ericson        Prisoner's Rights        Abenaki Dental
Correctional Facility           Attorneys at Law        6 Baldwin St.            Dr. Matt Heimbach
Attn: Dental (Medical)          P.O. Box 273            4th Floor                1 Hampton Rd
2559 Glen Rd,                   Chelsea, VT 05038       Montpelier, VT 05633     Suite # 305
Newport, VT 05855                                                                Exeter, NH 03833

April 12th, 2022

Dear Dr. Patel and/or Dental Provider,

In March I was told hydrogen peroxide had been ordered and arrived to this facility (NCSF). I have asked on numerous instances for access to it for use in cleaning my mouth and maintaining my oral hygiene. Hydrogen peroxide is a normal therapy (antiseptic agent) that is highly effective at promoting oral hygiene. It is a uniquely valuable chemistry. The molecule is small and simple and the product of the chemical reaction when used in cleaning the mouth is just ultra clean water. There is no substitute that can do the job of hydrogen peroxide for oral care.

For several years I have relied on H2O2 (Hydrogen Peroxide) for daily mitigation and preservation of a tooth that has a hole in it. I have had 100% success with this method. Since arriving to NSCF my tooth has entered a state of chronic severe pain. I have been given salt to rinse my mouth with, but it has not helped. Salt performs its antiseptic function via a different chemical mechanism than hydrogen peroxide and they are not interchangable. It is not a one-to-one comparison between the two. They are not equal.

Twice in the past week I asked nurses if they would let me rinse my mouth with hydrogen peroxide and they said an order from the doctor needs to be entered into my chart for this to be possible. PLEASE Dr. Patel or whoever the provider is that deals with dental issues, can you place on order that I can come to medical three times per week to rinse my mouth with hydrogen peroxide. I can come off hours, rinse my mouth and spit it in a sink, in a cup and dump it in the bathroom, or spit it outside. It will take only minutes. PLEASE help me.

I have maintained meticulous care of my teeth for years. As a result of not having access to hydrogen peroxide my teeth are being injured and I am in chronic pain. I feel scared and this is causing me tremendous anxiety. I feel constant overwhelming stress about this topic.

My teeth are very important to me and I want to continue to preserve them carefully and to take good care of them. My request for access to hydrogen peroxide three times per week is a reasonable request. As an individual that has worked in all sorts of laboratories and administrative settings I understand the principles and protocols that must be followed, especially in a jail medical setting. The logistics to provide me with access to hydrogen peroxide are easily solvable.

Please Dr. Patel et al., put an order in so I can come up three times per week to rinse my mouth and spit it in a sink or toilet. My oral hygiene is suffering badly as a result of not having access to this therapy. My teeth are very important to me.

Thank you Kindly for your time,    Anatoly Kishinevski  Anatoly Khi_  Scientist
I/t # 164759

Anatoly Kishinevski,
#164759
2559 Glen Road
Newport, VT 05855

July 14th, 2022

Ms. Lori Perkins, Superintendant
Northern State Correctional Facility
2559 Glen Road
Newport, VT 05855

Dear Ms. Perkins,

I am certain you are extremely busy and the following is only a drop in the bucket of your concerns. To me it is my universe. I am a Jewish scientist and for the past two decades I have maintained an extremely strict orthodoxy of Kosher practice. I am struggling to get the things I actually need to be okay. My way of life is completely foreign to most and people don't comprehend how significant the things I am requesting are.

There is a tremendous amount I need to convey, but I cannot accomplish that in this correspondence. A second composition will come shortly.

Please understand the enclosed is not some frivilous construct. This is a serious event and I am sustaining injury while being deprived of the hygiene products I need.

Please review the enclosed carefully and have the appropriate parties review and respond in a timely manner. The original copy of my prescription was sent to HSA Amanda Nagell at the same time this correspondence was sent, so she likely has it in her possession as you are reading this.

Please return a copy of the Religious Accomodation Form once you have signed it.

Thank you greatly for your time.

Sincerely,

Anatoly Kishinevski

Jew & Scientist

# INMATE RELIGIOUS ACCOMMODATION REQUEST FORM

If more than one inmate is filing a request, each inmate must submit a form. If this is a group request, information must be submitted to the facility Volunteer Services Coordinator who will compile information about the group request and foward the information to the Department of Corrections Facilities Executive and the facility Superintendent. **NOTE:** Do not use this form to request a religious diet. See administrative directive #354.05, Inmate Alternative Diets, for the correct form. Please attach additional pages if needed.

**Inmate Name:** Anatoly Kishinevski | **DOB:** Feb 14, 1985 | **Date:** July 14, 1985

**Name of Religion:** Judiasm

1. Describe, in detail, your religion's basic tenets or beliefs which you feel require that you be provided with the requested accommodations: In Judiasm the body is regarded as sacred. It is a fundamental responsibility of a Jew to keep the body clean and pure, both physically and spiritually. The instruction book for Jewish life is the Torah. The Torah combined with teachings from sages and priest from roughly years 70 A.D to 300 A.D. is called the Talmud. The Torah and Talmud are the law books of Judiasm and they are the center of Jewish life. The laws are complex and take years of study to learn. Part of the learning process includes examining the laws and their merits, subjecting them to interpretation for personal observance.

2. Give a detailed description of the requested accommodation or property source: I am a materials scientist and chemist. I have identified that standard hydrogen peroxide solution, which can be purchased at every pharmacy, is the most effective oral hygiene product. I have adopted daily use of hydrogen peroxide as part of my religious practice in keeping my mouth clean. I also rely on hydrogen peroxide for my safety to prevent a tooth with a damaged filling from progressing in its state of decay. I have elected not to have the filling replaced as it is a violation of Jewish law to modify the body.

3. List any publications, which explain the religious significance of the requested accommodation. Provide a copy of the publication(s) to the Volunteer Services Coordinator.
I got fillings in my teeth many years ago before ascending in my understanding and devotion to my faith. I have relied on hydrogen peroxide for keeping my mouth clean and progression preventing progression of my problem tooth for years with 100% success. Since arriving to NSCF I have not had access to hydrogen peroxide and I have been in chronic pain and decay of my tooth has progressed rapidly. Please give me daily access to hydrogen peroxide so I can rinse my mouth with it. My dentist wrote me a prescription which has been given to medical.

4. Is there a recognized governing body for this Faith Group? If so, please provide contact information. There are many branches of Judiasm and there is no central governing body for all. See: A Guide to Jewish Religious Practice by Isaac Klein p5 XXI and Invitation to the Talmud by Jacob Neusner. XXI

**Inmate Signature:** Anatoly K.

**Superintendent Signature:** | **Date:** July 14, 2022 | 7-26-22

**Comments and/or Recommendation:** ☐ Approved  ☒ Denied (& Reason - Use back if needed.) Hydrogen peroxide can be corrosive to the eyes, skin and respiratory system. It can cause burns to the

**Facilities Executive Signature:** | **Date:** | skin and damage eyes. It is not allowed.

**Comments and/or Recommendation:** (Use back if needed.)

Cc: Facility Volunteer Services Coordinator, Property Officer, Caseworker, Inmate, Inmate Core File

See attached prescription

**Abenaki Dental Care**
**One Hampton Road Suite 305**
**Exeter, NH 03833**
**(603)583-4533 x**

NPI:  1730258641

| DEA Reg. No: | BH8807541 |
| License No.: | 3407 |

April 20, 2022

| Name: | **Anatoly Kishinevski** | DOB: | **02/14/85** |
| Address: | **5 Brentwood Rd Apt 2** | Age: | **37** |
| | **Exeter, NH  03833** | | |

RX:    **Colgate Peroxyl**

Dispense:    **500mL**
**Rinse 10mL for 30 seconds twice a day.**

Alerts    **MH/AB Only**

Refills    **10**

Signature

*[signature]*

Matthew S. Heimbach, DMD

---

# Prescription Record

## Abenaki Dental Care

April 20, 2022

| Name: | **Anatoly Kishinevski** | ID: | **237801** |
| Address: | **5 Brentwood Rd Apt 2** | DOB: | **02/14/85** |
| | **Exeter, NH  03833** | Age: | **37** |

Account:    **Kishinevski, Anatoly**

RX    **Colgate Peroxyl**

Dispense    **500mL**
**Rinse 10mL for 30 seconds twice a day.**

Refills    **10**

Prescribed by  **Matthew S. Heimbach, DMD**
DEA Reg. No: **BH8807541**

Instructions:

---

## Abenaki Dental Care
### One Hampton Road Suite 305
### Exeter, NH 03833

### (603)583-4533 x

Anatoly Kishinevski
5 Brentwood Rd Apt 2
Exeter, NH  03833

Dear Anatoly,

Dr. Heimbach has prescribed Colgate Peroxyl for you. Please follow these instructions for its use:

*Please call our office if you have any questions.*

US POSTAGE FIRST-CLASS FOREVER $ 005.68°
ZIP 05855
02 7H
0001353617
JUL 19 2024

FIRST-CLASS

7011 2970 0000 5857 6629

Amanda R. Somerville
RN BSN
3 Spruce Road
Newport, VT 05855

NBCC
Attn: L.G.A. Perkins, Superintendent
350 Glen Road
Newport, VT 05855

U.S. Postal Service™
CERTIFIED MAIL™ RECEIPT
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com®

OFFICIAL USE

| | |
|---|---|
| Postage | $ 1.68 |
| Certified Fee | 4.00 |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ 5.68 |

Sent To NBCC L.G.A. Perkins, Superintendent
Street, Apt. No.; or PO Box No. 2559 Glen Rd.
City, State, ZIP+4 Newport, VT 05855

PS Form 3800, August 2006            See Reverse for Instructions

7011 2970 0000 5857 6629



US POSTAGE $ 005.68

JUL 18 2022

FIRST-CLASS

CERTIFIED MAIL

7011 2470 0000 5357 6636

Amanda Kishnevsky
#181056
2559 Glen Road
Newport, VT 05855

NSCF
Attn Amanda Kishnevsky, HSA
2559 Glen Road
Newport, VT 05855

U.S. Postal Service™
CERTIFIED MAIL™ RECEIPT
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com

OFFICIAL USE

Postage $ 1.08

Certified Fee 4.00

Return Receipt Fee
(Endorsement Required)

Restricted Delivery Fee
(Endorsement Required)

Total Postage & Fees $ 5.08

Sent To NSCF - Amanda Nagely, HSA
Street, Apt. No; 2559 Glen Rd
or PO Box No.
City, State, ZIP+4 Newport, VT 05855

7011 2970 0000 5357 6636

State of Vermont
Department of Corrections
Northern State Correctional Facility

**Incarcerated Individual Request Form**

To: Mr. Scott Martin   NSCF Superintendant
(Name and Title of Staff Member)

Date: Feb 4th, 2022

SUBJECT: (State Briefly, but completely, the problem on which you desire assistance.)
Dear Susan K. I am Jewish and maintain a strict orthodoxy of Kosher practice. The fundamental principle of Kosher practice is to keep the body and mind clean and pure. It is a formal law of Judiasm not to modify one's body. Fluoride is a negatively charged ion of the element fluorine. In tooth-paste, fluoride comes from the dissociation of sodium fluoride when it enters an aqveous suspension. The liberated fluoride ion is extremely chemically reactive with a very strong chemical affinity for calcium. This is in fact how fluoride strengthens teeth and reduces the incidence of cavities. The fluoride bonds so strongly to the calcium in your teeth that nothing else can interrupt that bond, effectively arresting the possibility for any other chemical reactions to occur with your teeth such as cavities and decay. If you were to take a break from using fluoridated toothpaste for a few weeks (I highly recommend Auramere), and then resumed using fluoridated toothpaste, you would notice a distinct tingle or light sting on your tongue which is caused by the fluoride reacting with your tongue (I am assuming you use fluoridated -

ACTION REQUESTED: (State exactly how you believe your request may be handled, what you think should be done.)
- toothpaste). With daily use of fluoride tooth paste a person becomes desensitized to this sensation and does not notice it. The process of treating one's teeth with fluoride is unnatural and is a modification of our natural state as G_d engineered us. Additionally, fluoride or sodium fluoride is a very powerful toxin. That is why there are stories of young children that eat toothpaste and die. These stories are not fiction. To a larger human the impact on our physiology is less or not noticeable, but I can assure you there is an effect. Our brains use $Ca^{2+}$ (calcium ions) to conduct electricity across our synapses. The fluoride that you introduce into your body to strengthen your teeth also makes it into your blood and nervous system causing a very subtle and progressive cognitive decline. The regular introduction of fluoride into your body over time injures your brain or like lead poisoning is irreversable. For these reasons fluoride is not Kosher and I decline use of the FDA regulated drug offered to me by NSCF. All of the toothpaste offered in commisary contains fluoride. There is no fluoride free option. Please allow me to exercise my freedom of religion and right to informed consent and provide me with a way to access a fluoride free (and sugar

Anatoly Kishinevski        DA/EC        Anatoly Kishin
(Print Name Here)          (Living Unit)         (Signature of Requester)
- free) toothpaste. I would like to use specifically Auramere brand toothpaste. How can I get

DISPOSITION: (Staff Response.)
permission to order this? Please help me. In response to a recent reply I received from medical stating my "chart does not list an allergy to fluoride", I never claimed an allergy to fluoride. My request submitted to medical on Jan 25th and Jan 26th for fluoride free toothpaste is me exercising my constitutional right to freedom of religion and human right to decline any drugs I do not want in my being.
I am exercising my right to decline this drug and ask you to help me acquire an alternate (fluoride and sugar free) toothpaste. I have not had toothpaste since I arrived on Jan 14th, 2022. My oral hygiene is beginning to suffer.

Thank you greatly for your time and due attention to this urgent matter. Sincerely, Anatoly Kishinevski #164759

_____                    _____
(Signature of Staff)                              (Date)

Wednesday October 2nd, 2024

On Wednesday October 2nd, 2024 at approximately 1:22I arrived for my weekly probation meeting at Hartford Probation and Parole. As I approached the 2nd floor probation office lobby, my probation officer Ed Adams was standing in the hallway. I thought that he had just finished speaking to someone and was just going to say hello to me, but he greeted me and asked to speak to me for a few minutes. The time was now about 1:25pm.

He told me that Hunger Mountain Coop had tried to reach me several times by phone, but were not able to.

I have a weekly group-therapy class at 1:30pm that I attend and that is what I had arrived to the office for originally. I meet with my probation officer bi-weekly and this week was not a probation officer meeting week... so I was a little surprised when we asked to meet with me. It also made me scared and had a very negative emotional impact on me. The legal trouble I have experienced and being on probation has been a very stressful experience.

When we arrived to my probation officer's office he told me that he had been contacted by the Hunger Mountain Coop and that they had issued a no trespassing order against me. As he informed me he handed me a document that was a letter dated October 2nd, 2024. It was a typed letter stating that one two instances I had made staff members uncomfortable with them and that I was not welcome on Co-op property. The letter was not signed, but it had a typed

During the group therapy it was a primary topic of conversation with the other group members and with the instructor. It was very stressful and everyone was telling me that I must act in a way that I don't realize I act and that I scare people. I continuously tried to explain to the group that I was 100% respectful of the person Gale Ford and asked for her consent in every single aspect of our exchange and did not do anything without her expressed explicit communication of her interest or consent. I explained that towards the end of our meeting, I offered to buy her tea she liked and instead of reply she just shook her head at me... and then said "It's a control thing. You are the guy that offered to buy a Kombucha for Katie and asked her if she wanted to go for a walk.  That really scared her." I replied that I have purchased thousands of kombucha for people as I believe it is very good for people and my soul intent is to nurture people. I explained that the week prior I had distributed an entire case of kombucha at my work. I expressed that I cannot afford for there to be any room for misunderstanding so I am going to go. I politely collected my possessions and left.

I emphasized  to the group that I had only been 100% respectful ofGale and that when she found out I had offered another girl kombucha and to go for a walk that is when she became rude to me. During group I said she is a "insert profanity" implying bitch. I emphasized to the group that I was notning but 100% respectful of Gale and that she was a lying B*tch.  I was nothing but respectful of her. It was extremely stressful and the group did not believe me.

October 9th, 2024
At the end of group, Zach Scott the instructor asked me if I had spoken to Ed Adams. He said the girl

from Hunger Mountain Coop, with the approval of Hunger Mountain had contacted Ed Adams. Zach
Scott told me that she had said the same thing that I had said, but had just expressed some concerns.

 **Gmail**                                    Anatoly Kishinevski <fishmousebear3@gmail.com>

## Meeting
6 messages

---

**Anatoly Kishinevski** <fishmousebear3@gmail.com>                    Wed, Oct 9, 2024 at 9:13 AM
To: "Adams, Edward" <edward.adams@vermont.gov>

Mr. Adams,

Because we met last week, do we need to meet again this week? If we need to meet this week can we plan for Fri morning. I'm hurrying on a project and this help me.

Thank you. I hope you are well.

-Anatoly

---

**Adams, Edward** <Edward.Adams@vermont.gov>                    Wed, Oct 9, 2024 at 9:14 AM
To: Anatoly Kishinevski <fishmousebear3@gmail.com>

I can see you around group time next week.

---

**From:** Anatoly Kishinevski <fishmousebear3@gmail.com>
**Sent:** Wednesday, October 9, 2024 9:14 AM
**To:** Adams, Edward <Edward.Adams@vermont.gov>
**Subject:** Meeting

**EXTERNAL SENDER: Do not open attachments or click on links unless you recognize and trust the sender.**

[Quoted text hidden]

---

**Anatoly Kishinevski** <fishmousebear3@gmail.com>                    Wed, Oct 9, 2024 at 9:49 AM
To: "Adams, Edward" <Edward.Adams@vermont.gov>

Thank you greatly.

Friday-Saturday is Yom Kippur.

I wish you a good week/weekend.
[Quoted text hidden]

---

**Anatoly Kishinevski** <fishmousebear3@gmail.com>                    Wed, Oct 16, 2024 at 9:18 AM
To: "Adams, Edward" <Edward.Adams@vermont.gov>

As group is cancelled today, do you object to us waiting until next week to meet/resume our normal meeting schedule? I have nothing significant to report.

I am under a time crunch to complete some projects. Conserving use of time will be helpful.

On Wednesday, October 9, 2024, Adams, Edward <Edward.Adams@vermont.gov> wrote:

[Quoted text hidden]

---

**Adams, Edward** <Edward.Adams@vermont.gov>                  Wed, Oct 16, 2024 at 9:34 AM
To: Anatoly Kishinevski <fishmousebear3@gmail.com>

That is fine with me. See you next week.

[Quoted text hidden]

---

**Anatoly Kishinevski** <fishmousebear3@gmail.com>            Wed, Oct 16, 2024 at 9:43 AM
To: "Adams, Edward" <Edward.Adams@vermont.gov>

Thank you Mr. Adams. I wish you a perfect rest of the week and an excellent weekend.
[Quoted text hidden]

October 2, 2024

Anatoly Kishinevski,

There have been two instances at the Hunger Mountain Co-op where you have made staff
members uncomfortable by your interactions with them. I am issuing this Do Not Trespass
order to you effective immediately. You are not welcome on Co-op property and support
from the Montpelier Police Department will be requested if you violate this order.

Please let me know if you have any questions.

Mary Mullally

General Manager

Hunger Mountain Co-op

Cc:

Montpelier Police Department

Kevin O'Donnell, Operations Manager

Leo Ormiston, Facilities Manager

# AFFIDAVIT

I, Anatoly Kishinevski, Affiant herein and resident of Vermont, do hereby Swear, Depose and Declare under penalties of perjury that the following statements are true and accurate, to the best of my personal knowledge and belief:

1. On Friday September 27th, 2024 I arrived to Hunger Mountain Co-op in Montpelier, Vermont. I estimate I arrived at about 4:40-5pm. It was a few hours before dark.

2. Upon arrival I parked my car in their parking lot and then rode my bicycle downtown for roughly 40min to get exercise and relax prior to entering Hunger Mountain Coop to buy food. I have done this once or twice a month on Fridays as it is a combination of activities I enjoy in a setting I like, which enables me to relax in anticipation of Shabbat.

3. Upon return to the store, I began shopping and selected several items for myself including food from their prepared food bar in with the intent of sitting in their café in the back of the store to eat and rest.

4. Hunger Mountain Coop has a single cash register at the back of their store which is at the entrance to their café (hereinafter "café cash register") which is also in the back of their store.

5. As I approached the café cash register I observed the female attendant working at the register was very social and she was engaging with the patrons enthusiastically and kindly.

6. When it was my turn to pay, she greeted me with a lot of energy and began conversation with me. She asked me my name and told me her name was Gale (hereinafter will be referred to as "Gale"). There were no customers behind me. My food sat on the register counter as we talked. I offered to buy her a beverage which she accepted the offer of.

7. I retrieved a kombucha (GT's Synergy, Sacred Life which is bright blue) and returned and she scanned it in. She then deliberated over if she used her employee code for the transaction stating it would give a discount. I kindly asked her not to do this and offered her my thoughts that it was it was important to keep the energy of the transaction and exchange as pure as possible and that it would injure the Universe if she used her discount for my transaction. After I expressed this I observed her to continue to deliberate whether she would use the code or not, ultimately conceding to my request not to do so. I paid and handed the beverage to her.

8. She thanked me for the kombucha with happiness expressing it was a flavor she always wanted to try, but never had. We continued to talk for what I estimate was at

least another 20 minutes.

9. In each instance a customer came, I stepped away from the register entirely, allowing her to do her job without my presence. I had asked her early in the conversation if I should just leave her be and let her do her job and she told me "there were no customers and it was fine for us to chat". She mentioned that she had been known to talk too much with customers when she works at the registers in the front of the store and that it may be why she was working at the café in the back of the store.

10. Gale brought up Torah at one point and I shared with her that I study Torah daily and that it is a very important part of my life. She expressed some familiarity with mentioning that she had lived in New York City.

11. We talked about my work history including that I am a scientist and that I also am a glass artist. When Gale learned I was a glass artist she excitedly told me that her son was very interested in glass art (iampworking), and that she was familiar with it from pictures he had shown her.

12. I shared with Gale that I had two projects I was looking for someone to work with on and that I thought she might be a good candidate. We chatted about the projects a bit and asked her if she would be into the idea of working on them to which she told me she would be open to the idea and we could chat more about it. She then gave me her business card which had her contact info on it.

13. While Gale and I were talking several patrons that finished in the café left and upon passing by Gale and I, the patrons said goodnight and goodbye to her with a warm undertone i.e. it was apparent that they enjoyed their exchange with her and it was important to them they were acknowledged by her.

14. One of the patrons that had made a purchase while Gale and I were talking was a man named Keith. Gale and I were still chatting at the register and he had finished in the café and began to exit the seating area walking by the café cash register where Gale and I were. He said goodnight to us and I wished him a goodnight back, but also asked him how he was.

15. He stopped and talked to Gale and I, telling us that he was suffering from heart ache because he had not seen his kids for a long time. I believe he said it had been almost two years.

16. Keith and I put our arms around each other as two brothers standing side by side and I comforted him. Gale participated, expressing sadness in hearing what Keith was going through. The three of us continued to talk for a few minutes and when another customer came, Keith and I went and sat in the café and continued to talk. He began to tell me the story of what had happened between him and the mother of his children

and how they had grown apart.

17. Keith then described what he did for work, running a small business (Good Home & Company of Montpelier, Vermont) that makes household wares out of cast concrete i.e. soap dishes, candle holders and other small objects. Keith began to show me pictures on his phone of the products he manufactured.

18. Keith showed me many photos on his phone as we sat at the table and the sun was setting. I explained to him that as part of my observance of Shabbat I did not use cell phones. I expressed to him I would be interested to see more of his work in the near future, but I asked him that we not involve the phone in our conversation anymore for that evening. He kindly acknowledged my request and put the phone away.

19. Keith and I talked a bit longer about kabbalah and the feminine energy of G-d which is called Shekhinah. I shared with him that in Jewish mysticism, the absence of his female partner from his life would be described as the Shekhinah (feminine energy of G-d) having left him. We talked about how in Judaism that the Shekhinah departing is an indicator that some adjustment is needed in order for him to ascend his spiritual state so that the Shekhinah will return to him.

20. When our conversation concluded I walked him to the exit of the café.

21. It was clear that both Gale and I were enjoying conversation with each other. At some point during my conversation with Gale at the café register I mentioned that I some of my glass art in my car and asked her if she would be interested to meet after she got done her shift and chat more and I could show her my art. She said she would like to meet. It was agreed I would text her so she could reach me when she got out.

22. While I was still sitting in the café reading and eating, Gale was taken off of the café register and put on a register at the front of the store. I had forgotten that I could not use my phone to text her because of my observance of Shabbat which includes avoiding phones use. I did not want to "stand her up" by accident by not texting so I made another small purchase and went through her line at the front of the store and we chatted briefly while concluding that transaction. I proposed that I meet her when she get out of work at the little seating area outside of the store, to which she agreed. She told me she gets done at 8pm ish.

23. Before the store closed I left and went for a walk to enjoy the fresh night air. I left my care parked in the Hunger Mountain co-op parking lot while I walked. I returned to the store's parking lot a little before 8pm and retrieved a box of my glass art from my car and went and sat in the outdoor seating area and waited for her. I also brought two books Jewish books which I study that I thought she might be interested to see.

24. Gale came out of the store around 8:20pm and came and greeted me. We sat and

chatted for a few minutes. We both acknow

**Notary**

Subscribed and sworn to, before me, on

this _____ day of _____, 20_____

Notary Print_____

Notary Sign_____

Commission No. _____

State_____

**Affiant**

Affiant Print_____

Affiant Sign_____

Date_____

 Gmail

**Anatoly Kishinevski <fishmousebear3@gmail.com>**

---

## Attached: Medical Records from Counseling Associates

---

**Sandy Elhage** <selhage@ca-mh.com>                                        Thu, Jun 6, 2024 at 10:59 AM
To: "fishmousebear3@gmail.com" <fishmousebear3@gmail.com>

Anatoly, good day,

May my email find you well.

Please see attached your records from Counseling Associates. If you have any questions, please do not hesitate to contact me.

And, again, my apologies for the delay!

Sandy Elhage

She/Her

Medical Records Coordinator

**Counseling Associates Upper Valley**
2 Buck Road – Suite J
Hanover, NH, 03755

Phone: (603) 865-1321 ext. 161

Fax: (603) 865-1327

selhage@ca-mh.com



CONFIDENTIALITY NOTICE: This email message, including any attachmets, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure, or distribution is prohibited. If you are not the intended recipient, please contact sender by reply email and destroy all copie of the original message.

---

 **Kishinevski, Anatoly.pdf**
211K



# Counseling Associates
# Eva Johnson

## Chart Notes

### Chart Entry - 05/15/2023 - Locked

**Appointment Time:** 5:00pm through 6:00pm on 05/15/2023
**CPT Code:** 90791
**POS Code:** 11

## IDENTIFYING INFORMATION

- Anatoly Kishinevski is a 38 year old married male born on February 14, 1985
- Client Legal Name: Anatoly Kishinevski

## SUBJECTIVE

- CHIEF CONCERNS: substance use, Pt has a significant substance use hx with alcohol. Pt states that this has caused him legal issues as well as relationship issues.
- REPORTED MOOD: euthymic
- REPORTED MOOD: worried
- RECENT STRESSORS: legal: Pt reports that he has a lot of stress currently to include finances, legal, loss of relationship
- REPORTED COPING ABILITY: normal, Pt reports that overall he has been able to manage what he needs to however when he drinks alcohol this substantially limits his ability to cope effectively
- ATTITUDE TOWARD THERAPY: cooperative
- ALCOHOL USE: heavy use
- TOBACCO USE: non-user
- CANNABIS USE: Pt use to use Cannabis however he does not now as he is on probation
- STREET DRUG USE: non-user
- PHYSICAL HEALTH ISSUES: healthy
- PHYSICAL ACTIVITY LEVEL: active
- SLEEP: adequate
- SOCIAL ACTIVITY: occasional
- WORK ACTIVITY: over-working
- HOBBY ACTIVITY/SPORTS ACTIVITY: occasional
- REMARKS MADE DURING SESSION: Pt states he is here "not because I have to be but because I want to be but I am on probation so I want to get ahead of it."

## OBJECTIVE

### APPEARANCE

- STATURE: average
- WEIGHT: average

counseling associates

# Counseling Associates
# Eva Johnson

- CLOTHING: neat/clean
- GROOMING: neat/clean
- POSTURE/GAIT: normal
- ACTIVITY: normal

## SENSORIUM

- ATTENTION: normal
- CONCENTRATION: normal
- ORIENTATION: all spheres
- MEMORY: normal

## RELATING

- EYE CONTACT: normal
- FACIAL EXPRESSION: responsive
- AFFECT: appropriate

## LANGUAGE/THOUGHT

- SPEECH FLOW: normal
- THOUGHT CONTENT: appropriate: Thought content appeared appropriate however did display some thought that demonstrated he is overly suspicious of certain things (for example probation officer)
- PREOCCUPATIONS: none
- HALLUCINATIONS: none
- ORGANIZATION: logical

## EXECUTIVE FUNCTIONING

- INTELLIGENCE: bright
- ABSTRACTION: normal
- JUDGMENT: fair
- REALITY TESTING: normal
- INSIGHT: normal

# ASSESSMENT

## DIAGNOSIS

F10.21

PROBLEM LIST: alcohol, boundaries, legal problem, trust

counseling associates

# Counseling Associates
# Eva Johnson

VIRTUE LIST: creativity, curiosity, perspective/wisdom

AVAILABLE SUPPORT: group of friends

## RISK ASSESSMENT

- SUICIDE/SELF HARM: none
  - Details: Denies SI/plan/SA
- HOMICIDE/VIOLENCE: none
  - Details: Denies HI/plan/HA
- SUBSTANCE ABUSE: high
  - Details: Pt has significant substance us hx specifically issues with alcohol

## ASSESSMENT NARRATIVE

Pt is 38 yr old who present to counseling "not because I have to be but because I want to be but I am on probation so I want to get ahead of it." Pt has significant alcohol use hx dating back to his teenage years. Recently this issue has caused him significant legal issues including incarceration followed by 14 years of probation. The charges pt reported were significant and he attributes these charges to his issues with alcohol and states that he believes they "were consensuel but I know how it probably looked to other's on the video. Although pt is able to report that he understands how serious these charges were and how serious what he did was he was observed to struggle to take real accountability for these actions. Pt states significant substance use hx on father's side of the family and reports "that was just sort of the culture for eastern Europeans." He states he has a brother who also has significant SA issues who he has minimal contact with. He states his father was "shot in the head in one of those Eastern European like killings." Pt denies and MH hx on father's side that he is aware of. Denies that mother has any MH or SA issues however reports he has minimal contact with her as "I think she struggles to understand what I did and what I have been through." Although minimal family support pt reports he has a "really solid group of good friends they are who paid my legal fees." Pt was observed to test boundaries during session asking questions that were not appropriate for therapist client relationship and needed to be reminded of this several times. Pt is observed to need clear expectations and accountability in order for counseling to be supportive and successful.

## PLAN

INTERVENTIONS:

#1: individual therapy using Cognitive Behavior Therapy.

GOALS

#1: CONTINUE TO ABSTAIN FROM ALCOHOL USE
Plans for achievement: Client will work though individual counseling to identify and address issues and triggers that have led to alcohol use
Progress: established
Addressed in this session: yes

**counseling associates**

## Counseling Associates
## Eva Johnson

Future priority: high

#2: IDENTIFY UNHEALTHY THOUGHT PATTERNS THAT COULD POTENTIALLY INCREASE POTENTIAL FOR RELAPSE
Plans for achievement: Client will work through individual counseling to identify unhealthy thought patterns
Progress: established
Addressed in this session: mentioned
Future priority: high

MEDICATION ISSUES: None reported
NEXT APPOINTMENT: 05/23/2023
OVERALL PROGNOSIS: fair

Update Due: 11/23/2023

**Electronically signed on 05/24/2023 at 10:49 AM**

*Eva Johnson*

**counseling associates**

## Counseling Associates
## Eva Johnson

### Chart Entry - 05/23/2023 - Locked

**Client Name:** Anatoly Kishinevski
**Client Legal Name:** Anatoly Kishinevski
**Birthdate:** 02/14/1985
**Appointment Time:** 4:00pm through 5:00pm on 05/23/2023
**CPT Code:** 90837
**Diagnosis:** F10.21
**Notes:**

S: Met with client for individual session.  Discussed tx plan and established boundaries for sessions.  Client concerned that PO does not have his best interest at heart and reports he lies.  This writer reminded client that if he is following all expectations of his probation than he will limit potential issues/worries such as this.  Client concerned that 14 years is a long time to be on probation and we discussed framing this differently to remember that the alternative to that is incarceration and how to remain positive that he is not.

O: AOx3, appropriate dress, affect and mood appropriate, appropriate eye contact, thought process logical and without evidence of symptoms of psychosis, speech clear with normal rate and tone, no evidence of symptoms of impairment or withdrawal, no evidence of SI/plan/SA or HI/plan/HA.

A: Client appears to struggle with boundaries and will benefit from clear expectations.  Client was engaged in session and does appear to want to learn new ways to manage his struggles.

P: Weekly individual sessions

**Electronically signed on 05/31/2023 at 10:36 AM**

*Eva Johnson*

**counseling associates**

## Counseling Associates
## Eva Johnson

### Chart Entry - 06/01/2023 - Locked

**Client Name:** Anatoly Kishinevski
**Client Legal Name:** Anatoly Kishinevski
**Birthdate:** 02/14/1985
**Appointment Time:** 4:00pm through 5:00pm on 06/01/2023
**CPT Code:** NCLCX
**Diagnosis:** F10.21
**Notes:**

Client had to cancel due to work, will resume appts next tuesday at 4pm

**Electronically signed on 06/01/2023 at 1:38 PM**

*Eva Johnson*

counseling associates

## Counseling Associates
## Eva Johnson

### Chart Entry - 06/06/2023 - Locked

**Client Name:** Anatoly Kishinevski
**Client Legal Name:** Anatoly Kishinevski
**Birthdate:** 02/14/1985
**Appointment Time:** 4:00pm through 5:00pm on 06/06/2023
**CPT Code:** 90837
**Diagnosis:** F10.21
**Notes:**

S: Met with client for individual session. Client, "extremely stressed over my almost impossible legal situation." Explained to client that while I could help him work through the stress of this I could not provide support in terms of legal advice. Client states that he is starting to have trouble financially due to his charges and things being so viewable now through social media. He also discussed his religious and personal views on marriage. We discussed the positives and negatives of his thoughts in terms of having healthy relationships moving forward.

O: AOx3, appropriate dress, affect and mood appropriate, thought process logical and without evidence of psychosis, speech clear and with normal rate and tone, no evidence of symptoms of withdrawal or impairment, No evidence of SI/plan/SA or HI /plan/HA.

A: Client continues to be engaged in sessions. This writer has had to speak to him about focusing on himself and spending less time trying to figure out what others may be thinking. It is unclear at this time if this is for a secondary gain or this has been a built in survival skill.

P: Continue weekly individual counseling.

**Electronically signed on 06/12/2023 at 8:29 AM**

*Eva Johnson*

counseling associates

# Counseling Associates
# Eva Johnson

## Chart Entry - 06/13/2023 - Locked

**Client Name:** Anatoly Kishinevski
**Client Legal Name:** Anatoly Kishinevski
**Birthdate:** 02/14/1985
**Appointment Time:** 4:00pm through 5:00pm on 06/13/2023
**CPT Code:** 90837
**Diagnosis:** F10.21
**Notes:**

S: Met for individual session. Client states he continues to be under a significant amount of stress due to his legal issues. He reports he has continued to abstain from alcohol and has not had a drink since he was released from incarceration. We reviewed how he has been able to maintain this though his current stress level. We also discussed some unhealthy thought patterns and ways he can work to learn new perspectives.

O: AOx3, appropriate dress, affect and mood appropriate for session, no evidence of symptoms of withdrawal or impairment, thought process logical without evidence of symptoms of psychosis, speech clear with normal rate and tone, no evidence of SI/plan/SA or HI/plan/HA.

A: Client continues to be engaged in sessions and has started reflecting on some possible unhealthy thinking patterns.

P: Continue weekly individual counseling.

**Electronically signed on 06/16/2023 at 12:24 PM**

*Eva Johnson*

**counseling associates**

## Counseling Associates
## Eva Johnson

### Chart Entry - 06/20/2023 - Locked

**Client Name:** Anatoly Kishinevski
**Client Legal Name:** Anatoly Kishinevski
**Birthdate:** 02/14/1985
**Appointment Time:** 4:00pm through 5:00pm on 06/20/2023
**CPT Code:** 90837
**Diagnosis:** F10.21
**Notes:**

S: Met with client for individual session. Client reports he is under significant financial stress and it is getting worse as people are posting about his crimes in social media accounting for a slow down in sales. He is weighing his options on what is the next best step. We discussed the ways he is managing this stress and discussed his level of risk of returning to alcohol use due to this level of stress. He states that he does not anticipate any alcohol use as he is aware of the possible ramifications.

O: AOx3, appropriate dress, affect and mood appropriate, thought process logical and without evidence of symptoms of psychosis, no evidence of symptoms of withdrawal or impairment, no evidence of SI/plan/SA or HI/plan/HA.

A: Client appeared tired today and does not have a consistent sleep pattern recently raising concern. This was discussed today during session.

P: Continue weekly individual counseling.

**Electronically signed on 06/21/2023 at 10:53 AM**

*Eva Johnson*

## counseling associates

# Counseling Associates
# Eva Johnson

### Chart Entry - 07/06/2023 - Locked

**Client Name:** Anatoly Kishinevski
**Client Legal Name:** Anatoly Kishinevski
**Birthdate:** 02/14/1985
**Appointment Time:** 4:00pm through 5:00pm on 07/06/2023
**CPT Code:** 90837
**Diagnosis:** F10.21
**Notes:**

S: Met with client for individual session. Client reports he had a friend pass away from a drug overdose over the last week. He feels conflicted about this and feels some level of responsibility due to different situations that have happened between the two of them. We processed this and discussed the idea that it is not his fault but the importance of making good decisions as he moves forward in his life. We also addressed some of his criminal thinking patterns and how this could affect his life negatively.

O: AOx3, appropriate dress, affect and mood appropriate, thought process logical and without evidence of symptoms of psychosis, speech clear and with normal rate and tone, no evidence of SI/plan/SA, or HI/plan/HA.

A: Client is working to become more transparent and honest and look at the reasons that he may struggle with this. He continues to be engaged in sessions.

P: Continue weekly individual counseling.

**Electronically signed on 07/06/2023 at 5:19 PM**

*Eva Johnson*

## counseling associates

## Counseling Associates
## Eva Johnson

### Chart Entry - 07/11/2023 - Locked

**Client Name:** Anatoly Kishinevski
**Client Legal Name:** Anatoly Kishinevski
**Birthdate:** 02/14/1985
**Appointment Time:** 4:00pm through 5:00pm on 07/11/2023
**CPT Code:** 90837
**Diagnosis:** F10.21
**Notes:**

S: Met with client for individual session.  Client identified and discussed unhealthy thought patterns.  Client discussed the positives he has in his life including an upcoming possible business endeavor.  Client states that he continues to find the positives in his life and to learn from his mistakes.  He continues to feel stressed about his legal situation but states he is taking steps to try and reduce this such as leaning on his faith.  He reports continued abstinence from alcohol.

O: AOx3, affect and mood appropriate, thought process logical and without evidence of symptoms of psychosis, speech clear with normal rate and tone, no evidence of symptoms of impairment or withdrawal, no evidence of SI/plan/SA or HI/plan/SA.

A: Client continues to identify and work through unhealthy thought patterns.

P: Continue weekly individual counseling.

**Electronically signed on 07/14/2023 at 2:13 PM**

*Eva Johnson*

counseling associates

## Counseling Associates
## Eva Johnson

### Chart Entry - 07/20/2023 - Locked

**Client Name:** Anatoly Kishinevski
**Client Legal Name:** Anatoly Kishinevski
**Birthdate:** 02/14/1985
**Appointment Time:**  5:00pm through 6:00pm on 07/20/2023
**CPT Code:** 90837
**Diagnosis:** F10.21
**Notes:**

S: Met with client for individual session.  Client feeling positive that a business opportunity he had went well but continues to feel stressed stating, "that will not fix all my problems."  Client reports no major cravings for alcohol but does admit to fleeting thought on occasion about how, "a beer would be nice."  We processed what he does in these moments in order to successfully avoid drinking alcohol.  We also reviewed what he will do moving forward if he sells his business as he will have a large amount of free time.  He states that he has several other business ventures in the works and does not plan to allow himself to have too much free time.

O: AOx3, appropriate dress, affect and mood appropriate, thought process logical and without evidence of symptoms of psychosis, speech clear with normal rate and tone, no evidence of symptoms of withdrawal or impairment, no evidence of SI /SA/plan or HI/HA/plan.

A: Client continues to be engaged in sessions and work on his recovery efforts without issue.

P: Continue weekly individual counseling


**Electronically signed on 07/21/2023 at 2:54 PM**

## *Eva Johnson*

**counseling associates**

## Counseling Associates
## Eva Johnson

### Chart Entry - 07/25/2023 - Locked

**Client Name:** Anatoly Kishinevski
**Client Legal Name:** Anatoly Kishinevski
**Birthdate:** 02/14/1985
**Appointment Time:** 4:00pm through 5:00pm on 07/25/2023
**CPT Code:** 90837
**Diagnosis:** F10.21
**Notes:**

S: Met with client for individual session. Client states he continues to abstain from alcohol and does not want to drink. He is continuing to work on completing things related to the sale of his business and this has been keeping him pretty busy. We discussed the need for him to focus on himself and what he can control as opposed to things he can not control in others.

O: AOx3, appropriate dress, affect and mood appropriate, thought process logical and without evidence of symptoms of psychosis, no evidence of symptoms of withdrawal or impairment, speech clear with normal rate and tone, no evidence of SA /plan/SI or HA/plan/HI.

A: Client continues to be engaged in sessions and has been observed to progress in regards to tx plan goals.

P: Continue weekly individual counseling.

**Electronically signed on 08/10/2023 at 5:46 PM**

*Eva Johnson, MLADC*

counseling associates

# Counseling Associates
# Eva Johnson

## Chart Entry - 08/10/2023 - Locked

**Client Name:** Anatoly Kishinevski
**Client Legal Name:** Anatoly Kishinevski
**Birthdate:** 02/14/1985
**Appointment Time:** 4:00pm through 5:00pm on 08/10/2023
**CPT Code:** 90837
**Diagnosis:** F10.21
**Notes:**

S: Met with client for individual session. Client reports that things are going well overall however he is still conflicted about the details in his trial/sentencing that he states are untrue. He reports that while he acknowledges he did some things wrong this weighs on him as he is unsure why his wife reported things that were also not true. We discussed being able to control what he can and focus on himself and continuing to work on staying healthy. We revisited the idea that we can not control how others feel or what they do, and how he can work on acceptance/peace if he is not able to have things "end" the way he would like.

O: AOx3, appropriate dress, affect and mood appropriate, no evidence of symptoms of psychosis, speech clear with normal rate and tone, no evidence of symptoms of withdrawal or impairment, no evidence of SA/plan/SI or HA/plan/SI.

A: Client continues to be engaged in sessions and working towards goals. Client does appear to struggle with the idea of things that are out of his control and figuring out a way to come to terms with such things.

P: Continue weekly individual counseling.

**Electronically signed on 08/11/2023 at 9:22 AM**

*Eva Johnson, MLADC*

## counseling associates

# Counseling Associates
# Eva Johnson

### Chart Entry - 08/15/2023 - Locked

**Client Name:** Anatoly Kishinevski
**Client Legal Name:** Anatoly Kishinevski
**Birthdate:** 02/14/1985
**Appointment Time:** 4:00pm through 5:00pm on 08/15/2023
**CPT Code:** 90837
**Diagnosis:** F10.21
**Notes:**

S: Met with Anatoly for individual session. He reports he is doing well but continues to struggle with the conditions of his probation/parole as well as the length of his suspended sentence. He states that this is very overwhelming and can make it difficult to have relationships that he would possible like to engage in. We discussed ways in which he can manage this and discuss this when/if necessary with probation.

O: AOX3, appropriate dress, affect and mood appropriate for session, thought process logical and without evidence of symptoms of psychosis, speech clear with normal rate and tone, no evidence of SI/SA/plan or HI/HA/plan, no evidence of symptoms of withdrawal or impairment.

A: Client continues to be engaged in sessions and working towards treatment goals.

P: Continue weekly individual counseling.

**Electronically signed on 08/31/2023 at 1:32 PM**

*Eva Johnson, MLADC*

**counseling associates**

## Counseling Associates
## Eva Johnson

### Chart Entry - 08/22/2023 - Locked

**Client Name:** Anatoly Kishinevski
**Client Legal Name:** Anatoly Kishinevski
**Birthdate:** 02/14/1985
**Appointment Time:** 4:00pm through 5:00pm on 08/22/2023
**CPT Code:** 90837
**Diagnosis:** F10.21
**Notes:**

S: Met with client for individual session. Client reports he is doing well including eating and sleeping well recently. Client states he continues to focus on his future financial endeavors which he is feeling positive about. He also reports he continues to focus on his physical and mental health.

O: AOX3, appropriate dress, affect and mood appropriate for session, thought process logical and without evidence of symptoms of psychosis, speech clear with normal rate and tone, no evidence of SI/SA/plan or HI/HA/plan, no evidence of symptoms of withdrawal or impairment.

A: Client continues to be engaged in session and working on treatment goals.

P: Continue weekly individual counseling.

**Electronically signed on 08/31/2023 at 2:27 PM**

*Eva Johnson, MLADC*

# counseling associates

## Counseling Associates
## Eva Johnson

### Chart Entry - 08/29/2023 - Locked

**Client Name:** Anatoly Kishinevski
**Client Legal Name:** Anatoly Kishinevski
**Birthdate:** 02/14/1985
**Appointment Time:** 4:00pm through 5:00pm on 08/29/2023
**CPT Code:** 90837
**Diagnosis:** F10.21
**Notes:**

S: Met with client for individual session. Client reports he continues to abstain form alcohol use but states that he does still have cravings at times. We discussed possible triggers to his cravings and reviewed specific situations in which he felt cravings. Client reports that overall he continues to feel he is doing well.

O: AOX3, appropriate dress, affect and mood appropriate for session, thought process logical and without evidence of symptoms of psychosis, speech clear with normal rate and tone, no evidence of SI/SA/plan or HI/HA/plan, no evidence of symptoms of withdrawal or impairment.

A: Client continues to be engaged in sessions and work towards treatment goals.

P: Continue weekly individual sessions.

**Electronically signed on 08/31/2023 at 2:33 PM**

*Eva Johnson, MLADC*



## Counseling Associates
## Eva Johnson

### Chart Entry - 09/07/2023 - Locked

**Client Name:** Anatoly Kishinevski
**Client Legal Name:** Anatoly Kishinevski
**Birthdate:** 02/14/1985
**Appointment Time:** 4:00pm through 5:00pm on 09/07/2023
**CPT Code:** 90837
**Diagnosis:** F10.21
**Notes:**

S: Met with client for individual session. Client reports he is very concerned about probation conditions he was unaware of. Client also states he has some things he would really like to work on and discuss with this writer but feels as though based on his probation conditions and "unrestricted communication" with his service providers, that he is unable to share everything he would like to out of fear his probation officer could "demand" the information. We discussed this issue and this writer acknowledged that could be difficult to feel comfortable in a counseling setting with this worry. This writer suggested he speak with his PO and get clarification around his releases and/or probation conditions. This writer gave some examples of what would and would not be appropriate for this writer to share.

O: AOx3, appropriate dress, affect and mood appropriate, through process logical and without evidence of symptoms of psychosis, no evidence of symptoms of withdrawal or impairment, no evidence of SI/SA/Plan or HI/HA/Plan, speech clear with normal rate and tone.

A: Client continues to be engaged in sessions, client continues to work to gain insight into some of his unhealthy behaviors and thought patterns.

P: Continue weekly individual counseling.

**Electronically signed on 09/08/2023 at 12:40 PM**

*Eva Johnson, MLADC*

# counseling associates

## Counseling Associates
## Eva Johnson

### Chart Entry - 09/14/2023 - Locked

**Client Name:** Anatoly Kishinevski
**Client Legal Name:** Anatoly Kishinevski
**Birthdate:** 02/14/1985
**Appointment Time:** 4:00pm through 5:00pm on 09/14/2023
**CPT Code:** 90837
**Diagnosis:** F10.21
**Notes:**

S: Met with client for individual session. Discussed with client concerns regarding his motivations for certain behaviors and requests that he demonstrates. Client discussed this issue from his perspective as gave feedback and information about how this ties to his current state of living.

O: AOx3, affect and mood appropriate for session, appropriate dress, thought process logical without evidence of symptoms of psychosis, speech clear with normal rate and tone, no evidence of symptoms of withdrawal or impairment, no evidence of SI/SA/plan or HI/HA/plan.

A: Client continues to be actively engaged in sessions and is working to hear and understand how some of his behaviors may be perceived by others.

P: Continue weekly individual counseling.

**Electronically signed on 09/15/2023 at 1:06 PM**

*Eva Johnson, MLADC*

**counseling associates**

# Counseling Associates
# Eva Johnson

## Chart Entry - 09/21/2023 - Locked

**Client Name:** Anatoly Kishinevski
**Client Legal Name:** Anatoly Kishinevski
**Birthdate:** 02/14/1985
**Appointment Time:** 4:00pm through 5:00pm on 09/21/2023
**CPT Code:** TxCxl
**Diagnosis:** F10.21
**Notes:**

Appt canceled due to illness

**Electronically signed on 09/29/2023 at 1:48 PM**

*Eva Johnson, MLADC*

counseling associates

## Counseling Associates
## Eva Johnson

### Chart Entry - 09/26/2023 - Locked

**Client Name:** Anatoly Kishinevski
**Client Legal Name:** Anatoly Kishinevski
**Birthdate:** 02/14/1985
**Appointment Time:** 4:00pm through 5:00pm on 09/26/2023
**CPT Code:** LCXCH
**Diagnosis:** F10.21
**Notes:**

Client canceled day of appt unknown reason

**Electronically signed on 09/29/2023 at 1:46 PM**

*Eva Johnson, MLADC*

# counseling associates

## Counseling Associates
## Eva Johnson

### Chart Entry - 10/06/2023 - Locked

**Client Name:** Anatoly Kishinevski
**Client Legal Name:** Anatoly Kishinevski
**Birthdate:** 02/14/1985
**Appointment Time:** 4:00pm through 5:00pm on 10/06/2023
**CPT Code:** 90837
**Diagnosis:** F10.21
**Notes:**

S: Met with client for individual session. Client continues to report no alcohol consumption. Client discussed the positives and negatives of non-alcoholic beverages and we discussed the behavior vs. the substance and its effects. Client continues to work to be creative in regards to future employment opportunities and feels hopeful about this.

O: AOx3, affect and mood appropriate for session, appropriate dress, thought process logical and without evidence of symptoms of psychosis, no evidence of symptoms of withdrawal or impairment, no evidence of Si/plan/intent or HI/plan /intent.

A: Client continues to be engaged in sessions and works to challenge himself on issues of concern.

P: Continue weekly individual counseling.

**Electronically signed on 10/19/2023 at 9:22 AM**

*Eva Johnson, MLADC*

counseling associates

## Counseling Associates
## Eva Johnson

### Chart Entry - 10/10/2023 - Locked

**Client Name:** Anatoly Kishinevski
**Client Legal Name:** Anatoly Kishinevski
**Birthdate:** 02/14/1985
**Appointment Time:** 4:00pm through 5:00pm on 10/10/2023
**CPT Code:** 90837
**Diagnosis:** F10.21
**Notes:**

S:: Met with client for individual session. Client discussed frustrations with probation and parole and felt some of his conditions were unfair. We discussed the importance of getting clarification on this if he felt something was unclear, so that he knew exactly what was expected of him. We also discussed the fact that he has been on probation for around 9 months and has had several encounters where the other individuals felt he crossed a line in his conversations with them. We discussed how others may perceive the way he communicates and how he can work on this.

O: AOx3, affect and mood appropriate for session, appropriate dress, thought process logical and without evidence of symptoms of psychosis, no evidence of symptoms of withdrawal or impairment, no evidence of Si/plan/intent or HI/plan /intent.

A: Client was engaged in session and appeared to understand how his communication style can make others uncomfortable at times.

P: Continue weekly individual counseling

**Electronically signed on 10/19/2023 at 9:28 AM**

*Eva Johnson, MLADC*

# counseling associates

## Counseling Associates
## Eva Johnson

### Chart Entry - 10/17/2023 - Locked

**Client Name:** Anatoly Kishinevski
**Client Legal Name:** Anatoly Kishinevski
**Birthdate:** 02/14/1985
**Appointment Time:** 4:00pm through 5:00pm on 10/17/2023
**CPT Code:** 90834
**Diagnosis:** F10.21
**Notes:**

S: Met with client for individual session. Client reports that he is filing a motion related to his probation conditions. Client reports the reasons he is doing this and how he feels the system is unjust. This writer encouraged him to think about the decisions he makes and his motivations behind these as he works to continue to gain skills to live a healthy and productive life outside of incarceration and without substance use.

O: AOx3, affect and mood appropriate for session, appropriate dress, thought process logical and without evidence of symptoms of psychosis, no evidence of symptoms of withdrawal or impairment, no evidence of Si/plan/intent or HI/plan /intent.

A: Client continues to be engaged in sessions, sometimes struggles when he is challenged however he is able to process this and look at things from another's perspective.

P: Continue weekly individual counseling.

**Electronically signed on 10/19/2023 at 9:40 AM**

*Eva Johnson, MLADC*

counseling associates

## Counseling Associates
## Eva Johnson

### Chart Entry - 10/19/2023 (new)

N/A - No note entered.

**Last saved on 11/06/2023 at 4:02 PM**

Unsigned

# counseling associates

## Counseling Associates
## Eva Johnson

### Chart Entry - 10/24/2023 - Locked

**Client Name:** Anatoly Kishinevski
**Client Legal Name:** Anatoly Kishinevski
**Birthdate:** 02/14/1985
**Appointment Time:** 4:00pm through 5:00pm on 10/24/2023
**CPT Code:** TxCxl
**Diagnosis:** F10.21
**Notes:**

Therapist child sick

**Electronically signed on 11/06/2023 at 3:58 PM**

*Eva Johnson, MLADC*

# counseling associates

## Counseling Associates
## Eva Johnson

### Chart Entry - 11/02/2023 - Locked

**Client Name:** Anatoly Kishinevski
**Client Legal Name:** Anatoly Kishinevski
**Birthdate:** 02/14/1985
**Appointment Time:** 4:00pm through 5:00pm on 11/02/2023
**CPT Code:** TxCxl
**Diagnosis:** F10.21
**Notes:**

Therapist sick

**Electronically signed on 11/06/2023 at 3:57 PM**

*Eva Johnson, MLADC*

# counseling associates

## Counseling Associates
## Eva Johnson

### Chart Entry - 11/07/2023 - Locked

**Client Name:** Anatoly Kishinevski
**Client Legal Name:** Anatoly Kishinevski
**Birthdate:** 02/14/1985
**Appointment Time:** 4:00pm through 5:00pm on 11/07/2023
**CPT Code:** 90837
**POS Code:** 11
**Diagnosis:** F10.21 (Alcohol dependence, in remission)
**Notes:**

S: Met with client for individual session. Client continues to abstain from alcohol use but reports he does continue to have cravings on occasions. Overall he states he is doing well and continuing to focus on completing this business transaction with his buyer.

O: AOx3, appropriate dress, affect and mood appropriate, thought process logical with no evidence of symptoms of psychosis, speech clear with normal rate and tone, no evidence of SI/SA/plan or HI/HA/plan, no evidence of symptoms of impairment or withdrawal.

A: Client continues to be engaged in sessions.

P Continue weekly individual counseling.

**Electronically signed on 12/08/2023 at 11:59 AM**

*Eva Johnson, MLADC*



## Counseling Associates
## Eva Johnson

### Chart Entry - 11/14/2023 - Locked

**Client Name:** Anatoly Kishinevski
**Client Legal Name:** Anatoly Kishinevski
**Birthdate:** 02/14/1985
**Appointment Time:** 4:00pm through 5:00pm on 11/14/2023
**CPT Code:** 90837
**POS Code:** 11
**Diagnosis:** F10.21 (Alcohol dependence, in remission)
**Notes:**

S: Met with client for individual session. Client reports still being conflicted about technically being married (but there is a no contact and court related things etc) and having the desire to at some point have new relationships with females. We discussed this issue along with his probation conditions related to this and how he can move in the directions of having new and healthy relationship with another female at some point.

O: AOx3, appropriate dress, affect and mood appropriate, thought process logical with no evidence of symptoms of psychosis, speech clear with normal rate and tone, no evidence of SI/SA/plan or HI/HA/plan, no evidence of symptoms of impairment or withdrawal.

A: Client continues to be engaged in sessions without major issue or prompting.

P: Continue weekly individual counseling.

**Electronically signed on 12/08/2023 at 11:50 AM**

*Eva Johnson, MLADC*

# counseling associates

## Counseling Associates
## Eva Johnson

### Chart Entry - 11/21/2023 - Locked

**Client Name:** Anatoly Kishinevski
**Client Legal Name:** Anatoly Kishinevski
**Birthdate:** 02/14/1985
**Appointment Time:** 4:00pm through 5:00pm on 11/21/2023
**CPT Code:** 90837
**POS Code:** 11
**Diagnosis:** F10.21 (Alcohol dependence, in remission)
**Notes:**

S: Met with client for individual session. We discussed the upcoming Thanksgiving holiday and his plans related to this. He states that the individual who will be buying a machine of his will be here for Thanksgiving and they will be working on that. We also discussed temptations around drinking around the holiday and how to manage any potential cravings.

O: AOx3, appropriate dress, affect and mood appropriate, thought process logical with no evidence of symptoms of psychosis, speech clear with normal rate and tone, no evidence of SI/SA/plan or HI/HA/plan, no evidence of symptoms of impairment or withdrawal.

A: Client continues to be engaged and work on self-awareness.

P: Continue weekly individual counseling.

**Electronically signed on 12/08/2023 at 11:52 AM**

*Eva Johnson, MLADC*

## counseling associates

## Counseling Associates
## Eva Johnson

### Chart Entry - 11/28/2023 - Locked

**Client Name:** Anatoly Kishinevski
**Client Legal Name:** Anatoly Kishinevski
**Birthdate:** 02/14/1985
**Appointment Time:** 4:00pm through 5:00pm on 11/28/2023
**CPT Code:** 90837
**POS Code:** 11
**Diagnosis:** F10.21 (Alcohol dependence, in remission)
**Notes:**

S: Met with client for individual session. Client reports he working with his buyer on a machine over the Thanksgiving holiday and stated that it was obvious his buy has substance use issues. He reported that this was an eye opener to him and how much of a reminder that he does not want to go back to drinking. We processed this situation in great detail.

O: AOx3, appropriate dress, affect and mood appropriate, thought process logical with no evidence of symptoms of psychosis, speech clear with normal rate and tone, no evidence of SI/SA/plan or HI/HA/plan, no evidence of symptoms of impairment or withdrawal.

A: Client continues to be engaged in sessions.

P: Continue weekly individual sessions.

**Electronically signed on 12/08/2023 at 12:14 PM**

## *Eva Johnson, MLADC*

counseling associates

## Counseling Associates
## Eva Johnson

### Chart Entry - 01/04/2024 - Locked

**Client Name:** Anatoly Kishinevski
**Client Legal Name:** Anatoly Kishinevski
**Birthdate:** 02/14/1985
**Appointment Time:** 3:00pm through 4:00pm on 01/04/2024
**CPT Code:** 90837
**POS Code:** 10
**Diagnosis:** F10.21 (Alcohol dependence, in remission)
**Notes:**

S: Met with client for individual session. Client reported significant increased stress due to an issue with his landlord. He reported having cravings for alcohol recently due to this. We reviewed possible options in regards to his landlord situation and also reviewed coping skills to manage cravings. He denied any alcohol use.

O: AOx3, affect and mood appropriate for session, appropriate dress, thought process logical and without evidence of symptoms of psychosis, no evidence of withdrawal or impairment, no evidence of SI/SA/plan or HI/HA/plan.

A: Client continues to work towards maintaining long term recovery.

P: Continue weekly individual counseling.

**Electronically signed on 01/12/2024 at 12:24 PM**

*Eva Johnson, MLADC*

## counseling associates

# Counseling Associates
# Eva Johnson

## Chart Entry - 01/09/2024 - Locked

**Client Name:** Anatoly Kishinevski
**Client Legal Name:** Anatoly Kishinevski
**Birthdate:** 02/14/1985
**Appointment Time:** 4:00pm through 5:00pm on 01/09/2024
**CPT Code:** 90837
**POS Code:** 11
**Diagnosis:** F10.21 (Alcohol dependence, in remission)
**Notes:**

S: Met with client for individual session. Client reports increased stress due to court and issues with his landlord. We reviewed how he has been able to continue to abstain from alcohol due to the increase in stress. We also discussed prioritizing some things in his life in order to reduce stress levels.

O: AOx3, affect and mood appropriate for session, thought process logical without evidence of symptoms of psychosis, speech clear with appropriate tone, no evidence of symptoms of withdrawal or impairment, no evidence of symptoms of SI /SA/plan or HI/HA/plan.

A: Client continues to be engaged in sessions and working to increase knowledge and skill related to SUD.

P: Continue weekly individual sessions.


**Electronically signed on 01/19/2024 at 1:20 PM**

# *Eva Johnson, MLADC*

**counseling associates**

## Counseling Associates
## Eva Johnson

### Chart Entry - 01/16/2024 - Locked

**Client Name:** Anatoly Kishinevski
**Client Legal Name:** Anatoly Kishinevski
**Birthdate:** 02/14/1985
**Appointment Time:** 4:00pm through 5:00pm on 01/16/2024
**CPT Code:** 90837
**POS Code:** 11
**Diagnosis:** F10.21 (Alcohol dependence, in remission)
**Notes:**

S: met with client for individual session. Client reports he has established a plan to address issue with his landlord. He also states that although he did not get the results he wanted in court at that time that it went fine. He reports that he is still working on other legal matters that are contributing to his stress levels but he is continuing to manage this.

O: AOx3, affect and mood appropriate for session, thought process logical without evidence of symptoms of psychosis, speech clear with appropriate tone, no evidence of symptoms of withdrawal or impairment, no evidence of symptoms of SI /SA/plan or HI/HA/plan.

A: Client continues to be engaged in sessions.

P: Continue weekly individual counseling.

**Electronically signed on 01/19/2024 at 1:22 PM**

*Eva Johnson, MLADC*

# counseling associates

## Counseling Associates
## Eva Johnson

### Chart Entry - 01/23/2024 - Locked

**Client Name:** Anatoly Kishinevski
**Client Legal Name:** Anatoly Kishinevski
**Birthdate:** 02/14/1985
**Appointment Time:** 3:15pm through 4:00pm on 01/23/2024
**CPT Code:** 90837
**POS Code:** 11
**Diagnosis:** F10.21 (Alcohol dependence, in remission)
**Notes:**

S: Met with client for individual session. Client reports increased stress has he recently had a car accident and is having issues with his insurance company. Client states he was not injured but that it has increased his stress level. Client reports that despite increased stress level he has still been able to abstain from alcohol use. Client discussed other things he has been doing recently to reduce stress and maintain "a clear mind."

O: AOx3, affect and mood appropriate for session, thought process logical without evidence of symptoms of psychosis, speech clear with normal rate and tone, no evidence of symptoms of withdrawal or impairment, no evidence of SI/SA/plan or HI/HA/plan.

A: Client continues to work on and address issues that have been related to his past substance use.

P: Continue weekly individual counseling.


**Electronically signed on 02/01/2024 at 10:30 AM**

*Eva Johnson, MLADC*

**counseling associates**

## Counseling Associates
## Eva Johnson

### Chart Entry - 01/25/2024 - Locked

**Client Name:** Anatoly Kishinevski
**Client Legal Name:** Anatoly Kishinevski
**Birthdate:** 02/14/1985
**Appointment Time:** 4:30pm through 5:00pm on 01/25/2024
**CPT Code:** 90832
**POS Code:** 11
**Diagnosis:** F10.21 (Alcohol dependence, in remission)
**Notes:**

S: Client requested to meet with this writer today as this is not our normal scheduled appointment. Client requested to meet due to reporting a significant increase in stress. We discussed current situation and ways to manage this. Client reported that he just needed to talk through his current situation and was feeling a lot better at the end of session.

O: AOx3, affect and mood appropriate for session, thought process logical without evidence of symptoms of psychosis, speech clear with normal rate and tone, no evidence of symptoms of withdrawal or impairment, no evidence of SI/SA/plan or HI/HA/plan.

A: Client was observed to identify current problem/situation today and process through this without issue.

P: Continue weekly individual counseling.

**Electronically signed on 02/01/2024 at 10:35 AM**

*Eva Johnson, MLADC*

# counseling associates

## Counseling Associates
## Eva Johnson

### Chart Entry - 02/01/2024 - Locked

**Client Name:** Anatoly Kishinevski
**Client Legal Name:** Anatoly Kishinevski
**Birthdate:** 02/14/1985
**Appointment Time:** 3:00pm through 4:00pm on 02/01/2024
**CPT Code:** NSCHG
**POS Code:** 11
**Diagnosis:** F10.21 (Alcohol dependence, in remission)
**Notes:**

Client did not show for appointment and then reached out to state he had confused the time.


**Electronically signed on 02/05/2024 at 9:37 AM**

*Eva Johnson, MLADC*

## counseling associates

## Counseling Associates
## Eva Johnson

### Chart Entry - 02/06/2024 - Locked

**Client Name:** Anatoly Kishinevski
**Client Legal Name:** Anatoly Kishinevski
**Birthdate:** 02/14/1985
**Appointment Time:** 3:00pm through 4:00pm on 02/06/2024
**CPT Code:** 90837
**POS Code:** 11
**Diagnosis:** F10.21 (Alcohol dependence, in remission)
**Notes:**

S: Met with client for individual session. This writer let client know that I will be transitioning out of Counseling Associates and allowed for a discussion to process this. Client requested a transition period in order to process this and go over gains he has made and what he may need to continue to work on. He stated that he feels he needs to continue counseling in order to support his probation and parole conditions along with his legal situation.

O: AOx3, affect and mood appropriate for session, speech clear with normal rate and tone, thought process logical without evidence of symptoms of psychosis, no evidence of symptoms of withdrawal or impairment, no evidence of SI/SA/plan or HI /HA/plan.

A: Client continues to want to engage in counseling to continue to work on the issues that have caused him significant troubles in his life.

P: Client will meet with this writer weekly and will then transition to a new clinician as time/scheduling allows.

**Electronically signed on 02/13/2024 at 10:34 AM**

*Eva Johnson, MLADC*

**counseling associates**

## Counseling Associates
## Eva Johnson

### Chart Entry - 02/13/2024 - Locked

**Client Name:** Anatoly Kishinevski
**Client Legal Name:** Anatoly Kishinevski
**Birthdate:** 02/14/1985
**Appointment Time:** 3:00pm through 4:00pm on 02/13/2024
**CPT Code:** 90834
**POS Code:** 11
**Diagnosis:** F10.21 (Alcohol dependence, in remission)
**Notes:**

S: Met with client for individual session. Continued to discuss and process transition from myself to new clinician. Discussed worries and fears, along with validating the fact it can be difficult to terminate a therapeutic relationship with someone you have been working with for a while. We also discussed the positives of a transition and the ability to learn new things from a different therapist. We discussed the idea of keeping an open mind and the belief that we can always learn something from everyone we meet.

O: AOx3, affect and mood appropriate, thought process logical without evidence of symptoms of psychosis, speech clear with normal rate and tone, no evidence of symptoms of withdrawal or impairment, no evidence of SI/SA/plan or HI/HA/plan.

A: Client is working to remain positive about transition, but as expected change can cause stress and worry as expressed by client.

P: Continue weekly individual counseling and transition planning.

**Electronically signed on 02/19/2024 at 10:12 AM**

*Eva Johnson, MLADC*

## counseling associates

# Counseling Associates
# Eva Johnson

### Chart Entry - 02/23/2024 - Locked

**Client Name:** Anatoly Kishinevski
**Client Legal Name:** Anatoly Kishinevski
**Birthdate:** 02/14/1985
**Appointment Time:**  2:30pm through 3:30pm on 02/23/2024
**CPT Code:** 90837
**POS Code:** 11
**Diagnosis:** F10.21 (Alcohol dependence, in remission)
**Notes:**

S: Met with client for individual session.  We continued to plan for transition to new clinician moving forward.  We continued to review progress and areas of need as well as coping skills for current situation which clients states is "extremely stressful I worry about my freedom everyday."

O: AOx3, affect and mood appropriate for session, thought process logical without evidence of symptoms of psychosis, speech clear with normal rate and tone, no evidence of symptoms of impairment or withdrawal, no evidence of SI/SA/plan or HI/HA/plan.

A: Client acknowledges he needs to continue counseling but also acknowledges transition will be hard for him.  Client appears to be doing the work to make this a successful transition.

P: Continue weekly individual counseling, transition plan in process to new clinician.


**Electronically signed on 03/04/2024 at 9:40 AM**

# *Eva Johnson, MLADC*

counseling associates

**Counseling Associates**
**Eva Johnson**



## RESIDENTIAL LEASE

1.  The Lessor in this lease is G. Scott Graham-Stephens, hereinafter "Lessor."

2.  The Tenant is Anatoly Kishinevski, hereinafter "Tenant"

3.  The Premises is the approximately 10ft.x12ft. glass building on the northwest edge of 1098 Wild Hill Rd., Fairlee, VT 05045, hereinafter "Greenhouse." The Greenhouse is where the Tenant is permitted to reside and live as a residential dwelling unit.

4.  The Larger Premises is the entire property of 1098 Wild Hill Rd., Fairlee, Vermont 05045, hereinafter "the Property."

5.  The Lessor's Home, hereinafter "the House" is the house at the bottom of the Property. The Lessor resides within the House and this Lease does not provide the Tenant any access or rights to enter or dwell within the House.

6.  The Lessor's Camper, hereinafter referred to as "the Camper," is parked on the Property when the Lessor is not using it.

7.  The Lease – The Lessor leases to the Tenant, and the Tenant rents from the Lessor, certain rights in the Greenhouse and on the Property. This lease is subject to all terms, conditions, covenants, and agreements set out in this Lease.

8.  Good Faith – The Lessor and the Tenant are two humans who agree to honor each other and to operate under the universal Covenant of Good Faith including a spiritual addendum, to be kind and pure.

9.  The Initial Term of this lease begins on May 9th, 2024 and ends on November 1st, 2024 ("the Initial Ending Date").

10. Availability – The Tenant understands that the Greenhouse has already been rented out for the following dates:  5/24/2024 - 5/26/2024,  6/20/2024 - 6/23/2024, 6/23/2024 - 6/29/2024.  The Tenant agrees to vacate the Greenhouse on those dates completely.  The Tenant will have access to the Camper on the dates when the Greenhouse has already been rented out.  The Tenant has use of the Camper for sleeping and lounging and does not have access to the bathroom or kitchen equipment during this time.

11. Option to Extend Initial Term – So long as the Tenant is not in default under any provision of this Lease, and if the Tenant has made all rental payments in accordance with the provisions of this Lease, the Tenant may request from the Lessor that this Lease is extended.

12. Extension of Lease & Modification – Any agreement to extend or modify the Lease must be officiated in writing upon arrival of mutually agreeable terms by the Lessor and the Tenant.

13. Primary Rent – The Tenant agrees to pay, without demand, as rent for the Greenhouse and use of the Property, $500/month, unless Alternative Rent is paid.

14. Alternative Rent – The Lessor, per his own discretion, may offer to the Tenant the option to conduct work on the Property in exchange for Primary Rent. The Lessor is not obligated to offer Alternative Rent to the Tenant, but may elect to do so per his own discretion. In the event(s) that Alternative Rent is offered, the Tenant maintains the responsibility of recording each instance by sending an email to the Lessor, including a brief description of the Alternative Rent agreement, so records are maintained.

15. The Tenant is not required to conduct Alternative Rent and reserves the right to decline any offer of Alternative Rent by the Lessor to the Tenant.

16. Improvements – The Tenant, may, at his own expense and with the written permission of the Lessor, make improvements and modifications to the Greenhouse as he see fit.  These improvements and modifications will not be considered Alternative Rent unless expressly agreed upon in advance by the Lessor.  All improvements and modifications become the property of the Lessor unless agreed upon in advance in writing.

17. Basic Rent – Basic Rent shall be $500/month with the first month to be prorated per the following (31-9)/31 → 22/31 → 0.68 * $500 = $338.70. Rent is due reasonably at the beginning of each month.

18. Amenities – The Lessor agrees to provide the Tenant internet, water (via a spigot on the House), and basic electricity access. Electricity use is for computer (business and legal work), charging phone or other small devices. The Lessor is not obligated to provide any additional amenities to the Tenant such as heat. The Tenant agrees only to use electricity mindfully and sparingly, not beyond what is described in this section.

19. Mail – The Tenant is permitted to receive mail at the Property, 1098 Wild Hill Rd., Fairlee, Vermont 05045.

20. Summary – The Lessor has agreed to lease to the Tenant the Greenhouse for a period of six months, which the Tenant will live in as a residential dwelling unit. The Tenant understands that the Greenhouse is effectively an off-grid structure that does not offer normal amenities as a consumer apartment or house and that heat is not included nor will be provided by the Lessor.

Lessor

Print G. Slay Graham-Stephe

Sign

Date 5/9/2024

Tenant

Print Anatoly Kishinevski

Sign

Date May 9th, 2024

 **Gmail**

Anatoly Kishinevski <fishmousebear3@gmail.com>

---

# SIGNED lease attached

7 messages

---

**G Scott Graham-Stephens** <gscottgrahamstephens@gmail.com>           Thu, May 9, 2024 at 10:04 AM
To: Anatoly Kishinevski <fishmousebear3@gmail.com>

Thanks

**G. Scott Graham-Stephens**
  **p:** (802) 304-0836 | **w:** GScottGraham.com



---

📄 **Residential Lease - SGS - AK SIGNED.pdf**
   158K

---

**Anatoly Kishinevski** <fishmousebear3@gmail.com>           Thu, May 9, 2024 at 11:42 AM
To: G Scott Graham-Stephens <gscottgrahamstephens@gmail.com>

Received. Thank you again Scott. So grateful for you.

Praise the Creator of the Universe.
[Quoted text hidden]

---

**Anatoly Kishinevski** <fishmousebear3@gmail.com>           Fri, May 17, 2024 at 7:00 PM
To: G Scott Graham-Stephens <gscottgrahamstephens@gmail.com>

On May 17th, I made my first payment towards May rent to Scott Graham-Stephens, in the amount of $350. The monthly
rent is $500 total. It was agreed that I could make this partial payment today and that on May 24th, I will pay the
remaining $150 + $50 late fee.

I also informed Scott Graham-Stephens that I may need to stagger rent payment in June in a similar way, to which he
replied "no problem".

Thank you Scott 🙏🙏🙏🙏

Anatoly
[Quoted text hidden]

---

**G Scott Graham-Stephens** <gscottgrahamstephens@gmail.com>           Fri, May 17, 2024 at 10:49 PM
To: Anatoly Kishinevski <fishmousebear3@gmail.com>

agreed.

Thanks

Scott
[Quoted text hidden]

---

**Anatoly Kishinevski** <fishmousebear3@gmail.com>           Sun, May 26, 2024 at 10:04 AM
To: G Scott Graham-Stephens <gscottgrahamstephens@gmail.com>

On May 24th, I gave Scott an additional $200 cash.. to complete my rent payment for the month of May including a $50 late fee. We were standing in the driveway and there was a bottle of wine which were discussing with Marty's presence.

Please confirm. Thank you Scott.

[Quoted text hidden]

---

**G Scott Graham-Stephens** <gscottgrahamstephens@gmail.com>        Sun, May 26, 2024 at 10:26 AM
To: Anatoly Kishinevski <fishmousebear3@gmail.com>

Confirmed.

**G. Scott Graham-Stephens**
**p:** (802) 304-0836 | **w:** GScottGraham.com



[Quoted text hidden]

---

**Anatoly Kishinevski** <fishmousebear3@gmail.com>        Sat, Jun 22, 2024 at 11:56 AM
To: G Scott Graham-Stephens <gscottgrahamstephens@gmail.com>

This is record that on Thurs 13th I gave you $50 and today I gave you an additional $200. The balance for June rent will be paid on the 28th, in 7 days.

Thank you so much.

[Quoted text hidden]

 Gmail

**Anatoly Kishinevski <fishmousebear3@gmail.com>**

## June is paid
2 messages

**G Scott Graham-Stephens** <gscottgrahamstephens@gmail.com>       Wed, Jul 3, 2024 at 5:34 PM
To: Anatoly Kishinevski <fishmousebear3@gmail.com>

This confirms that June is paid in full and you handed me an extra $56 today as a late fee

Thanks

S

---

**Anatoly Kishinevski** <fishmousebear3@gmail.com>       Wed, Jul 3, 2024 at 5:40 PM
To: G Scott Graham-Stephens <gscottgrahamstephens@gmail.com>

You are proof to me that G-d is real and that he loves me. Thank you.
[Quoted text hidden]

 **Gmail**                                    Anatoly Kishinevski <fishmousebear3@gmail.com>

---

# Rent
11 messages

---

**Anatoly Kishinevski** <fishmousebear3@gmail.com>                    Sun, Jul 21, 2024 at 2:45 PM
To: G Scott Graham-Stephens <gscottgrahamstephens@gmail.com>

Please confirm I gave you $200 towards July rent on Friday July 19th. Thank you.

---

**G Scott Graham-Stephens** <gscottgrahamstephens@gmail.com>          Sun, Jul 21, 2024 at 3:22 PM
To: Anatoly Kishinevski <fishmousebear3@gmail.com>

Confirmed that you gave me $200 toward the July rent.

**G. Scott Graham-Stephens**
**p:** (802) 304-0836 | **w:** GScottGraham.com



[Quoted text hidden]

---

**Anatoly Kishinevski** <fishmousebear3@gmail.com>                    Sun, Jul 21, 2024 at 3:31 PM
To: G Scott Graham-Stephens <gscottgrahamstephens@gmail.com>

Thank you.
[Quoted text hidden]

---

**Anatoly Kishinevski** <fishmousebear3@gmail.com>                    Fri, Aug 2, 2024 at 3:31 PM
To: G Scott Graham-Stephens <gscottgrahamstephens@gmail.com>

I have the rest of July rent. I need to go to ATM in morning to retrieve the cash. I will do this first thing in the AM. Top priority.

I hope you are well.
[Quoted text hidden]

---

**Anatoly Kishinevski** <fishmousebear3@gmail.com>                    Sat, Aug 3, 2024 at 7:21 AM
To: G Scott Graham-Stephens <gscottgrahamstephens@gmail.com>

I just put $300 on the drivers seat of your truck, for a total of $500 for July. I will have to give you a bonus/ate fee in the next week or so.

Thank you Scott.

-Anatoly

On Sun, Jul 21, 2024 at 2:45 PM Anatoly Kishinevski <fishmousebear3@gmail.com> wrote:
[Quoted text hidden]

---

**G Scott Graham-Stephens** <gscottgrahamstephens@gmail.com>          Sun, Aug 4, 2024 at 8:31 AM
To: Anatoly Kishinevski <fishmousebear3@gmail.com>

Confirming receipt of $320 from driver's seat of truck.

Scott
[Quoted text hidden]

---

**Anatoly Kishinevski** <fishmousebear3@gmail.com>                    Sun, Aug 4, 2024 at 8:53 AM
To: G Scott Graham-Stephens <gscottgrahamstephens@gmail.com>

Thank you Scott. I did not realize it was $320. I had money left/set aside to pay my probation fees and yesterday I
counted it and could not figure out why I was $20 short... now I know.

You're the man. I'll have more money for you soon.
[Quoted text hidden]

---

**G Scott Graham-Stephens** <gscottgrahamstephens@gmail.com>                    Sun, Aug 4, 2024 at 9:06 AM
To: Anatoly Kishinevski <fishmousebear3@gmail.com>

Do you need that $20 back?

**G. Scott Graham-Stephens**
   **p:** (802) 304-0836 | **w:** GScottGraham.com



[Quoted text hidden]

---

**Anatoly Kishinevski** <fishmousebear3@gmail.com>                    Sun, Aug 4, 2024 at 9:09 AM
To: G Scott Graham-Stephens <gscottgrahamstephens@gmail.com>

No. you can keep it. Sorry I was not explicit about it in my last message. I thought to state it directly, but did not. It's for
you. I will give you a little more asap as a bonus bec I was late.

[Quoted text hidden]

---

**G Scott Graham-Stephens** <gscottgrahamstephens@gmail.com>                    Sun, Aug 4, 2024 at 9:16 AM
To: Anatoly Kishinevski <fishmousebear3@gmail.com>

Okey dokey. We should make a point of handing it over in person so the giving person counts it and the receiving person
counts it -- like double-checking your math on an equation...

**G. Scott Graham-Stephens**
   **p:** (802) 304-0836 | **w:** GScottGraham.com



[Quoted text hidden]

---

**Anatoly Kishinevski** <fishmousebear3@gmail.com>                    Sun, Aug 4, 2024 at 9:19 AM
To: G Scott Graham-Stephens <gscottgrahamstephens@gmail.com>

Sounds great Scott. I will make it a point to do as you suggest next time.
[Quoted text hidden]

 Gmail

**Anatoly Kishinevski <fishmousebear3@gmail.com>**

---

## The Greenhouse is now empty...
8 messages

---

**G Scott Graham-Stephens** <gscottgrahamstephens@gmail.com>     Thu, Jun 27, 2024 at 4:09 PM
To: Anatoly Kishinevski <fishmousebear3@gmail.com>

You DO NOT need to move back in tonight or tomorrow... I wanted you to know that you can if you want to... they left early because this was all a bit too rugged for them.

**G. Scott Graham-Stephens**
**p:** (802) 304-0836 | **w:** GScottGraham.com



---

**Anatoly Kishinevski** <fishmousebear3@gmail.com>     Thu, Jun 27, 2024 at 4:30 PM
To: G Scott Graham-Stephens <gscottgrahamstephens@gmail.com>

I just love you man. I am SO grateful for you. Thank you for your incredibly kind and generous energy you have given me.

Thank you for letting me know about greenhouse. I will follow up shortly. If I can just plan to move Sat it will be helpful.

Attached are what I submitted to VT Supreme Court. I ran out of time and there are typos.. but I accomplished the goal for the most part. No pressure to read it, but if you do your initial impression and perspective on it will be appreciated.

Headed into labor camp now.

Talk soon 🐟🐭🐻

[Quoted text hidden]

---

**2 attachments**

📄 **Brief - Principal.pdf**
255K

📄 **Printed Case.pdf**
14046K

---

**Anatoly Kishinevski** <fishmousebear3@gmail.com>     Fri, Jun 28, 2024 at 12:27 PM
To: G Scott Graham-Stephens <gscottgrahamstephens@gmail.com>

I'm still greatly dependent on internet. Legal work is not completely over. Do you know if it is functioning again up at greenhouse?
[Quoted text hidden]

---

**G Scott Graham-Stephens** <gscottgrahamstephens@gmail.com>     Sat, Jun 29, 2024 at 3:21 PM
To: Anatoly Kishinevski <fishmousebear3@gmail.com>

It is always functioning as long as the electric breaker hasn't popped. It was on all last week.

**G. Scott Graham-Stephens**
**p:** (802) 304-0836 | **w:** GScottGraham.com



 **Gmail**

**Anatoly Kishinevski <fishmousebear3@gmail.com>**

---

## internet

---

**Anatoly Kishinevski** <fishmousebear3@gmail.com>                                    Mon, Aug 5, 2024 at 10:12 AM
To: G Scott Graham-Stephens <gscottgrahamstephens@gmail.com>

Scott,

As I was going to sleep last night I was thinking how freakin grateful I am for you. Truly. If it matters to you, I hope you know that I appreciate you immensely. When I make my first million I will give you $50,000. I believe I will accomplish this within the next 12 months i.e. my rebound on this coming round will be significant.

I urgently needed to send a document last night, but was not able because the internet was not functioning. I got up with 5 hours of sleep to hurry to town to take care of it. I do not have time nor do I want to take the time to mess around with the internet on your property. I changed the breaker as an effort to curtail the intermittent connection. Please can I hand this off to you at this point.

I am in WRJ and will be here until roughly 1am when I get out of work.

I hope you have a good day.

-A

 **Gmail**

**Anatoly Kishinevski <fishmousebear3@gmail.com>**

---

## internet

---

**G Scott Graham-Stephens** <gscottgrahamstephens@gmail.com>
To: Anatoly Kishinevski <fishmousebear3@gmail.com>

Mon, Aug 5, 2024 at 11:56 AM

Hi.

The best qualities you have are acceptance, patience, and balance. So I know you will go with the flow, knowing that the Internet is completely out from the garage outward.

It seems there was an electrical strike on the property, which took out most of the outdoor components. This will cost thousands of dollars to replace, which I don't have. And I am not even sure of which components are not working or not.

I have to assess each component, decommission it, and then reconnect to determine if the problem is with the component or a wire. I have no estimated time frame for getting the Internet downstream from the garage online. I hope to have completed troubleshooting by the end of the week so I know what parts I need. Then, I will need to figure out how to purchase these,

Thanks for your understanding and flexibility.

**G. Scott Graham-Stephens**
**p:** (802) 304-0836 | **w:** GScottGraham.com



[Quoted text hidden]

---

 Gmail

**Anatoly Kishinevski <fishmousebear3@gmail.com>**

---

**internet**

---

**Anatoly Kishinevski** <fishmousebear3@gmail.com>                              Fri, Aug 9, 2024 at 1:11 PM
To: G Scott Graham-Stephens <gscottgrahamstephens@gmail.com>

I'm suffering a little bit without internet access. It is making it difficult for me to get my legal work done at a most important time. I realize you are leaving on Sunday. Is it possible the antennae behind the garage can be brought to be operational. I believe it will give enough range that I will have what I need in the greenhouse.

I am in tremendous financial danger and the cost to drive to places to work is significant.

This is not a complaint and I deliver this message with peace and as an inquiry. I am not familiar with your internet configuration and I am under incredible pressure right now. I am at VT law school right now in their library.
[Quoted text hidden]

 Gmail

**Anatoly Kishinevski <fishmousebear3@gmail.com>**

---

## (no subject)
1 message

---

**Anatoly Kishinevski** <fishmousebear3@gmail.com>                    Sat, Aug 10, 2024 at 10:49 AM
To: G Scott Graham-Stephens <gscottgrahamstephens@gmail.com>

Please fix the internet before you leave. It is now an emergency for me. I was trying to make do without it but I can not.



Aug 11th, 2024

Scott,

The internet problem is extremely serious. Please. I need you to fix it before you leave. I have multiple documents due between now and Aug 20th and they have grand implications to my life. Literally my life depends on them.

I examined the antennae behind the garage and it appears works, it seems that it is an achievable Wal-Mart to make it operational. As everything in the garage works, it seems that it is an achievable project to bring the antennae operational. I am certain if this antenna or a replacement is brought operational it will provide the range and bandwidth needed. I can get the faintest signal from the house occasionally, but it is not a usable signal.

I do not have money to pay for the components or for fuel to drive around to collect the components and each minute is precious. I have to keep working, I'm really fighting for my future.

Please fix the internet before you leave. I've tried my hardest to make do without it, but it is not going to be possible. I am bound to this property by a curfew and I need to be able to work efficiently. I lost most of the day yesterday struggling to open a 10gB file that has some of the emails and data in it I need for my legal work. This is not a vacation for me. I have been sleepless since 2am because of how serious this situation is for me. It is now 4:53AM and I have decided to write this letter because I don't know what else to do.

I am very grateful for you. The ability to stay here has allowed me refuge in the greatest time of need. When I recover, which I believe is just around the corner, I will make some sort of significant gesture in your direction. This I state sincerely.

I appreciate you,

Anatoly

 **Gmail**

**Anatoly Kishinevski <fishmousebear3@gmail.com>**

## internet

Anatoly Kishinevski <fishmousebear3@gmail.com>                                    Thu, Aug 22, 2024 at 11:20 AM
To: G Scott Graham-Stephens <gscottgrahamstephens@gmail.com>

Scott,

When we entered our lease agreement, we both acknowledged our capacity operate as two distinguished gentleman. My hope is that we will achieve this and I am committed to such. I think you are a very cool and interesting person and while I have not known you very long, I hope that in time we can comfortably regard each other as friends. I regard you as my friend and I genuinely care about your well being.

I came to you in a time of crisis in need of a place of refuge, which you have provided to me. Thank you greatly. The internet matter is significant. I am fighting for my life in an extremely serious legal proceeding. I need internet in order to maintain this process. When I got your message on this topic on Aug 5th I did my best to take it for what it is and roll with it. As the week progressed I attempted to operate without internet and it was simply impossible. It became an emergency for me.

I have spent a lot time troubleshooting your internet system and I have brought a single antennae operational which provides me with just barely enough signal that I can conduct business.

I can not afford to have any unexpected down time so I ask please do not begin to work on the internet or change or alter the current antennae and its connection until we can touch base and schedule down time. I am experiencing a nearly unmanageable level of stress as I am racing to prepare to present an oral argument on my own behalf to the Vermont Supreme Court in two weeks. I also have numerous significant filings I need to write as quickly as possible before then. The outcome has enormous implications to the next 12 years of my life.

So, first. I appreciate you and I thank you for all of the calories that you have spent in considering me. Genuinely. Second, please don't mess with the internet until we can take a moment to put our heads together on it and make a plan. I will die if it goes out again unpredictably.
Thirdly, I am suffering right now under incredible amount pressure. I need to keep working please.
Lastly, rent for August: I would like some sort of credit for the time that I spent troubleshooting the internet. I recognize this event is a force majure, but it has cost me a lot of lost time and energy at a moment when it is least affordable.

Praise the Creator of the Universe. If I am not here when you get back I am in WRJ either at work or prearing for work.

I hope you had a good trip,
Anatoly

On Mon, Aug 5, 2024 at 11:56 AM G Scott Graham-Stephens <gscottgrahamstephens@gmail.com> wrote:
> Hi.
>
> The best qualities you have are acceptance, patience, and balance.  So I know you will go with the flow, knowing that the Internet is completely out from the garage outward.
>
> It seems there was an electrical strike on the property, which took out most of the outdoor components.  This will cost thousands of dollars to replace, which I don't have.  And I am not even sure of which components are not working or not.
>
> I have to assess each component, decommission it, and then reconnect to determine if the problem is with the component or a wire.  I have no estimated time frame for getting the Internet downstream from the garage online.  I hope to have completed troubleshooting by the end of the week so I know what parts I need.  Then, I will need to figure out how to purchase these,
>
> Thanks for your understanding and flexibility.
>
> **G. Scott Graham-Stephens**
>   **p:** (802) 304-0836 | **w:** GScottGraham.com

**Pg. 16 of 29**

 **Gmail**

**Anatoly Kishinevski <fishmousebear3@gmail.com>**

---

## (no subject)
4 messages

---

**Anatoly Kishinevski** <fishmousebear3@gmail.com>                    Thu, Aug 22, 2024 at 12:03 PM
To: G Scott Graham-Stephens <gscottgrahamstephens@gmail.com>

When you return, please don't block the line of sight between the antennae (just behind the garage) and the greenhouse, however you park.

---

**G Scott Graham-Stephens** <gscottgrahamstephens@gmail.com>                    Thu, Aug 22, 2024 at 3:20 PM
To: Anatoly Kishinevski <fishmousebear3@gmail.com>

I have to park where I usually park the camper.   I cannot park anywhere else as other sites are used for people who are paying to camp with their rv.

I have to say i'm a little dismayed too get a message from you that you have been tinkering around with the house's internet.  We had talked about the importance of talking before you do anything.

To get a message from you that you took it upon yourself without taking to me before hand  to make changes (I assume hardware changes) is disappointing when we had agreed on talking about things before hand.

Then to get another message telling me I might not be able to park where I usually park, because you took it upon yourself to make changes without talking to me before hand is more disappointing.

Then to get another message telling me you would like a discount on your rent for the changes that you made that we didn't talk about before hand that are now possibly impacting where I might park my camper is even more disappointing.

S
[Quoted text hidden]

---

**Anatoly Kishinevski** <fishmousebear3@gmail.com>                    Thu, Aug 22, 2024 at 3:37 PM
To: G Scott Graham-Stephens <gscottgrahamstephens@gmail.com>
Cc: Marty S <martysabo3@icloud.com>

Scott,

It is disappointing that for the week before you left you spent the whole week partying and made no effort to fix the internet before your trip.

Please don't block the antennae. I was not telling you not to park where your camper was last, but simply be careful of the antennae. Either back up more, angle your truck or whatever you need to do if you are going to return it to the same location. For the first six weeks I lived on the property your camper was parked in a different location near the shed.

You made zero effort to repair the internet before you left which was apparent when I began troubleshooting it. It took me several hours to fix it by carefully troubleshooting the components in the garage.

My life depends on internet access and you signed a contract with me obligating you to provide this utility to me. You also are fully informed of the importance of this utility to my current ability to do my legal work.

I hope you can remain civil. Your email makes me very uncomfortable. I can't handle anymore stress. My heart will literally stop.

Please reevaluate how you communicate with me. I have done but be kind and positive in all of my exchanges with you. My actions regarding the internet are reasonable given your lack of timely attention to this very critical matter.

-Anatoly
[Quoted text hidden]



On Mon, Aug 5, 2024 at 10:12 AM Anatoly Kishinevski <fishmousebear3@gmail.com> wrote:
Scott,

As I was going to sleep last night I was thinking how freakin grateful I am for you. Truly. If it matters to you, I hope you know that I appreciate you immensely. When I make my first million I will give you $50,000. I believe I will accomplish this within the next 12 months i.e. my rebound on this coming round will be significant.

I urgently needed to send a document last night, but was not able because the internet was not functioning. I got up with 5 hours of sleep to hurry to town to take care of it. I do not have time nor do I want to take the time to mess around with the internet on your property. I changed the breaker as an effort to curtail the intermittent connection. Please can I hand this off to you at this point.

I am in WRJ and will be here until roughly 1am when I get out of work.

I hope you have a good day.

-A







**Pg. 21 of 29**











 Gmail

**Anatoly Kishinevski <fishmousebear3@gmail.com>**

---

## Accepted: Power Hour - Rain or Shine @ Wed Jul 10, 2024 9:15am - 10:15am (EDT) (fishmousebear3@gmail.com)

1 message

**G Scott Graham-Stephens** <gscottgrahamstephens@gmail.com>
Reply-To: G Scott Graham-Stephens <gscottgrahamstephens@gmail.com>
To: fishmousebear3@gmail.com

Mon, Jul 8, 2024 at 9:03 AM

**G Scott Graham-Stephens has accepted this invitation.**

**Join with Google Meet**

**Meeting link**
meet.google.com/wic-grzp-sca

Power Hour, rain or shine.

**When**
Wednesday Jul 10, 2024 · 9:15am – 10:15am (Eastern Time - New York)

**Guests**
fishmousebear3@gmail.com - organizer
G Scott Graham-Stephens
**View all guest info**

---

Invitation from Google Calendar

You are receiving this email because you are subscribed to calendar notifications. To stop receiving these emails, go to Calendar settings, select this calendar, and change "Other notifications".

Forwarding this invitation could allow any recipient to send a response to the organizer, be added to the guest list, invite others regardless of their own invitation status, or modify your RSVP. Learn more

---

☐ **invite.ics**
  2K

 Gmail

Anatoly Kishinevski <fishmousebear3@gmail.com>

## (no subject)
1 message

**Anatoly Kishinevski** <fishmousebear3@gmail.com>　　　　　　　　　　Sun, Jul 7, 2024 at 9:09 PM
To: G Scott Graham-Stephens <gscottgrahamstephens@gmail.com>

We did great.





**Pg. 29 of 29**